**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GENUS LIFESCIENCES, INC.,

                Plaintiff,

   v.

ALEX AZAR et al,

                Defendants,

LANNETT CO., INC.

                Intervenor-Defendant.

Case No. 1:20-cv-00211-TNM

**REDACTED**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF
GENUS LIFESCIENCES, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND AND STATEMENT OF FACTS .................................................................2

    A.    The FDCA and New Chemical Entity Exclusivity .................................2

    B.    Statutory and Regulatory Framework Governing New Drug Applications.............6

    C.    Submission and Approval of Genus's Goprelto® Application .............................8

    D.    FDA's Acceptance and Approval of Lannett's Numbrino Submission.................10

STANDARD OF REVIEW .....................................................................................................14

ARGUMENT ...........................................................................................................................15

I.    FDA'S INITIAL ACCEPTANCE OF LANNETT'S APPLICATION FOR
FILING WAS ARBITRARY AND CAPRICIOUS ........................................................16

II.    FDA'S SUBSEQUENT ACCEPTANCE OF LANNETT'S RESUBMITTED
APPLICATION VIOLATED GOPRELTO®'S STATUTORILY-
GUARANTEED NCEE.....................................................................................................22

    A.    The Plain Text of the FDCA And Its Implementing Regulations Prohibit
Any Submission During the Exclusivity Period ....................................................22

    B.    FDA's Attempt to Depart from the Plain Language Fails ....................................26

III.    EVEN IF FDA COULD LEGALLY ACCEPT LANNETT'S RESUBMISSION
(IT COULD NOT), FDA LACKED AUTHORITY TO APPROVE THE
APPLICATION DURING THE NCEE PERIOD ...........................................................29

CONCLUSION.........................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Abbott Labs v. Young*,
  920 F.2d 984 (D.C. Cir. 1990) ................................................................................................3

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) ..............................................................................................3

*Actavis Elizabeth LLC v. FDA*,
  625 F.3d 760 (D.C. Cir. 2010) ..............................................................................................3

*Amarin Pharm. Ireland Ltd. v. FDA*,
  106 F. Supp. 3d 196 (D.D.C. 2015) ......................................................................................6

*Animal Legal Def. Fund, Inc. v. Perdue*,
  872 F.3d 602 (D.C. Cir. 2017) ............................................................................................26

*AstraZeneca Pharmaceuticals LP v. FDA*,
  713 F.3d 1134 (D.C. Cir. 2013) ............................................................................................3

*Blue Water Navy Vietnam Veterans Ass'n, Inc. v. McDonald*,
  830 F.3d 570 (D.C. Cir. 2016) ............................................................................................21

*\* Bracco Diagnostics, Inc. v. Shalala*,
  963 F. Supp. 20 (D.D.C. 1997) .....................................................................................16, 20

*City of Anaheim v. FERC*,
  558 F.3d 521 (D.C. Cir. 2009) ............................................................................................25

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)..............................................................................................................22

*Eagle Pharm., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ..............................................................................................2

*Etelson v. Office of Pers. Mgmt.*,
  684 F.2d 918 (D.C. Cir. 1982) ............................................................................................16

*Fin. Planning Ass'n v. SEC*,
  482 F.3d 481 (D.C. Cir. 2007) ............................................................................................28

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
  92 F.3d 1248 (D.C. Cir. 1996) ......................................................................................16, 17

*Koi Nation of N. California v. United States Dep't of Interior*,
   361 F. Supp. 3d 14 (D.D.C. 2019) ................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .........................................................................................26

*Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ..............................................................2, 27

*Nat'l Envtl. Dev. Ass'n's Clear Air Project* v. *EPA*,
   752 F.3d 999 (D.C. Cir. 2014) ...............................................................23, 25

* *Otsuka Pharm. Co. Ltd. v. Burwell*,
   302 F. Supp. 3d 375 (D.D.C. 2016) ...................................................5, 29, 32

* *Otsuka Pharm. Co., Ltd. v. Price*,
   869 F.3d 987 (D.C. Cir. 2017) ........................................................... *passim*

*Petit v. Dep't of Educ.*,
   675 F.3d 769 (D.C. Cir. 2012) ......................................................................23

*PREVOR v. FDA*,
   895 F. Supp. 2d 90 (D.D.C. 2012) ...............................................................16

*Ranbaxy Labs., Ltd. v. Leavitt*,
   469 F.3d 120 (D.C. Cir. 2006) ........................................................................2

*Roberts* v. *United States*,
   883 F. Supp. 2d 56 (D.D.C. 2012) ...............................................................14

*United States v. Diapulse Corp. of Am.*,
   748 F.2d 56 (2d Cir. 1984).............................................................................20

*United States* v. *Villanueva-Sotelo*,
   515 F.3d 1234 (D.C. Cir. 2008) ....................................................................22

## STATUTES

5 U.S.C.
   §§ 701 *et seq.* ...............................................................................................14
   § 706.........................................................................................................15, 17
   § 706(2)...........................................................................................................14

21 U.S.C.

§ 355(a) .................................................................................................................2, 6
§ 355(b)(1) ................................................................................................................4
§ 355(b)(2) ................................................................................................................3
§ 355(b)(2)(A)(iv) ...............................................................................................5, 30
§ 355(c)(3)(C) ........................................................................................................31
§ 355(c)(3)(E)(ii) .............................................................................................. passim
§ 355(c)(3)(E)(iii) .......................................................................................1, 33, 34
§ 355a(b)(1) ..............................................................................................................1
§ 360cc(a) .................................................................................................................1

Pub. L. No. 98-417, 98 Stat. 1585 ...........................................................................2

## RULES

Fed. R. Civ. P. 56(a) ..............................................................................................14

## REGULATIONS

21 C.F.R.

§ 312.47(a) ...............................................................................................................7
§ 314.3 ....................................................................................................................27
§ 314.3(b) ...........................................................................................................8, 24
§ 314.50 .............................................................................................................6, 24
§ 314.54(a)(1)(vi) .....................................................................................................4
§ 314.60(a) .......................................................................................................24, 26
§ 314.60(a)-(c) ..........................................................................................................8
§ 314.60(b) .............................................................................................................26
§ 314.60(c)(2) ...............................................................................................7, 25, 27
§ 314.101(a)(1) .........................................................................................................6
§ 314.101(e)(2) .......................................................................................................21
§ 314.108(b)(2) .........................................................................................................6
§ 314.108(b)(4) .......................................................................................................33
§ 314.110 ..................................................................................................................7
§ 314.110(a) ...........................................................................................................23
§ 314.110(b) ...........................................................................................7, 23, 24, 27
§ 314.110(b)(1) .............................................................................................7, 8, 25

*Abbreviated New Drug Application Regulations*, 54 Fed. Reg. 28,872, 28,897
   (July 10, 1989) .....................................................................................................33

*Applications for Approval to Market a New Drug; Complete Response Letter;
   Amendments to Unapproved Applications*, 69 Fed. Reg. 43,351, 43,356 (July
   20, 2004) ..............................................................................................................27

*Applications for Approval to Market a New Drug; Complete Response Letter;
   Amendments to Unapproved Applications*, 73 Fed. Reg. 39,588, 39,590-91
   (July 10, 2008) .....................................................................................................26

## OTHER AUTHORITIES

130 Cong. Rec. H24,425 (daily ed. Sept. 6, 1984) .......................................................32

130 Cong. Rec. S23,767 (daily ed. Aug. 10, 1984) ....................................................28

Center for Drug Evaluation and Research, Guidance for FDA Staff and Industry:
    Marketed Unapproved Drugs – Compliance Policy Guide (Jun. 2006),
    https://www.regulations.gov/docket?D=FDA-2003-D-0030-0008;......................................10

Center for Drug Evaluation and Research, Guidance for FDA Staff and Industry:
    Marketed Unapproved Drugs – Compliance Policy Guide (Sept. 19, 2011),
    www.fda.gov/media/71004/download ...........................................................13, 14

FDA *PDUFA Reauthorization Performance Goals and Procedures Fiscal Years
    2018 Through 2022*, https://www.fda.gov/media/99140/download .........................................8

H. R. REP. NO. 98-857 (1), (1984) ......................................................................3

OXFORD DICTIONARY OF ENGLISH 1516 (3d ed. 2010)....................................................23

U.S. FDA, CDER CONVERSATION: PATIENTS AND EXCLUSIVITIES FOR GENERIC
    DRUG PRODUCTS (Sept. 25, 2017), https://www.fda.gov/drugs/news-events-
    human-drugs/cder-conversation-patents-and-exclusivities-generic-drug-
    products....................................................................................6

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1175 (3d ed. 1984) ......................................23

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1937 (1993)...........................................23

## INTRODUCTION

In the Federal Food, Drug, and Cosmetic Act (FDCA), Congress created multiple statutory incentives to encourage drug makers to invest in and develop "pioneer drugs"—new treatments for diseases and other medical conditions.  *See*, *e.g.*, 21 U.S.C. §§ 355(c)(3)(E)(ii), (iii), (iv), 360cc(a), 355a(b)(1).  Congress's principal tool for structuring those incentives is a period of "market exclusivity," lasting for six months or multiple years depending upon the particular statutory provision at issue.  In general, Congress structured those exclusivity incentives as a bar on FDA's *approval* of a competing drug for the specified period of time.  *See*, *e.g.*, 21 U.S.C. § 355(c)(3)(E)(iii) (FDA cannot approve the same drug for the same "conditions of approval" for three years).

One specific form of statutory exclusivity is purposely broader, however.  Congress created "new chemical entity" exclusivity (NCEE) to spur drug makers to invest in and develop drugs with active ingredients never previously utilized in any FDA-approved drug.  NCEE bars FDA *both from **accepting** a submission of another competing drug application for five years, and from **approving** any pending application for that same period*.  21 U.S.C. § 355(c)(3)(E)(ii).  The bar on "submissions" is unique to NCEE, and was intended to prevent a competing drug maker from even beginning the very lengthy FDA application approval process until the period of statutory exclusivity had run.  *See infra* at 4-5.

It is undisputed in this case that FDA has granted NCEE to Plaintiff Genus Lifesciences, Inc. (Genus) for its FDA-approved drug Goprelto®.  Goprelto® is a cocaine hydrochloride product indicated for "████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Genus's NCEE period does not end until at least December 14, 2022.  FDA003141.

Here, FDA made three specific errors of law.  First, on November 29, 2017, FDA illegally accepted Intervenor Lannett's submission of a drug application for its competing cocaine hydrochloride drug Numbrino in violation of the Administrative Procedure Act (APA).  *See infra* a 15-21.  Second, on July 20, 2018, after determining that it could not approve Lannett's application, FDA then illegally permitted Lannett to "resubmit" that application in direct violation of Genus's statutory exclusivity and FDA's own regulations implementing that statutory provision. *See infra* at 21-26; ▮▮▮▮▮▮.  Third, FDA ultimately approved Lannett's competing drug on January 10, 2020, again in direct violation of Genus's statutory exclusivity.  *See infra* at 29-35.

Unfortunately, this case is not unique.  Although this case presents certain questions of first impression, FDA has made it a standard practice to impose unlawful administrative limits on Congress's market exclusivity incentives.  And courts have repeatedly rejected FDA's attempts to do so.  *See, e.g., Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 336 (D.C. Cir. 2020) (rejecting FDA's efforts to limit statutory exclusivity); *Ranbaxy Labs., Ltd. v. Leavitt*, 469 F.3d 120, 121 (D.C. Cir. 2006) (rejecting FDA effort to attach extra-statutory condition to exclusivity); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1069 (D.C. Cir. 1998) (same).

Consistent with multiple D.C. Circuit precedents, this Court should enter summary judgment in Genus's favor; declare that FDA's approval of Numbrino was unlawful; set aside Numbrino's approval; and enjoin FDA from accepting the submission (including the resubmission) of an application for, or approving, any cocaine hydrochloride drug in violation of Genus's NCEE.

## BACKGROUND AND STATEMENT OF FACTS

### A.      The FDCA and New Chemical Entity Exclusivity

Under the FDCA, no new drug may enter the market without first obtaining FDA approval. *See* 21 U.S.C. § 355(a).  In 1984, Congress enacted the Drug Price Competition and Patient Term

Restoration Act in order to introduce more streamlined pathways to approval. *See* Pub. L. No. 98-417, 98 Stat. 1585 (Hatch-Waxman Amendments). In doing so, Congress sought to balance competing forces—increasing innovation while ensuring consumers' access to affordable medicines. *See generally Actavis Elizabeth LLC v. FDA*, 625 F.3d 760, 765 (D.C. Cir. 2010); H. R. REP. NO. 98-857 (1), at 14-15 (1984). Congress acknowledged that the costs of developing new drugs—commonly referred to as "pioneer drugs"—are high. *AstraZeneca Pharmaceuticals LP v. FDA*, 713 F.3d 1134, 1136 (D.C. Cir. 2013). For pioneer applications submitted under Section 505(b)(1) of the FDCA, companies must invest significantly in scientific research and development, conduct "clinical trials with human subjects," and complete detailed reports of investigations of the safety and effectiveness of the drug based on those trials (and other such studies). *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007); *see also Otsuka Pharm. Co., Ltd. v. Price*, 869 F.3d 987, 990 (D.C. Cir. 2017) (noting the "substantial expenses associated with safety-and-efficacy testing"). Companies may also submit pioneer applications under Section 505(b)(2) of the FDCA, where they must generally still submit all of this same information, but may rely upon at least some investigations that they have not conducted and do not have ownership over. 21 U.S.C. § 355(b)(2).

Because pioneer drug development can be expensive and time-consuming, Congress provided substantial financial incentives in the Hatch-Waxman Amendments to encourage drug makers to undertake this process. The principal incentives are "periods of 'marketing exclusivity' to pioneering drug products." *Otsuka Pharm.*, 869 F.3d at 988. These exclusivity provisions are designed to "reward[] a pioneer drug" and thereby "encourage innovation in the drug industry." *Abbott Labs v. Young*, 920 F.2d 984, 986 (D.C. Cir. 1990).

This case concerns one specific exclusivity—NCEE, or "new chemical entity" exclusivity—that is awarded to drug makers who develop drugs containing an active ingredient that is not a component of an existing FDA-approved drug. NCEE is "the FDCA's broadest grant of marketing exclusivity." *Otsuka Pharm.*, 869 F.3d at 990. This broad grant is "commensurate with the degree of innovation required to earn exclusivity under it," *id.* at 993; it reflects Congress's recognition that an applicant could face multiple scientific and regulatory hurdles to obtain approval for a never-before-approved active ingredient. *See infra* at 8-10.

NCEE is codified at 21 U.S.C. § 355(c)(3)(E)(ii) (FDCA § 505(c)(3)(E)(ii)). The statutory text contains multiple cross-references and requires some time to parse. The first clause refers to a drug application submitted for a drug with a new active ingredient (here, this is Genus's application for Goprelto®, which was approved on December 14, 2017 as the first drug with the active ingredient cocaine hydrochloride):

> If an application submitted under subsection [355](b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), is approved after September 24, 1984 …

The second clause of the statutory provision bars *submission* of certain competing drug applications (like Lannett's applications here[1]) for drugs with the same active ingredient for five years (here, drugs with cocaine hydrochloride, the same active ingredient as Goprelto®):

> …**no application** which refers to the drug for which the subsection (b) application was submitted [*here Goprelto*] and for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted **may be** *submitted* **under subsection (b) before the expiration of five years from the date of the approval of the application under subsection (b)**, …

---

[1] NCEE does not block 505(b)(1) applications. 21 U.S.C. § 355(b)(1). It does, however, block *all* 505(b)(2) applications (like Lannett's). 21 C.F.R. § 314.54(a)(1)(vi).

The remaining text of the provision addresses FDA's ultimate ability to *approve* another drug with the same active ingredient after the five-year exclusivity period expires.  (Goprelto®'s exclusivity runs until at least December 14, 2022.)  That remaining text creates a specific exception where a four-year rather than a five-year bar on submissions could apply.  It additionally makes clear that the exclusivity period also applies to FDA's ultimate "approval" of such an application, unless certain other specific provisions addressing patent litigation apply to extend that period even further (such patent litigation provisions are not applicable here):

> except that such an application may be submitted under subsection (b) after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in clause (iv) of subsection (b)(2)(A).  **The approval of such an application shall be made effective in accordance with this paragraph** except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (C) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.[2]

21 U.S.C. § 355(c)(3)(E)(ii) (emphasis added).  Summarizing: **if** a drug product containing a new active ingredient obtains approval, **then** no 505(b)(2) (or generic) **application** for a drug product containing that same active ingredient **may be submitted or approved** for a period of 5 years from the date of the first approved application.  *See*, *e.g.*, *Otsuka Pharm. Co. Ltd. v. Burwell*, 302 F. Supp. 3d 375, 384-85 (D.D.C. 2016) (NCEE establishes a bar on applications "submitted (or approved) for five years.").

---

[2] As indicated, the statute reduces the usual five-year submission bar to four years if the subsequent 505(b)(2) application contains a Paragraph IV Certification—that is, a "certification of patent invalidity or noninfringement." 21 U.S.C. § 355(c)(3)(E)(ii).  Such certification may, under certain circumstances, be filed if the drug that has received NCEE is covered by a patent.  *See id.* § 355(b)(2)(A)(iv).  But that is not an issue in this case.

FDA's regulations summarize the NCEE provision this way:  "If a drug product that contains a new chemical entity [i]s approved . . . in an [application] submitted under section 505(b) of the [FDCA], no person may submit a 505(b)(2) application . . . for a drug product that contains the same active moiety[3] as in the new chemical entity for a period of 5 years from the date of approval of the first approved [new drug application]."  21 C.F.R. § 314.108(b)(2).  Notably, a bar on "submission" is even broader than a bar on FDA "approvals"—it means the second-in-time applicant cannot even *begin* the lengthy FDA review process, and so cannot be ready for approval on the day after the exclusivity period ends, as frequently occurs under other forms of exclusivity. (Indeed, under other forms of exclusivity, FDA often completes its full review of the competing drug application prior to the expiration of exclusivity and "tentatively" approves it.[4])

### B.    Statutory and Regulatory Framework Governing New Drug Applications

To understand the sequence of events in this case, an understanding of FDA's typical approval process is helpful.  As noted, generally no new drug may enter the market without first obtaining FDA approval.  *See* 21 U.S.C. § 355(a).  That is so regardless of whether another drug is enjoying statutory exclusivity.  The principal pathway for a company to obtain FDA approval of its drug is through a New Drug Application (NDA) submitted pursuant to section 505(b) of the FDCA.  *Id*. § 355(b).  Through regulation and practice, FDA has established a robust body of law governing the process of accepting submissions and resubmissions of NDAs.

---

[3] *See Amarin Pharm. Ireland Ltd. v. FDA*, 106 F. Supp. 3d 196, 206 (D.D.C. 2015) ("When dealing with single molecule drugs, the 'active ingredient' and the 'active moiety' refer to the same molecule and thus the distinction typically makes no difference to the Agency's exclusivity analyses.").

[4] *See* U.S. FDA, CDER CONVERSATION: PATIENTS AND EXCLUSIVITIES FOR GENERIC DRUG PRODUCTS (Sept. 25, 2017), https://www.fda.gov/drugs/news-events-human-drugs/cder-conversation-patents-and-exclusivities-generic-drug-products.

FDA's regulation at 21 C.F.R. § 314.50 codifies the voluminous material required in a new drug application.  FDA will accept an application only after it makes "a threshold determination that the [application] is sufficiently complete to permit a substantive review."   21 C.F.R. § 314.101(a)(1).  If FDA determines that an NDA is incomplete, it will "refuse to file" or "RTF" the application.  *See id.* § 314.101(d), (e).  If FDA refuses to file an NDA, that means the application is no longer before the agency for substantive review.  FDA's "expectation," however, "is that an application is complete upon submission."  *See* FDA003148.  In order to ensure that this expectation is met, FDA encourages applicants to meet with the agency prior to submitting a new drug application in order to "resolv[e] questions and issues raised during the course of a clinical investigation."  21 C.F.R. § 312.47(a).  FDA refusals to file are not uncommon; many applicants receive them and are directed to conduct more studies and/or submit more information before FDA can accept their application for filing.

Once an application is formally submitted, FDA reviews its contents and decides whether it can or cannot approve the application as submitted.  When FDA determines that the application cannot be approved for any reason, it issues a "Complete Response Letter" (CRL) pursuant to 21 C.F.R. § 314.110.  A CRL is a denial in every practical sense, and FDA must issue a CRL once it reaches a decision that an application will be denied.  Upon receipt of a CRL, a drug sponsor has only three options:  it may attempt to "resubmit" its application, withdraw the application, or request an opportunity for a hearing on FDA's decision.  *Id.* § 314.110(b).  No amendments to the application are permitted at that point.  *See id.* § 314.60(c)(2).  If the applicant decides to resubmit its application and attempt again to seek FDA approval, it must address in that resubmission "all deficiencies identified in the complete response letter."  *Id.* § 314.110(b)(1).  Just as FDA "refuses to file" initial applications that are incomplete, FDA also will not accept any resubmitted

application unless it determines that the resubmission is complete and "addresses all deficiencies in the [CRL]." FDA002774.

FDA's regulations forthrightly acknowledge that a "resubmission" of an application in response to a CRL is no less a "submission" than the initial filing of the application. *See* 21 C.F.R. § 314.60(c)(2). Indeed, FDA defines a "[r]esubmission, in the context of a complete response letter" as a "submission" of the information needed for approval. *Id*. § 314.3(b). And FDA regulations provide distinct processes for resubmitting an application versus amending a pending application. *Compare id.* § 314.110(b)(1) (setting forth the procedure for resubmission) *with id.* § 314.60(b), (c)(2) (setting forth the procedure for amendments).[5] Additionally, resubmission has significant consequences for, *inter alia*, the time required for FDA to evaluate and approve an application. When FDA receives a resubmission, a new review cycle—the time period in which FDA works to complete its review of an application—begins. *See* 21 C.F.R. § 314.110(b)(1). The length of that new review cycle depends on the type of information included in the resubmission. *See id*. § 314.110(b)(1)(i)-(ii); § 314.3(b) (defining Class 1 and 2 resubmissions, which trigger the beginning of two- and six-month review cycles, respectively); FDA *PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2018 Through 2022*, https://www.fda.gov/media/99140/download.

### C.    Submission and Approval of Genus's Goprelto® Application

Goprelto® is a cocaine hydrochloride product ███████████████████ ████████████████████████████████████████████ ████████████████████████████████ Cocaine hydrochloride is a valuable tool

---

[5] Indeed, FDA's regulations expressly distinguish between an iterative amendment to a pending drug application and the full resubmission of an application. *See infra* at 26-27, discussing 21 C.F.R. § 314.60(a)-(c).

for medical professionals performing a range of medical procedures, "such as biopsies, endoscopies, nasal cauterization, foreign body removal, and nasal debridement, among others." FDA002816.

FDA accepted Genus's submission of a 505(b)(2) application for Goprelto® on November 23, 2016. ██████████ Before accepting that application for filing, however, FDA required Genus to either submit already existing results of medical testing on a range of specific issues, itself perform those same scientific tests prior to submission, or demonstrate why such testing was not medically necessary in this particular context.  Three of FDA's specific and complex scientific requirements are important here. ████████████████████████

███████████████████████████████  ████████  ████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████  █  ████████████████████

████████████████████████████████████████████

███████████████████  ████████████  ████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

      ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

9



With the inclusion of all of this information (and much more), FDA finally accepted Goprelto®'s NDA submission for filing on November 23, 2016.  FDA then reviewed Genus's application and ultimately approved it on December 14, 2017, and awarded Goprelto® NCEE pursuant to 21 U.S.C. § 355(c)(3)(E)(ii).  FDA003626.  Goprelto®'s NCEE remains in effect until at least December 14, 2022.

### D.    FDA's Acceptance and Approval of Lannett's Numbrino Submission

In the weeks before FDA issued its approval of Goprelto and informed Genus that it had been awarded NCEE, FDA was also deciding whether to accept for filing Lannett's 505(b)(2) initial application for its competing cocaine hydrochloride drug, Numbrino.  Although, as explained above, FDA had required painstaking and lengthy submissions from Genus on a range of topics prior to accepting Genus's submission for review more than a year earlier, the record demonstrates that FDA did not apply the same acceptance criteria to Lannett's application.



Numbrino, like Goprelto®, contains cocaine hydrochloride as its active

---

[6] Although Lannett waited until 2017 to initiate this process, it actually began marketing a version of its cocaine hydrochloride product without FDA approval years earlier, in 2008—notwithstanding clear FDA guidance that "illegally marketed drugs must obtain FDA approval." Center for Drug Evaluation and Research, Guidance for FDA Staff and Industry: Marketed Unapproved Drugs – Compliance Policy Guide (Jun. 2006), https://www.regulations.gov/docket?D=FDA-2003-D-0030-0008; *see e.g.*, FDA003240-49.  In

ingredient and ████████████████████████████████████ Because Numbrino

and Goprelto® share the same active ingredient and are essentially the same product for purposes

of FDA review, FDA gave both Genus and Lannett essentially the same initial instructions for

filing, ███████████████████████████████████████████

███████████████████████████████████ But unlike for

Genus, FDA did not actually *enforce* those standards against Lannett.  Although it is not clear *why*

FDA did this, the answer appears at least in part to reflect that FDA already had Genus's answers

to the questions Lannett was supposed to provide. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████   ███████████████████████████

---

2012, Lannett petitioned FDA to allow legal marketing of its cocaine hydrochloride product; FDA
denied the petition, finding that Lannett had no legal basis to market its unapproved product based
on the information provided by Lannett.  *See* FDA003165.  Despite that clear denial, Lannett
continued to market its unapproved cocaine hydrochloride product until 2019.  Indeed, it was not
until August 15, 2019 that Lannett agreed to cease distribution of its unapproved drug.  *See*
FDA003311.



██████████████          But FDA accepted Lannett's application for filing in spite of all of these

deficiencies.  The following side-by-side chart illustrates the disparity between what FDA required

Genus to file in its initial submission and what FDA accepted from Lannett:

| Genus Filing | Lannett Filing |
|---|---|
| ████████████████████████ ██████ █ ████████ █ ██ ████████████████████████ ████████████████████████ ████████████████████████ ██████████████████ ████████████████████████ ██████████ | ████████████████████████ ██████████████████████ █████████████████ ████████████████████████ |
| ████████████████████████ ████████████████████████ ██████████████████ | ████ ████ ████ ████ ████ ████ █ ████████████████████████ |
| ████████████████████████ ██ █████ ████ ████ ████ ████ █████████ | ████████████ ██ ████████ ████████████████████████ █ █ ██ ██ ██ ████ ███ ███ ████████████████ |

After accepting Lannett's application for filing despite these deficiencies, FDA took the

position that Lannett's pending application would not be subject to Genus's NCEE, because ██

██████████████████████████████████          ████████████

---

[7] In addition to violating the APA, this specifically ignores the text of the NCEE provision, 21
U.S.C. § 355(c)(3)(E)(ii), prohibiting an "approval."

（）

In the months that followed, however, FDA concluded that these same initial defects in Lannett's application prevented FDA from ultimately *approving* Lannett's application.  FDA issued a CRL to Lannett on July 20, 2018 ███████████████████████████

████████████████████████████  ████████████  ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████

Following receipt of FDA's CRL, Lannett opted to try to resubmit its application.  FDA003626.  In order to complete that resubmission, Lannett finally performed certain of the analyses that Genus was required to perform more than two years earlier to make its initial application submission. ██████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████

Lannett resubmitted its application on June 21, 2019, more than a year and a half after Genus's five-year NCEE had taken effect.  FDA003626.  At that point, rather than reject Lannett's

---

[8] The different submission standards do not appear to be the only discrepancy in FDA's treatment of Goprelto® and Numbrino.  FDA guidance makes clear that after a company obtains approval through the NDA process for a product that other companies are marketing without approval, "FDA is more likely to take enforcement action against remaining unapproved drugs."  Center for Drug Evaluation and Research, Guidance for FDA Staff and Industry: Marketed Unapproved Drugs – Compliance Policy Guide (Sept. 19, 2011), www.fda.gov/media/71004/download.  Here, Goprelto® received approval on December 14, 2017.  ████████████  Lannett was still marketing its unapproved cocaine hydrochloride product at that time, yet FDA did not take action to halt Lannett's sales of its unapproved drug until August 15, 2019—almost two years after Goprelto®'s approval.  FDA003311.  The illegal marketing and distribution of Numbrino during that almost two-year period significantly undercut Goprelto®'s statutorily-guaranteed market exclusivity.

resubmission as a submission barred by Genus's NCEE, FDA accepted it *again* and began reviewing Lannett's resubmitted application for approval.  *Id.*

FDA ultimately approved Lannett's Numbrino on January 10, 2020.  At that time, FDA explained its decision to accept the Lannett resubmission despite Genus's NCEE by contending that the term "resubmission" in its regulations sometimes has one meaning, and sometimes has another.  FDA003627.  FDA did not explain how the text of its regulations could support its position.[9]  Nor did it explain how its decision to accept Lannett's resubmission could be squared with the plain statutory text of the FDCA.[10]

### STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Where, as here, final agency action under the APA, 5 U.S.C. §§ 701 *et seq.*, is involved, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Roberts* v. *United States*, 883 F. Supp. 2d 56, 62-63 (D.D.C. 2012).  Under the APA, a court must set aside agency action that is arbitrary and

---

[9] Apparently, under FDA's current view, a "resubmission" of an application following a CRL is simply "an amendment" to a "pending, unapproved application."  See FDA003627-28.  But FDA's regulations themselves specifically distinguish between an iterative amendment of a pending application and a resubmission of the application following a CRL.  Indeed, amendment of an application is prohibited in this context, where FDA has already issued a CRL.  *See infra* at 26-27.

[10] ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████

capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2).

## ARGUMENT

By its plain terms, the FDCA provides that, once an application for a drug containing a new active ingredient is approved, no Section 505(b)(2) application for a drug using that same ingredient may be submitted or approved for five years from the date of approval.  In this case, FDA correctly awarded Goprelto® NCEE because it contains an active ingredient that was not a component of any previously approved drug.  But FDA then committed multiple violations of the APA, FDCA, and FDA's implementing regulations by accepting and ultimately approving Lannett's application for its competing Numbrino product.  The APA prohibits agencies from treating similarly situated entities differently, but FDA accepted Lannett's application for filing even though the application lacked critical studies and data that FDA not only mandated that Genus include in its application, but also specifically directed Lannett to include in its own.  Had FDA applied the same standard to Lannett, even its initial application could not have been submitted prior to the effectiveness of Genus's NCEE, and there would then be no dispute that Lannett's application for Numbrino could not be submitted *or* approved.  After improperly accepting Lannett's initial application, FDA compounded its error by committing multiple violations of the plain statutory text.  FDA ignored the clear statutory bar on submission—it accepted Lannett's resubmission, thus flouting Congress' mandated five-year period of exclusivity for Goprelto®. And even if FDA's acceptance of Lannett's resubmitted application did not violate Goprelto®'s NCEE, its approval of that application did.

15

## I.   FDA'S INITIAL ACCEPTANCE OF LANNETT'S APPLICATION FOR FILING WAS ARBITRARY AND CAPRICIOUS

FDA's process culminating in the Numbrino approval was defective from the beginning because it was arbitrary and capricious under the APA.  5 U.S.C. § 706.  "[T]he very meaning of the [APA's] arbitrary and capricious standard" is that the "treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent."  *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996); *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982) ("Government is at its most arbitrary when it treats similarly situated people differently.").  Although Goprelto® and Numbrino are functionally indistinguishable for FDA review purposes, FDA subjected them to highly inconsistent treatment, to Lannett's benefit and Genus's significant detriment.  And this disparate treatment had the ultimate effect (according to FDA's improper application of 21 U.S.C. § 355(c)(3)(E)(ii)) of defeating Genus's statutory exclusivity.

There is no question that Goprelto® and Numbrino are functionally indistinguishable for purposes of FDA review.  They have an identical active ingredient: cocaine hydrochloride.  ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮  And Genus and Lannett were given materially identical instructions for how to submit a complete application that would not receive a refuse-to-file letter.  ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮  This is well beyond past FDA cases where courts have deemed separate products to be functionally indistinguishable.  *See PREVOR v. FDA*, 895 F. Supp. 2d 90, 92, 99-100 (D.D.C. 2012) (under FDCA, device "consist[ing] of a liquid substance contained in a canister propelled by pressurized gas" was similarly situated to "sponge applicator"

that used "lotion" to "remove and/or neutralize chemicals . . . from the skin"); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 23, 27-28 (D.D.C. 1997) (under FDCA, "injectable contrast imaging agents" were all "similarly situated" where they were designed "for use with diagnostic ultrasound equipment in the diagnosis of cardiac dysfunction").

Because of that, FDA was required to treat Genus and Lannett consistently.  *See* 5 U.S.C § 706; *Indep. Petroleum Ass'n*, 92 F.3d at 1260.  Yet FDA did the opposite: ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████      █████████████████████

████████████

          ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████  ███████  ███  █████  █████  █████  █████  ██████  █████  █████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████    ██████████████████████████████    █████  ██████

███████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████  ████████████  ████████████████████████ ██  ███████████████

███████████████████████████████████████████  ████████ ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  █████████████  ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[11] A subpopulation analysis evaluates a subset of patients who participated in a broader study that was not specific to any particular subpopulation.  By contrast, a "dedicated study" specifically studies the subpopulation in question.

████████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████    ██████████████████

████████   ████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████   ████████████   ████████████   ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    Yet again, FDA filed Lannett's application anyway.  FDA then allowed Lannett
to remedy this facial deficiency as part of Lannett's resubmission, *after* FDA issued its CRL and
*after* Genus's NCEE became applicable.

██████████████████████   ██████████████████████████

████████████████████████████████████████████████████

██████████████████   ████████████████████████   ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████



But, whereas Genus had to complete this study simply to file an adequate application, FDA allowed Lannett to conduct this study *after* filing—as part of its "resubmission" after Genus's NCEE became applicable.

Each of these three instances of disparate treatment were independently unlawful. And, as courts in this district and elsewhere have repeatedly held, FDA cannot subject similarly situated parties to different testing standards, nor grant leeway to one party that it denies to the other. *Bracco*, 963 F. Supp. at 28 ("Plaintiffs merely maintain that the same tests and studies should be required of each [similarly situated] product before it is approved . . . . The Court agrees."); *United States v. Diapulse Corp. of Am.*, 748 F.2d 56, 62 (2d Cir. 1984) ("FDA may not . . . grant to [one party] what it denies to [a similarly situated one].").  This disparate treatment also severely prejudiced Genus.  As noted *supra*, Genus's Goprelto® was approved on December 14, 2017.

After this date, even FDA concedes that Genus's NCEE barred the agency from accepting any new cocaine hydrochloride application for filing.  *See* FDA003149 ("FDA *will* refuse to file a 505(b)(2) NDA . . . if another drug qualifies for 5-year NCE exclusivity." (emphasis added)); 21 C.F.R. § 314.101(e)(2).  FDA accepted Lannett's defective application for filing on November 29, 2017— mere weeks before it approved Goprelto®.  FDA003623 n.3.  And as explained *infra* at Section II, FDA (wrongly) believes that because it had accepted Lannett's application by this point, it was permitted under the statute to allow Lannett to *re-submit* its application after the critical December 14, 2017 date.  But because FDA should never have accepted Lannett's application to begin with, even under FDA's incorrect reading of the statute and its regulations Lannett's submission should have been barred.

    As a result of this disparate treatment, vacatur of Lannett's approval is required.  FDA's disparate treatment had the effect, under FDA's reading of NCEE, of defeating Genus's exclusivity.  FDA's only justification for why it could accept Lannett's resubmission and then approve Lannett's application is, ultimately, that Lannett's initial application was filed before Genus's application was approved.  FDA003151-52.  If Lannett's initial application was subject to the same standard as Genus's, it would not have been filed, and Lannett could not have then resubmitted its application or obtained approval.  *See Blue Water Navy Vietnam Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("vacatur is the normal remedy" for "unsupported agency action"); *Koi Nation of N. California v. United States Dep't of Interior*, 361 F. Supp. 3d 14, 56 (D.D.C. 2019) (vacating agency's disparate regulatory treatment of Tribe application for gaming privileges).

II.    **FDA'S SUBSEQUENT ACCEPTANCE OF LANNETT'S RESUBMITTED APPLICATION VIOLATED GOPRELTO®'S STATUTORILY-GUARANTEED NCEE**

FDA then committed a second violation of law by accepting Lannett's resubmission at a time when Genus indisputably had a statutory right to NCEE.

A.    **The Plain Text of the FDCA And Its Implementing Regulations Prohibit Any Submission During the Exclusivity Period**

The FDCA unambiguously prohibits any "submi[ssion]" of an "application" during the NCEE period.  *See* 21 U.S.C. § 355(c)(3)(E)(ii).  It is a "cardinal canon" of statutory interpretation that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut Nat'l Bank* v. *Germain*, 503 U.S. 249, 253-54 (1992); *see United States* v. *Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) ("[Courts] must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  If it does, [the] inquiry ends and [courts] apply the statute's plain language." (internal citations omitted)).  Here, Congress was clear in conveying its instructions:  "If an application submitted [for a drug containing a new active ingredient] . . . is approved after September 24, 1984, *no application* which [uses that same active ingredient] . . . *may be submitted* . . . before the expiration of five years from the date of the approval of [the initial drug]."  21 U.S.C. § 355(c)(3)(E)(ii) (emphasis added).  Congress made no exception to NCEE in the statute; instead, the prohibition is categorical and absolute.

It is undisputed that Genus's application for Goprelto® relied on a new active ingredient, and that FDA approved that application after September 24, 1984—on December 14, 2017.  That is why FDA awarded Goprelto® NCEE.  FDA003626.  Thus, under the clear terms of the statute, FDA is prohibited from allowing any drug sponsor to (1) "submit" any (2) 505(b)(2) "application" for a drug with the same active ingredient as Goprelto® during the exclusivity period—until at

22

least December 14, 2022.  21 U.S.C. § 355(c)(3)(E)(ii).  The question for the Court is whether FDA impermissibly allowed Lannett to "submit" an "application" when Lannett, in response to FDA's CRL, conducted the work necessary to complete its application and provided that information to FDA on June 21, 2019.  The plain language of the statute and FDA's regulations leave no doubt that it did.  *See Nat'l Envtl. Dev. Ass'n's Clear Air Project* v. *EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic . . . that an agency is bound by its own regulations." (internal citations omitted)).

FDA issues a CRL only if "the agency determines that [it] will not approve the application . . . in its present form."  21 C.F.R. § 314.110(a).  In other words, a CRL issues when the initial application submitted by the applicant is inadequate and cannot be approved.  Following receipt of a CRL, an applicant has only three options:  (1) "Resubmission.  Resubmit the application . . . addressing all deficiencies identified in the complete response letter.";  (2) "Withdrawal" of the application; or (3)  "Request opportunity for hearing."  *Id.* § 314.110(b).  That is, if a drug sponsor wants to continue seeking approval after a CRL, its sole option (absent persuading the FDA to overturn its CRL through a hearing) is to file a "resubmission," which requires the drug sponsor to "resubmit the application."  *Id.*  It is undisputed that Lannett chose to resubmit its application following its receipt of FDA's CRL.  *See* FDA003626.  FDA's acceptance of that resubmission was unlawful.

As a matter of basic linguistics, the NCEE provision prohibits equally an applicant from "submitting" or "resubmitting" an application.  The statute does not define the term "submit," so it must be given its ordinary meaning.  *Petit v. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012) ("In the absence of an express definition, [courts] must give a term its ordinary meaning.").  In ordinary English, the verb "submit" means "to present or propose to another for review,

consideration, or decision." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1175 (3d ed. 1984).

And the verb "resubmit" simply means to "submit (something, such as a plan, application, or

resignation) again." OXFORD DICTIONARY OF ENGLISH 1516 (3d ed. 2010); *see also* WEBSTER'S

THIRD NEW INTERNATIONAL DICTIONARY 1937 (1993) (defining "resubmit" to mean "to offer . . .

again or anew"). Consistent with ordinary English, FDA's regulations forthrightly acknowledge

that a *resubmission* is a *submission*. 21 C.F.R. § 314.3(b) (expressly defining "*[r]esubmission*, in

the context of a complete response letter, [as] *submission* by the applicant of all materials needed

to fully address all deficiencies identified in the complete response letter" (emphasis added)).

Congress included no language in the statute limiting or qualifying the submission bar to prohibit,

for example, submission of only an *initial* application. Thus, there can be no serious dispute that

the NCEE provision bars FDA from allowing a sponsor to resubmit an application to the same

extent that it bars FDA from allowing a sponsor to submit an initial one.

   FDA's regulations also confirm that a resubmission following a CRL involves the

submission of an "application." 21 U.S.C. § 355(c)(3)(E)(ii). As explained, the only options for

a drug sponsor who wishes to gain approval following a CRL are to "[r]esubmit the *application*"

or get the CRL overturned through a hearing, in which case the initial application could proceed.

21 C.F.R. § 314.110(b) (emphasis added). Moreover, Section 314.50, which governs the "content

and format" of applications, expressly provides that the "applicant must submit a completed and

signed application form that contains" a statement specifying "whether the submission is an

original submission, a 505(b)(2) application, a *resubmission*, or a supplement to an application

under § 314.70." *Id.* § 314.50(a)(2) (emphasis added). And Section 314.60(a)—titled

"Submission of [New Drug Application]"—similarly states that "FDA generally assumes that

when an original NDA, supplement to an approved NDA, or *resubmission of an NDA* or

supplement is submitted to the Agency for review, the applicant believes that the Agency can approve the NDA, supplement, or resubmission as submitted." All of those regulations make clear the same thing—a resubmission, like the submission of an original NDA, is a submission of an application.

And the procedure following a resubmission confirms as much. A resubmission triggers the start of an entirely new application review period. *See id.* § 314.110(b)(1). And just like how FDA inspects an initial application to determine whether it is complete enough to file, FDA similarly inspects a resubmitted application for completeness. *Compare id.* § 314.101(d), (e) (FDA may "refuse to file an NDA" if the NDA "is incomplete because it does not on its face contain [the required] information") *with* FDA002774 (FDA will "determine whether the resubmission constitutes a complete response that addresses all deficiencies in the complete response letter" and will inform applicant of FDA's determination by "letter to the applicant within 30 calendar days").

Given all this, it is unsurprising that FDA long ago recognized that NCEE blocks "resubmissions" following a CRL. Its own regulations provide that "a resubmission of the NDA[] . . . may not be accepted except as provided in accordance with [the NCEE statutory provision]." 21 C.F.R. § 314.60(c)(2). Under that regulation, FDA was barred from accepting Lannett's "resubmission" because it was not filed "in accordance with" Section 355(c)(3)(E)(ii)— the "resubmission" was filed well after Goprelto®'s NCEE entered into effect, but long before Goprelto®'s five-year NCEE expired.

It would defy both clear statutory text and common sense to conclude that a "resubmission"—a second "submission" following an effective denial of the first—falls outside the broader category of submissions prohibited by Section 355(c)(3)(E)(ii). FDA's violation of

the plain language of the statute and its own regulations requires that Numbrino's approval be set

aside.  *See City of Anaheim v. FERC*, 558 F.3d 521, 522 (D.C. Cir. 2009) (setting aside agency

action that "flatly violate[d] the plain language of" the statute); *Nat'l Envtl Dev.*, 752 F.3d at 1011

("[A]n agency is not free to ignore or violate its regulations while they remain in effect." (internal

citations omitted)).

### B.       FDA's Attempt to Depart from the Plain Language Fails

In order to escape the clear instructions of both the statute and its own regulations, FDA

has made the untenable and apparently never-before-invoked argument that a "resubmission" in

response to a CRL is not a "submission" of an "application" within the meaning of the statute, but

is instead just an "amendment" to a "pending, unapproved application."  FDA003627-28.  FDA is

bound by that rationalization here.  *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 615-16

(D.C. Cir. 2017) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the

agency itself." (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 50 (1983)).

The problem for FDA is that its argument is squarely foreclosed by the agency's own

regulations, which make crystal clear that a resubmission is not simply a form of an amendment.

Section 314.60—titled "Amendments to an unapproved NDA, supplement, or resubmission"—

governs the permissibility of amendments to pending applications.  The provision specifies that an

amendment may be used to *add* content to an initial application or to a resubmitted application

*while it is pending*.  *See* 21 C.F.R. § 314.60(a) (providing that "the applicant may submit an

amendment to an NDA, supplement, or resubmission that has been filed under § 314.101 but is

not yet approved"); *see Applications for Approval to Market a New Drug; Complete Response

Letter; Amendments to Unapproved Applications*, 73 Fed. Reg. 39,588, 39,590-91 (July 10, 2008)

(distinguishing between "resubmissions" and "amendments" and noting that the procedure for

26

amendments to unapproved applications "appl[ies] to amendments to original applications, efficacy supplements, *and resubmissions*" (emphasis added)).  The regulation further explains that such amendments are permitted at certain points during FDA's review cycle.  *See* 21 C.F.R. § 314.60(b) (explaining timing implications for submission of major amendments and non-major amendments).  But "amendment" and "resubmission" are distinctly different concepts.  *See, e.g.*, *id.* § 314.60(c)(2) (noting a circumstance where an amendment is re-classified as a resubmission). And notably, an amendment is *not* permitted following a CRL.  Instead, as discussed, the only three options available to a drug sponsor following a CRL are: (1) resubmission; (2) withdrawal; or (3) request a hearing.  *See id.* § 314.110(b); *see also Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications*, 69 Fed. Reg. 43,351, 43,356 (July 20, 2004) (expressly distinguishing between "amendment" submitted "before issuance of [a] complete response letter" and a "resubmission").  That is fatal to FDA's argument.

But even putting aside that insurmountable textual problem for a moment, FDA's regulations also define an "application" to "*includ[e] all amendments* and supplements to the application."  21 C.F.R. § 314.3 (emphasis added).  The statute, in turn, bars submission of an "application."  21 U.S.C. § 355(c)(3)(E)(ii).  So even if FDA were correct that a resubmission is actually an amendment (which is definitively *not true*), Lannett's so-called "amendment" would be prohibited just the same as a brand new application.  So even ignoring the text of FDA's regulations distinguishing between resubmissions and amendments, FDA's principal argument would get it nowhere.[12]

---

[12] Indeed, given how FDA has chosen to define "application" in its regulations, the NCEE submission bar should preclude FDA from accepting any type of amendment to a competing drug application.  The Court need not go that far, however, if it agrees that FDA violated Genus's NCEE by accepting Lannett's resubmitted application.

In addition to violating the Agency's own regulations, FDA's argument should be rejected because it would be inconsistent with Congress's carefully constructed statutory scheme. *Mova Pharm.*, 140 F.3d at 1068 (stating that an agency should consider whether its "reading of a statute would thwart the purposes of Congress"); *see also Fin. Planning Ass'n* v. *SEC*, 482 F.3d 481, 487 (D.C. Cir. 2007) (instructing that "the traditional tools of statutory construction" require looking to "the text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve" (internal citations omitted)). Most of the FDCA's statutory exclusivity mandates bar FDA from *approving* a competing drug product for a designated period of time. This means that a competing drug product may submit its application and go through the multi-year FDA review process during the period of exclusivity, so as to enter the market the day after the exclusivity period expires. But Congress deliberately created a stronger protection with NCEE. By prohibiting *submissions*, and not just approvals, competitors must wait five years before they can even *begin* FDA's lengthy review process. In effect, then, the party holding NCEE will enjoy a much longer exclusivity that just five years, and Congress *knew* that would happen. *See* 130 Cong. Rec. S23,767 (daily ed. Aug. 10, 1984) (Sen. Metzenbaum) ("Then there is another provision in this bill that breaks even more new ground . . . It provides that the FDA, upon approval of a drug, may grant exclusivity, exclusive rights to use that drug for 5 years. Then if you read it closely enough, you will learn it really is not 5 years, it is closer to 6 years because of the date and the manner in which it is written."); 130 Cong. Rec. S23,765 (daily ed. Aug. 10, 1984) (statement of Sen. Hatch) ("There is to be a prospective 5-year *waiting period for filing* of [follow-on drug applications] following approval by FDA of a new chemical entity new drug application." (emphasis added)).

FDA's interpretation—that NCEE blocks only initial submissions, and not resubmissions or approvals—would upend Congress's scheme, by creating an easy workaround that enables competitors to achieve complete FDA review during another party's NCEE period. Under FDA's interpretation, a company could file a bare-bones application just prior to the approval of a drug containing a new active ingredient. The incomplete application could not be approved as filed, but the company would receive a CRL from the FDA outlining the deficiencies in its application. The company could then conduct the requisite studies and investigations, file a different, completely revamped submission bearing little to no resemblance to the initial submission, and thereby achieve full FDA review of its drug—even if the revamped submission was filed well after NCEE had entered into effect. Thus, FDA's interpretation would make a mockery of Congress's statutory scheme. It would encourage competitors to sidestep any potential NCEE bar by filing an incomplete, placeholder application before a pioneer drug's approval in order to evade the mandated five-year exclusivity period. And in doing so, it would severely undermine the incentives for innovation Congress viewed as vital.

## III. EVEN IF FDA COULD LEGALLY ACCEPT LANNETT'S RESUBMISSION (IT COULD NOT), FDA LACKED AUTHORITY TO APPROVE THE APPLICATION DURING THE NCEE PERIOD

FDA committed a third legal error by *approving* Lannett's drug during Genus's NCEE period. Congress made clear in the NCEE provision that an application, even if legally submitted, cannot be approved by the FDA during the NCEE exclusivity period. *See Otsuka Pharm.*, 869 F.3d at 990 (noting that NCEE "confers an exclusivity period of five years, during which no [subsequent] application which refers to the first-in-time drug may be ***approved***" (internal citations omitted; emphasis added)); *Otsuka Pharm.*, 302 F. Supp. 3d at 384-85 (noting that NCEE establishes a bar on applications which "may be submitted (***or approved***) for five years" (emphasis added)). FDA disagrees, notwithstanding that it cannot point to any prior instance in which it has

approved a second-in-time 505(b)(2) application (*i.e.*, the type of application Lannett filed) that was "submitted" before the approval of a drug application that received NCEE.  *See* FDA002827; FDA003154.  But the novel position FDA adopts in this litigation conflicts, once again, with the plain language of the statute and the broader statutory context.

Understanding how requires parsing the NCEE provision (and several related provisions) at some length.  *See supra* at 4-5 (quoting and explaining NCEE provision).  The first half of the first sentence of the provision has been the focus thus far, as it establishes the general five-year submission bar for drugs containing new chemical entities.  *See* 21 U.S.C. § 355(c)(3)(E)(ii) (stating that "no application . . . may be submitted . . . before the expiration of five years" if an application containing a new active ingredient "is approved after September 24, 1984").

The second half of the first sentence expressly acknowledges one circumstance where a second applicant can submit an application *before* five years:  where the active ingredient for the drug that has received NCEE is covered by a patent.  In that case, a subsequent application for a drug containing the same active ingredient must, under certain conditions, include a certification that the NCEE drug's patent "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted"—*i.e.*, a Paragraph IV Certification.  21 U.S.C. § 355(b)(2)(A)(iv).  If a subsequent application contains such a certification, the second half of the first sentence reduces the submission bar from five years to four by directing that "such an application"—*i.e.*, a subsequent application by a competitor—"may be submitted . . . after the expiration of four years from the date of the approval of the [NCEE] application."  *Id*. § 355(c)(3)(E)(ii).

But the next clause provides that even in this circumstance, where an application is on file before five years, the *approval* still cannot occur before five years.  The next clause, *i.e.*, the first

half of the second sentence, links the first time an application may be approved to the timing bar for submissions of applications. *Id.* ("***The approval of such an application*** shall be made effective in accordance with this paragraph." (emphasis added)). That is, the clause instructs that a subsequent application for the same active ingredient—"such an application"—may only be "approv[ed] . . . in accordance with this paragraph." *Id.* That means most subsequent applications (*i.e.*, those that do not involve a Paragraph IV certification) may only be approved at a minimum after "the expiration of five years" from the NCEE drug's approval date.

The final clause of Section 355(c)(3)(E)(ii) confirms that Congress intended for the rules governing the timing of submissions to apply to approvals as well. If a subsequent application contains a certification of patent invalidity or non-infringement, a different provision of the FDCA gives the patent holder 45 days to bring a patent infringement suit against the competitor drug's sponsor. *See* 21 U.S.C. § 355(c)(3)(C). If such suit is brought, the statute stays *approval* of the subsequent application—separate from any market exclusivity—for a period of 30 months (unless a district court finds the patent invalid during this period). *Id.* The final clause of Section 355(c)(3)(E)(ii) explains how that 30 month stay applies in the context of NCEE: If a subsequent application for a competitor drug contains a certification of patent invalidity or non-infringement and the sponsor of the NCEE drug responds by filing a patent infringement suit, the subsequent application may not be *approved* until at least "seven and one-half years . . . have elapsed from the [NCEE drug's] date of approval" (absent a district court decision finding the patent invalid). *Id.* § 355(c)(3)(E)(ii).

Putting the different clauses of Section 355(c)(3)(E)(ii) together, Congress's instructions are apparent: Once NCEE is awarded, FDA may neither accept nor approve during the exclusivity period an application submitted for a drug containing the same active ingredient. Congress

31

provided in Section 355(c)(3)(E)(ii)'s first sentence that a subsequent application containing a Paragraph IV Certification may not be "submitted" for four years after the NCEE drug's approval date; in all other circumstances, a subsequent application may not be "submitted" for five years after the NCEE drug's approval date.  21 U.S.C. § 355(c)(3)(E)(ii).  Congress then directed that "such an application" may only be "approv[ed] . . . in accordance with this paragraph"—*i.e.*, after "the expiration of five years" from the date of the NCEE drug's approval.  *Id.*  But finally, Congress provided a limited extension of the usual five-year approval bar—a subsequent application may not be approved (absent judicial decree) until "seven and one-half years . . . have elapsed" from the NCEE drug's approval date if the NCEE drug sponsor files a patent infringement suit against the competitor drug sponsor.  *Id.*  Without a patent infringement suit, however, the general rule of thumb applies—a subsequent application may only be "approv[ed]" after "the expiration of five years" from the date of the NCEE drug's approval.  *Id.*  That general rule applies here.

Thus, by enacting Section 355(c)(3)(E)(ii), Congress not only barred competitors' application submissions during the five-year NCEE period, it also expressly contemplated that sometimes an application may be submitted before five years, but *even those applications* may not be *approved* before five years.  Indeed, the D.C. Circuit understood the provision to apply to approval, and has said so.  *See Otsuka Pharm.*, 869 F.3d at 990 (noting that NCEE "confers an exclusivity period of five years, during which no [subsequent] application which refers to the first-in-time drug may be approved" (internal citations omitted)); *see also Otsuka Pharm.*, 302 F. Supp. 3d at 384-85 (D.D.C. 2016) (noting that NCEE establishes a bar on applications which "may be submitted (*or approved*) for five years" (emphasis added)).  And the legislative history is supportive as well.  130 Cong. Rec. H24,429 (daily ed. Sept. 6, 1984) (statement of Rep. Moorhead) ("We give them 5 years in which to recover their investment."); 130 Cong. Rec.

H24,425 (daily ed. Sept. 6, 1984) (statement of Rep. Waxman) (NCEE "provides a 5-year period of exclusive market life."). Accordingly, irrespective of whether Lannett's application was submitted legally, FDA was not permitted to "approv[e]" that submission during the five-year NCEE period. 21 U.S.C. § 355(c)(3)(E)(ii).

FDA's contrary interpretation is fundamentally at odds with the statutory scheme Congress enacted. If FDA may approve subsequent applications for competitor drugs during the five-year new chemical entity exclusivity period, that could render NCEE—the "FDCA's broadest grant of marketing exclusivity," "commensurate with the degree of innovation required to" obtain it, *Otsuka Pharm.*, 869 F.3d at 990, 993—significantly less protective than other FDA exclusivities, including the three-year new clinical investigation exclusivity established in 21 U.S.C. § 355(c)(3)(E)(iii). That provision states that if a drug application for a product for which the active ingredient has already been approved "contains reports of new clinical investigations . . . essential to the approval of the application and conducted or sponsored by the applicant," FDA may not approve a subsequent 505(b)(2) application with the same "conditions of approval . . . before the expiration of three years from the date of the approval" of the innovative drug. *Id*. Unlike how it treats NCEE, FDA unequivocally interprets this exclusivity to block *approval*. 21 C.F.R. § 314.108(b)(4). Thus, even if a second application is *filed* before this three-year exclusivity takes effect, FDA will not *approve* that subsequent application until the expiration of three years. That means that in some instances (such as here), FDA applies the three-year new clinical investigation exclusivity to reach more broadly than NCEE. But the courts, and even FDA, have repeatedly recognized that *it would undermine Congress's intent to interpret the two provisions that way. See Otsuka Pharm.*, 869 F.3d at 1001 (explaining it "would make little sense" if the three-year exclusivity was in any way "broader in scope" than NCEE); *Abbreviated New*

*Drug Application Regulations*, 54 Fed. Reg. 28,872, 28,897 (July 10, 1989) ("FDA does not believe that Congress intended . . . the protection offered by the exclusivity for changes in approved drugs to be broader than the protection offered by exclusivity for new chemical entities.").[13]

Beyond mere inconsistency with the statutory scheme, FDA's interpretation of NCEE actually creates a logical paradox where Genus has been *punished* for being first.  NCEE and new clinical investigation exclusivity are mutually exclusive; NCEE is awarded to the first applicant to obtain approval for a new active ingredient, whereas new clinical investigation exclusivity is by its plain terms available only to *subsequent* applicants.  21 U.S.C. § 355(c)(3)(E)(iii) (providing new clinical investigation exclusivity to an applicant who obtains approval for an active ingredient "that has [already] been approved in another application"); *see Otsuka Pharm.*, 869 F.3d at 990 (noting that new clinical investigation exclusivity is awarded to "innovations more modest than the introduction of a new chemical entity" and is accordingly "more confined in scope and duration than the five-year [NCEE]").  Genus, of course, was the first applicant to obtain approval with the active ingredient cocaine hydrochloride, and so it was awarded NCEE.  But if, counterfactually, Genus was *not* first, it would have been entitled to new clinical investigation exclusivity because it conducted new clinical investigations essential to its approval, including a safety and efficacy study.  21 U.S.C. § 355(c)(3)(E)(iii).  And had Genus obtained that three-year exclusivity, there is

---

[13] *See also* FDA Response to Citizen Petition from Otsuka Pharmaceutical Development & Commercialization, Inc. at 22, Docket No. FDA-2015-P-2482 (posted Oct. 5, 2015) ("It seems clear that Congress did not intend for the range of drugs blocked by exclusivity for a less innovative change (i.e., those changes covered by 3-year exclusivity) to be broader than the range of drugs that are blocked by exclusivity for a more innovative change (i.e., those protected by 5-year exclusivity)."); FDA Response to Citizen Petition from Biostratum, Inc. at 8, Docket No. FDA-2005-P-0259 (filed Jan. 12, 2009) (FDA expressing that NCEE "deserve[s] a longer period of exclusivity" than where a change is made to an existing drug).

no dispute that FDA would have been barred from approving Lannett's application until December 17, 2020.  Under FDA's interpretation, however, even though Genus engaged in *more* innovation (which involved not only new clinical investigations, but also creating a drug with a never-before-approved active ingredient) and was granted a longer and broader period of exclusivity (NCEE), Genus is entitled to significantly less protection.  Congress could not have intended that perverse result.

## CONCLUSION

For the foregoing reasons, Genus's motion for summary judgment should be granted.

Respectfully submitted,

Dated: April 15, 2020

/s/ Andrew D. Prins
Philip J. Perry (DC Bar 434278)
John R. Manthei (DC Bar 447123)
Andrew D. Prins (DC Bar 998490)
Ryan S. Baasch (DC Bar 144370)
Monica C. Groat (DC Bar 1002696)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com

*Attorneys for Plaintiff*
*Genus Lifesciences, Inc.*