# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GENUS LIFESCIENCES, INC.,

      *Plaintiff,*

    v.

ALEX AZAR, Secretary of Health and
Human Services, et al.,

      *Defendants,*

LANNETT CO., INC.,

      *Intervenor-Defendant.*

Case No. 1:20-cv-00211-TNM

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

    I.        Legal Background .................................................................................. 3

           A.      Drug approval and the Hatch-Waxman Amendments ................................ 3

           B.      Prescription Drug User Fee Act ................................................................ 7

           C.      Filing a new drug application .................................................................. 7

           D.      Complete response letter ........................................................................ 9

    II.       Factual Background ................................................................................ 10

ARGUMENT ...................................................................................................... 13

    I.        Standard of Review ................................................................................ 14

    II.       5-year NCE Exclusivity Does Not Bar Approval of Applications
           Submitted Before the Exclusivity Period ................................................ 17

           A.      The 5-Year NCE exclusivity provision unambiguously does not
                  bar the approval of applications during the exclusivity period ................ 17

           B.      Even if the statute were ambiguous, FDA's interpretation is
                  permissible under *Chevron* step two ...................................................... 24

    III.      FDA Reasonably Interpreted the 5-year NCE Exclusivity Provision to
           Permit Resubmission Following FDA's Complete Response Letter ..................... 26

           A.      FDA's reasonable interpretation of the statute should be upheld
                  under *Chevron* step two ...................................................................... 26

           B.      The 5-year NCE exclusivity provision does not unambiguously
                  prohibit FDA from accepting a resubmission following a complete
                  response letter ...................................................................................... 30

    IV.      FDA Did Not Act Arbitrarily and Capriciously by Accepting Lannett's
           Application for Filing ............................................................................ 34

A.    FDA applied the same filing standard to Genus's and Lannett's applications regarding pharmokinetic and dosing information in hepatically and renally impaired patients ....................................................36

B.    Lannett's QT prolongation potential data met the filing standard............38

C.    Later discovered deficiencies in Lannett's leachables data did not require a refuse-to-file decision .................................................................39

CONCLUSION...........................................................................................................................40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbott Labs. v. Young*,
  920 F.2d 984 (D.C. Cir. 1990) ........................................................................... 3, 29

*Actavis Elizabeth LLC v. FDA*,
  625 F.3d 760 (D.C. Cir. 2010) ......................................................................... 13, 21

*\*AID Atlanta, Inc. v. U.S. Dep't of Health and Human Servs.*,
  340 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................... 15

*Alfa Int'l Seafood v. Ross*,
  264 F. Supp. 3d 23 (D.D.C. 2017) ......................................................................... 14

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................................. 14

*Am. Horse Prot. Ass'n v. Yeutter*,
  917 F.2d 594 (D.C. Cir. 1990) ............................................................................... 14

*Amgen Inc. v. Hargan*,
  285 F. Supp. 3d 351 (D.D.C. 2018) ....................................................................... 26

*Amgen, Inc. v. Azar*,
  290 F. Supp. 3d 65 (D.D.C. 2018) ......................................................................... 40

*Apotex, Inc. v. FDA*,
  414 F. Supp. 2d 61 (D.D.C. 2006) ......................................................................... 18

*AstraZeneca Pharm. LP v. FDA*,
  713 F.3d 1134 (D.C. Cir. 2013) ............................................................................. 15

*AT&T Corp. v. Iowa Utils. Bd.*,
  525 U.S. 366 (1999) ............................................................................................... 26

*Auer v. Robbins*,
  519 U.S. 452 (1997) ............................................................................................... 17

*Barnhart v. Walton*,
  535 U.S. 212 (2002) ......................................................................................... 15, 25

*Baystate Franklin Med. Ctr. v. Azar*,
  950 F.3d 84 (D.C. Cir. 2020) ................................................................................. 14

*\*Authorities on which we chiefly rely are marked.*

*Bowles v. Seminole Rock & Sand Co.*,
   325 U.S. 410 (1945) .................................................................................................... 17

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) .................................................................................................... 15

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk*,
   566 U.S. 399 (2012) ...................................................................................................... 4

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................. 15, 27

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) .................................................................................... 34

*Connecticut Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) .................................................................................................... 18

*Davis v. Pension Benefit Guar. Corp.*,
   734 F.3d 1161 (D.C. Cir. 2013) .................................................................................. 34

*Eisai, Inc. v. FDA*,
   134 F. Supp. 3d 384 (D.D.C. 2015) ...................................................................... 22, 25

*Ethyl Corp. v. EPA*,
   541 F.2d 1 (D.C. Cir. 1976) ........................................................................................ 16

*Ferring Pharms. v. Azar*,
   296 F. Supp. 3d 166 (D.D.C. 2018) ............................................................................ 22

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) .................................................................................................... 15

*Henley v. FDA*,
   77 F.3d 616 (2d Cir. 1996) .......................................................................................... 16

*Int'l Fabricare Inst. v. EPA*,
   972 F.2d 384 (D.C. Cir. 1992) .................................................................................... 16

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ................................................................................................ 17

*Landstar Express Am., Inc. v. Fed. Maritime Comm'n*,
   569 F.3d 493 (D.C. Cir. 2009) .................................................................................... 23

*Lomak Petroleum, Inc. v. FERC*,
   206 F.3d 1193 (D.C. Cir. 2000) .................................................................................. 34

*Martin v. Occupational Safety and Health Review Comm'n,*
  499 U.S. 144 (1991) ...................................................................................... 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................ 15

*\*Mylan Labs., Inc. v. Thompson,*
  389 F.3d 1272 (D.C. Cir. 2004) ............................................................... 15, 16

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) ...................................................................................... 16

*Nat'l Shooting Sports Found., Inc. v. Jones,*
  716 F.3d 200 (D.C. Cir. 2013) ....................................................................... 18

*New Life Evangelistic Ctr. v. Sebelius,*
  753 F. Supp. 3d 103 (D.D.C. 2010) ............................................................... 15

*Novartis Pharms. Corp. v. Leavitt,*
  435 F.3d 344 (D.C. Cir. 2006) ....................................................................... 16

*Otsuka Pharm. Co. v. Price,*
  869 F.3d 987 (D.C. Cir. 2017) ............................................................... *passim*

*Otsuka Pharmaceutical Co., Ltd. v. Burwell,*
  302 F. Supp. 3d 375 (D.D.C. 2016) ............................................... 21, 24, 25, 29

*Pub. Citizen Health Research Grp. v. FDA,*
  185 F.3d 898 (D.C. Cir. 1999) ......................................................................... 4

*Purepac Pharm. Co. v. Thompson,*
  354 F.3d 877 (D.C. Cir. 2004) ....................................................................... 16

*Reep v. U.S. Dep't of Justice,*
  No. 18-5132, 2018 WL 6721099 (D.C. Cir. Dec. 18, 2018) .............................. 34

*Schering Corp. v. FDA,*
  51 F.3d 390 (3d Cir. 1995) ............................................................................ 17

*Serono Labs, Inc. v. Shalala,*
  158 F.3d 1313 (D.C. Cir 1998) ...................................................................... 16

*Stand Up for California! v. U.S. Dep't of Interior,*
  410 F. Supp. 3d 39 (D.D.C. 2019) ................................................................. 14

*Troy Corp. v. Browner,*
  120 F.3d 277 (D.C. Cir. 1997) ................................................................. 16, 36

*United States v. Missouri Pac. Ry. Co.*,
   213 F. 169 (8th Cir. 1914) ................................................................ 19

*Veloxis Pharms., Inc. v. FDA*,
   109 F. Supp. 3d 104 (D.D.C. 2015) ................................................. 4

*ViroPharma, Inc. v. Hamburg*,
   898 F. Supp. 2d 1 (D.D.C. 2012) ..................................................... 15

## FEDERAL STATUTES

5 U.S.C. § 706 ........................................................................................ 34

5 U.S.C. § 706(2)(A) ............................................................................. 14

21 U.S.C. § 355(a) ................................................................................. 3

21 U.S.C. § 355(b) ................................................................................. 33

21 U.S.C. § 355(b)(1) ............................................................................ 6

21 U.S.C. § 355(b)(2) ............................................................................ 4

21 U.S.C. § 355(b)(2)(A)(iv) ................................................................ 6

21 U.S.C. § 355(c)(3)(C) ...................................................................... 6

21 U.S.C. § 355(c)(3)(D)(ii) ................................................................ 25

21 U.S.C. § 355(c)(3)(E)(ii) ........................................................... *passim*

21 U.S.C. § 355(c)(3)(E)(iii) ............................................................... 18

21 U.S.C. § 355(j) ................................................................................. 4

21 U.S.C. § 355(j)(5)(B)(iv)(I) ............................................................ 18

21 U.S.C. § 379h(a) ............................................................................... 7

The FDA Reauthorization Act of 2017, Pub. L. No. 115-52, 131 Stat. 1005 (2017) ................... 7

The Medicare Prescription Drug Improvement and Modernization Act of 2003,
   Pub. L. No. 108-173, § 1101(b)(2)(C), (D), 117 Stat. 2066, 2454 ........................... 25

## FEDERAL REGULATIONS

21 C.F.R. § 10.30 ................................................................................. 13

21 C.F.R. § 312.23(6)(ii) ...................................................................... 5

21 C.F.R. § 314.3(b) ................................................................................................ *passim*

21 C.F.R. § 314.50(a)(2) ........................................................................................ 30

21 C.F.R. § 314.50(d) ............................................................................................. 8

21 C.F.R. § 314.60(a) ............................................................................................. 30

21 C.F.R. § 314.60(c) ............................................................................................. 32

21 C.F.R. § 314.60(c)(1) ........................................................................................ 32

21 C.F.R. § 314.60(c)(2) ........................................................................................ 32

21 C.F.R. § 314.100 ............................................................................................... 9

21 C.F.R. § 314.101(a) ........................................................................................... 38

21 C.F.R. § 314.101(a)(1) ................................................................................... 7, 33

21 C.F.R. § 314.101(a)(2) ....................................................................................... 7

21 C.F.R. § 314.101(d) ........................................................................................... 33

21 C.F.R. § 314.101(d)(3) ....................................................................................... 8

21 C.F.R. § 314.108(b)(2) .................................................................................. 6, 13

21 C.F.R. § 314.110 ........................................................................................... 9, 27

21 C.F.R. § 314.110(a) ........................................................................................... 9

21 C.F.R. § 314.110(b) ........................................................................................... 9

21 C.F.R. § 314.110(b)(2) ....................................................................................... 28

21 C.F.R. § 314.120 ............................................................................................... 9

*Abbreviated New Drug Application Regulations*, 54 Fed. Reg. 28, 872, 28,897, 28,898, 28,901
(July 10, 1989)  .......................................................................................... 21, 22, 25

*Abbreviated New Drug Application Regulations*, 57 Fed. Reg. 17,955 (Apr. 28, 1992) ............ 25

*Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to
Unapproved Application*, 73 Fed. Reg. 39,589, 39,599 (July 10, 2008) .............................. 9, 28

**FEDERAL RULES**

Fed. R. Civ. P. 56 ................................................................................................................ 13

## LEGISLATIVE HISTORY

130 CONG. REC. H24,425 (daily ed. Sept. 6, 1984) ........................................................ 5

130 CONG. REC. S23,765 (daily ed. Aug. 10, 1984) ..................................................... 19

H.R. REP. NO. 98-857, Part 1, at 14-15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647–2648
........................................................................................................................................ 3

## OTHER AUTHORITIES

Step 3: Clinical Research, *available at* https://www.fda.gov/patients/drug-development-
process/step-3-clinical-research#phases ...................................................................... 9

*Interdisciplinary Review Team for Cardiac Safety Studies*, *available at*
https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/interdisciplinary-
review-team-cardiac-safety-studies-formerly-qt-irt .....................................................39

Manual of Policies and Procedures 5018.2: *NDA Classification Codes*, at 2 (2015), *available at*
https://www.fda.gov/media/94381/download ...................................................................7

Manual of Policies and Procedures 6020.4, *Classifying Resubmissions of Original NDAs, BLAs,
and Efficacy Supplements in Response to Complete Response Letters*, at 2 (2015), *available at*
https://www.fda.gov/media/72727/download ................................................................10, 28, 31

Manual of Policies and Procedures 6020.14, *Interdisciplinary Review Team for QT Studies*
(2012), *available at* https://www.fda.gov/media/72745/download ...............................................39

Manual of Policies and Procedures 6025.4, *Good Review Practice:  Refuse To File,* at 2 (Sep. 5,
2018), *available at* https://www.fda.gov/media/87035/download ..................................................8

PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2018 through 2022,
*available at* https://www.fda.gov/media/99140/download ................................................7, 28, 31

## INTRODUCTION

This case arises out of the Food and Drug Administration's ("FDA") approval of two cocaine hydrochloride products, Goprelto and Numbrino, which are both used as a local anesthetic during nasal procedures.  Cocaine hydrochloride has been used in this manner for decades, but FDA approved these two drugs only recently.  Plaintiff Genus Lifesciences, Inc. ("Genus"), owner of Goprelto, and Intervenor-Defendant Lannett Co., Inc. ("Lannett"), owner of Numbrino, both took advantage of an abbreviated drug approval pathway that allowed them to rely, in part, on published literature about cocaine hydrochloride.  Both Genus and Lannett also independently conducted studies to test the safety and effectiveness of cocaine hydrochloride as a local anesthetic before submitting their new drug applications.  Ultimately, Genus submitted its new drug application in November 2016, and Lannett submitted its application approximately 10 months later, in September 2017.  FDA approved Goprelto in December 2017 and Numbrino in January 2020.

Because Goprelto was the first cocaine hydrochloride drug approved by FDA, it qualified for a 5-year period of exclusivity under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 355(c)(3)(E)(ii).  This period is referred to as the 5-year new chemical entity ("NCE") exclusivity period because only new chemical entities, *i.e.*, drugs approved for the first time in the United States, qualify for it.  During Genus's 5-year NCE exclusivity period, certain competing applications for cocaine hydrochloride drugs may not be submitted to FDA.  The 5-year NCE exclusivity provision was enacted in 1984 as part of the Hatch-Waxman Amendments, which made significant changes to the FDCA in order to make available more low-cost drugs while also incentivizing drug development.  To that end, the Hatch-Waxman Amendments established several

1

periods of exclusivity with varying lengths that apply in different circumstances.  All of the other exclusivity provisions, however, bar the *approval* of applications; the 5-year NCE exclusivity provision is the only one that bars the *submission* of applications.

In this lawsuit, Genus claims that FDA violated the Administrative Procedure Act ("APA") when it approved Numbrino, and asks this Court to set aside Numbrino's approval.  Genus contends that Goprelto's 5-year NCE exclusivity barred FDA from approving Numbrino, even though Lannett's application was submitted before FDA approved Goprelto.  Genus also argues that Goprelto's 5-year exclusivity prohibited FDA from accepting what is known as a "resubmission"—Lannett's response to FDA's request for more data and information about Numbrino, made after FDA filed and reviewed Lannett's application.  Genus further alleges that FDA acted arbitrarily and capriciously by applying different filing standards to Genus's and Lannett's applications.

Each of Genus's arguments fails.  First, the 5-year NCE exclusivity provision unambiguously does not bar the approval of applications; it only bars their submission.  Second, FDA reasonably concluded that Lannett's resubmission was not barred by Goprelto's 5-year NCE exclusivity.  A "resubmission" is defined in a regulation promulgated in 2008, and thus, was not considered by Congress when it enacted the 5-year NCE exclusivity provision more than two decades earlier.  But FDA's definition makes it clear that a resubmission is not the same as the submission of a complete application.  Among other things, a resubmission is limited to information requested by FDA, does not undergo the same filing review, and is subject to a shorter review period than an application.  Third, FDA did not act arbitrarily and capriciously in filing Lannett's application.  FDA applied the same filing standard to both Lannett's and Genus's applications, and differences between the two are the result of different choices made by Genus

and Lannett in response to the same options provided by FDA.  For the reasons explained below, FDA did not violate the APA by approving Numbrino, and this Court should grant the Cross-Motion for Summary Judgment by Defendants Alex Azar, Secretary of Health and Human Services; U.S. Department of Health and Human Services; Stephen Hahn, Commissioner of Food and Drugs; and FDA (collectively "Federal Defendants"), deny Genus's Motion for Summary Judgment, and dismiss this case with prejudice.

## **BACKGROUND**

### I.      **Legal Background**

#### A.  **New drug approval and the Hatch-Waxman Amendments**

The FDCA requires pharmaceutical companies seeking to market a new drug to first obtain FDA approval.  21 U.S.C. § 355(a).  A pharmaceutical company may secure FDA approval by filing a new drug application ("NDA"), which must contain extensive scientific and clinical data demonstrating the safety and effectiveness of the drug.  *Id.* § 355(b)(1); *see* 21 U.S.C. § 355(c)-(d).  One type of NDA, referred to as a "stand-alone NDA," is supported entirely by investigations either conducted by the applicant or to which the applicant has the right of reference.  In 1984, Congress amended the FDCA by enacting the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Amendments.  The Hatch-Waxman Amendments reflect Congress's desire to balance the need to "make available more low cost generic drugs by establishing a generic drug approval procedure," with new incentives for drug development.  *See* H.R. REP. NO. 98-857, Part 1, at 14-15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647-2648; *see also Abbott Labs. v. Young*, 920 F.2d 984, 985 (D.C. Cir. 1990) ("Facing the classic question of the appropriate trade-off between greater incentives for the invention of new products and greater affordability of those products, Congress struck a balance between

expediting generic drug applications and protecting the interests of the original drug manufacturers.").

To increase pharmaceutical competition, the Hatch-Waxman Amendments established two abbreviated drug approval pathways, which permit applicants to rely on information already known about other drugs. The first pathway allows a company seeking to market a generic drug to submit an abbreviated new drug application ("ANDA"). 21 U.S.C. § 355(j). "Rather than providing independent evidence of safety and efficacy, the typical ANDA shows that the generic drug has the same active ingredients as, and is biologically equivalent to, the brand-name drug." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk*, 566 U.S. 399, 405 (2012). The second pathway, described as an "intermediate process," requires an applicant to meet the same safety and effectiveness standard as a stand-alone NDA. *See Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 108 (D.D.C. 2015); 21 U.S.C. § 355(b)(2) (codifying section 505(b)(2) of the FDCA). But unlike a stand-alone NDA, which relies entirely on studies conducted by its applicant, a "505(b)(2) application" may rely on a combination of the applicant's own studies and other sources, such as published reports of studies and the Agency's findings of safety and/or effectiveness for one or more previously approved drugs, to meet the approval requirements. *See* 21 U.S.C. § 355(b)(2).

The process of obtaining new drug approval starts long before the submission of an NDA. "Before a company may begin clinical testing . . . it must first submit an Investigational New Drug application ('IND') describing the drug, the results of laboratory and pre-clinical (*i.e.*, animal) testing, and the proposed clinical testing." *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 901 (D.C. Cir. 1999). An IND must describe the plan for investigating the drug in humans and summarize the known pharmacological and toxicological effects of the drug. 21 C.F.R. § 312.23(5)(ii). The IND should include information about each planned study, including detailed

protocols for all Phase 2 and Phase 3 studies describing all aspects of the study.[1]  21 C.F.R.

§ 312.23(6)(ii).

One of the incentives for drug development in the Hatch-Waxman Amendments is a 5-year

period of exclusivity for new chemical entities.  *See* 130 CONG. REC. H24,425 (daily ed. Sept. 6,

1984).  The 5-year NCE exclusivity provision states, in full:

> If an application submitted under subsection (b) of this section for a drug, no active
> ingredient (including any ester or salt of the active ingredient) of which has been
> approved in any other application under subsection (b), is approved after September
> 24, 1984, ***no application*** which refers to the drug for which the subsection (b)
> application was submitted and for which the investigations described in clause (A)
> of subsection (b)(1) and relied upon by the applicant for approval of the application
> were not conducted by or for the applicant and for which the applicant has not
> obtained a right of reference or use from the person by or for whom the
> investigations were conducted ***may be submitted under subsection (b) before the***
> ***expiration of five years from the date of the approval of the application under***
> ***subsection (b)***, except that such an application may be submitted under subsection
> (b) after the expiration of four years from the date of the approval of the subsection
> (b) application if it contains a certification of patent invalidity or noninfringement
> described in clause (iv) of subsection (b)(2)(A).   The approval of such an
> application shall be made effective in accordance with this paragraph except that,
> if an action for patent infringement is commenced during the one-year period
> beginning forty-eight months after the date of the approval of the subsection (b)
> application, the thirty-month period referred to in subparagraph (C) shall be
> extended by such amount of time (if any) which is required for seven and one-half
> years to have elapsed from the date of approval of the subsection (b) application.

21 U.S.C. § 355(c)(3)(E)(ii) (emphasis added).  In simpler terms, this provision first defines the

scope of eligibility for 5-year NCE exclusivity.  A drug is eligible for 5-year NCE exclusivity if

(1) its application is submitted under section 505(b); (2) the drug contains no active ingredient

---

[1] Clinical trials are often conducted in multiple phases.  Phase 2 trials are intended to provide
preliminary evidence of a drug's effectiveness and safety, but are typically not large enough to
show that the drug's benefits outweigh its risks.  In Phase 3 trials, the drug is given to a larger
group of people to confirm its effectiveness, monitor side effects, compare it to commonly used
treatments, and collect information to allow the drug to be used safely.  *See* FDA, Step 3: Clinical
Research, *available at* https://www.fda.gov/patients/drug-development-process/step-3-clinical-
research#phases.

(including any ester or salt of the active ingredient) that has been previously approved by FDA; and (3) the drug was approved after September 24, 1984. *Id.* The provision then explains what is barred once a drug is approved and becomes eligible for 5-year NCE exclusivity: the *submission* of any other section 505(b)(2) application for the same drug for 5 years. *Id.*; *see also* 21 C.F.R. § 314.108(b)(2). Next, the provision describes one exception to the 5-year ban on submissions: a subsequent 505(b)(2) application may be submitted after just 4 years if it includes what is known as a "paragraph IV" certification. A paragraph IV certification is required for a subsequent application where the applicant asserts that at least one listed patent[2] for the drug is invalid or will not be infringed. 21 U.S.C. § 355(b)(2)(A)(iv) & (c)(3)(B)(2)(A)(iv); *see also* 21 C.F.R. § 314.50(i)(1)(i)(A)(4). The second sentence provides that if the patent holder sues an applicant with a paragraph IV certification for patent infringement, FDA's approval of the application is stayed for a period of time, the length of which depends on when the application was submitted and certain events arising in the patent litigation. 21 U.S.C. § 355(c)(3)(C), (c)(3)(E)(ii).

The FDCA provides for several other periods of exclusivity. Unlike the 5-year NCE exclusivity provision, these exclusivity periods prohibit the subsequent *approval* of a competing drug. *See, e.g.*, 21 U.S.C. § 355(c)(3)(E)(iii)-(iv) (3-year exclusivity provision barring approval of certain competing applications), § 355(j)(5)(B)(iv)(I) (180-day exclusivity period barring approval of competing ANDAs), § 360cc(a)(2) (7-year orphan-drug exclusivity barring approval of competing drugs for the same rare disease or condition). The 5-year NCE exclusivity provision

---

[2] The FDCA requires stand-alone and 505(b)(2) NDAs to include certain patent information, *see* 21 U.S.C. § 355(b)(1) & (c)(2), and directs FDA to publish that information. *See id.* 21 U.S.C. § 355(j)(7). FDA's Orange Book, available at https://www.fda.gov/media/71474/download, satisfies this publication requirement.

is the only FDCA exclusivity provision that prohibits the *submission* of another application.  *See* 21 U.S.C. § 355(c)(3)(E)(ii).

### B.  Prescription Drug User Fee Act

The Prescription Drug User Fee Act ("PDUFA"), first enacted in 1992, authorizes FDA to collect fees from companies that submit certain human drug applications for review and from companies that market certain approved prescription drug products.  21 U.S.C. § 379h(a).  In exchange for these fees, FDA commits to expedite its process for reviewing human drug applications, including by adopting and reporting on negotiated performance goals for reviewing and acting on applications within target timeframes.  *See* section 101(b) of FDA Reauthorization Act of 2017, Pub. L. No. 115-52, 131 Stat. 1005 (2017).  FDA's performance goals are reflected in a document that is commonly referred to as the PDUFA "goals letter" or "commitment letter."  *See* PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2018 through 2022, *available at* https://www.fda.gov/media/99140/download ("PDUFA Goals Letter").  One performance goal listed in the goals letter is for FDA to review and act on 90 percent of standard non-new molecular entity[3] new drug applications within 10 months of receipt.  *Id.*

### C.  Filing a new drug application

Within 60 days of receiving an NDA, FDA will determine whether the application may be filed.  21 C.F.R. § 314.101(a)(1).  FDA will file the NDA if it finds that none of the enumerated reasons for refusing to file the NDA apply.  21 C.F.R. § 314.101(a)(2).  Such reasons include, among others, that the application "is incomplete because it does not on its face contain

---

[3] The term "new molecular entity" is not defined in the statute or regulations, but, put simply, FDA considers a new molecular entity to be a "novel" drug, *i.e.*, one that has not been previously approved or marketed in the United States.  *See* FDA, Manual of Policies and Procedures 5018.2: *NDA Classification Codes*, at 2 (2015), *available at* https://www.fda.gov/media/94381/download.

information required under section 505(b) . . . of the Federal Food, Drug, and Cosmetic Act and § 314.50 . . . ." 21 C.F.R. § 314.101(d)(3).  Section 314.50 requires an NDA to contain a number of technical sections, each with "data and information in sufficient detail to permit the agency to make a knowledgeable judgment about whether to approve the NDA."  21 C.F.R. § 314.50(d).

In determining whether to file an application pursuant to 21 C.F.R. § 314.101, FDA does not review the data to determine whether it is sufficient to support an approval.  Rather, the purpose of the filing review is to identify deficiencies in order to help "avoid unnecessary review of incomplete applications," and to "allow an applicant to begin repair of critical deficiencies in the application far sooner than if these were identified much later."  FDA, Manual of Policies and Procedures 6025.4, *Good Review Practice:  Refuse To File,* at 2 (Sep. 5, 2018) ("MAPP 6025.4"), *available at* https://www.fda.gov/media/87035/download.  When assessing whether an application is "incomplete" under 21 C.F.R. § 314.101(d)(3), FDA determines whether there "are deficiencies that on their face render an application unreviewable, [or] administratively incomplete."  MAPP 6025.4 at 10.  FDA will refuse to file an application if it "is incomplete, [or] the potentially correctable [filing] deficiencies cannot be readily rectified or have not been rectified, or the application is inconsistent with regulatory practice."  *Id.* at 13.

Filing deficiencies that support FDA's refusal to file are distinct from what are called "review issues."   Review issues "may . . . ultimately affect the approval of the application," but should not serve as the basis for a refusal to file.  *Id.* at 2 & n.5; *see id.* at 10 ("[Refusal to file] actions should be based only on filing issues, not on review issues.").  Review issues "require in-depth review and complex judgments," and include, among others, risk and benefit assessments, nuances of protocol design, and adequacy of statistical plans and analyses; in other words, concerns about whether the application will ultimately meet the approval standard.  *Id.* at 10-11.

### D. Complete response letter

After an NDA has been filed, FDA reviews its contents and either approves the NDA or sends the applicant a "complete response letter."  21 C.F.R. § 314.100.  FDA established the complete response letter framework by regulation in 2008.  Before that time, FDA instead issued "approvable" and "not approvable" letters.  The complete response letter replaced both "approvable" and "not approvable" letters in order "to adopt a more consistent and neutral mechanism to convey that [FDA] cannot approve an application in its present form," "with no implication as to the approvability of the application."[4]  *Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Application*, 73 Fed. Reg. 39,589 (July 10, 2008).

Since 2008, FDA issues a complete response letter when it determines that it will not approve an application in its present form, regardless of whether the deficiencies are considered major or minor.  21 C.F.R. § 314.110(a).  A complete response letter is "a written communication to an applicant from FDA usually describing all of the deficiencies that [FDA] has identified in an NDA or ANDA that must be satisfactorily addressed before it can be approved."  21 C.F.R. § 314.3(b).  An applicant has three options in response to a complete response letter: (1) provide a "resubmission" that addresses "all deficiencies identified in the complete response letter;" (2) withdraw the application, or (3) request an opportunity for hearing.  21 C.F.R. § 314.110(b).

---

[4] An approvable letter stated that an "NDA is basically approvable if certain issues are resolved," 21 C.F.R. § 314.110 (effective until Aug. 10, 2008), whereas a "not approvable letter" informed the applicant that the "NDA cannot be approved for one of [the] reasons" provided for by regulation and described the deficiencies identified in the NDA, 21 C.F.R. § 314.120 (effective until Aug. 10, 2008).  In response to either type of letter, the applicant had four options: (1) amend the application, (2) withdraw the application, (3) request an opportunity for hearing, or (4) agree to extend the review period to decide which actions to take.  21 C.F.R. § 314.110 (effective until Aug. 10, 2008); 21 C.F.R. § 314.120 (effective until Aug. 10, 2008).

A resubmission "in the context of a complete response letter is [a] submission by the applicant of all materials needed to fully address all deficiencies identified in the complete response letter." 21 C.F.R. § 314.3(b). The applicant is not required to provide to FDA as part of its resubmission any data, information, or forms already included in the applicant's NDA. *See id.* A resubmission is classified as either Class 1 or Class 2.[5] 21 C.F.R. § 314.110(b)(i)-(ii). A Class 1 resubmission "constitutes an agreement by the applicant to start a new 2-month review cycle beginning on the date FDA receives the resubmission," whereas a Class 2 resubmission "constitutes an agreement by the applicant to start a new 6-month review cycle." 21 C.F.R. § 314.110(b)(i)-(ii).

Because FDA issues complete response letters to applications that have already been filed, "no filing determination is made for resubmissions." FDA, Manual of Policies and Procedures 6020.4, *Classifying Resubmissions of Original NDAs, BLAs, and Efficacy Supplements in Response to Complete Response Letters*, at 2 (2015) ("MAPP 6020.4"), *available at* https://www.fda.gov/media/72727/download. Moreover, resubmissions are not assigned a new NDA number. By contrast, applications that have been withdrawn by an applicant and submitted again later receive a new NDA number, and must undergo a filing determination.

## II.     Factual Background

The therapeutic usefulness of cocaine has been widely known since at least 1884. AR 2761-63. And for decades, unapproved cocaine hydrochloride topical solutions were used as

---

[5] A Class 1 resubmission "contains one or more of the following: Final printed labeling, draft labeling, certain safety updates, stability updates to support provisional or final dating periods, commitments to perform postmarketing studies (including proposals for such studies), assay validation data, final release testing on the last lots used to support approval, minor reanalyses of previously submitted data, and other comparatively minor information." 21 C.F.R. § 314.3(b). A Class 2 resubmission "includes any item not specified in the definition of 'Class 1 resubmission.'" *Id.*

anesthetic and vasoconstrictive agents in nasal and sinus surgeries.  AR 1166.  Beginning in 2008, Lannett marketed unapproved cocaine hydrochloride topical solutions in 4% and 10% strengths. AR 2395.  In late 2009, Lannett discussed a proposal with FDA to submit a 505(b)(2) application for its cocaine hydrochloride products.  AR 1414-15.  Lannett submitted an IND for cocaine hydrochloride in 2013 and conducted two Phase 3 clinical trials between 2014 and 2016.  AR 2233, 2374-75.  Meanwhile, in 2013, Genus discussed with FDA a plan to submit its own 505(b)(2) application for a cocaine hydrochloride topical solution.  AR 8.  Genus submitted an IND for its product in 2014, and conducted a single Phase 3 clinical trial.  AR 29, 658.

In pre-submission meetings, FDA informed Genus and Lannett that their applications needed to include "a complete clinical pharmacology package," addressing, among other things, "all pertinent clinical pharmacology information related to . . . [pharmacokinetics][6] and dosing in special populations (e.g., effect of age, gender, hepatic [liver] and renal [kidney] impairment),"— in other words, information that would guide practitioners on how to dose the drug in such patients—as well as information related to "QT-prolongation potential."[7]  AR 211-12 (advice to Genus), AR 1500-01 (advice to Lannett).  To fulfill these requirements, FDA provided both companies with the same options it provides to all applicants developing a drug that has not previously been approved.  Specifically, FDA informed Genus and Lannett that they could obtain this information from (1) dedicated studies, (2) sub-population analyses[8] in Phase 3 studies, or (3)

---

[6] Pharmacokinetics means the study of the bodily absorption, distribution, metabolism, and excretion of drugs.  MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/pharmacokinetics.

[7] QT-prolongation refers to a disturbance in how the heart's bottom chambers (ventricles) conduct electricity.  Mayo Clinic, Prolonged QT-interval, https://www.mayoclinic.org/diseases-conditions/long-qt-syndrome/multimedia/prolonged-q-t-interval/img-20007972.

[8] A subpopulation analysis is an evaluation of data in a targeted subset of the studied population.

published literature in the public domain.  *Id.*; *see* AR 3607, 3636.  FDA also gave Genus and Lannett instructions on how to address the potential of the drugs' container closure systems to leach compounds into the drug products.  AR 240-41 (advice to Genus), AR 1474 (advice to Lannett).

On November 23, 2016, Genus submitted an NDA under section 505(b)(2) for its cocaine hydrochloride topical nasal solution 4%.  AR 361.  Genus relied on published literature to support the safety and effectiveness of its product, as well as data collected from its own clinical trial.  AR 1164.  To support its clinical pharmacology package, Genus, among other things, conducted studies to address pharmacokinetics ("PK") and dosing in hepatically and renally impaired patients and to address the QT prolongation potential of its drug.  AR 655, *see also* AR 3607.  On February 6, 2017, FDA informed Genus that its application was sufficiently complete for filing and substantive review, and, in accordance with the PDUFA goals letter, set the user fee goal date for September 23, 2017.  AR 441-46.  FDA also identified a number of review issues in Genus's application.  *Id.*

Approximately 10 months later, on September 21, 2017, FDA received Lannett's section 505(b)(2) NDA for cocaine hydrochloride topical nasal solutions, 4% and 10%.  AR 1976.  Like Genus, Lannett relied on a combination of published literature and its own studies to establish the safety and effectiveness of its product.  AR 2395, 2746-59.  Lannett's clinical pharmacology package included a sub-population analysis for QT-prolongation potential, and Lannett relied on published literature to address PK and dosing in hepatically and renally impaired patients.  AR 1855-57, *see also* AR 3607 & n.17.  On November 29, 2017, FDA informed Lannett that its application was sufficiently complete for filing and substantive review, and, in accordance with

the PDUFA goals letter, set the user fee goal date for July 21, 2018.  AR 1976-83.  FDA also identified a number of review issues in Lannett's application.  *Id.*

The following month, on December 14, 2017, FDA approved Genus's NDA for Goprelto. AR 1315-40.  Because Genus's application was the first to be approved for a drug that contained cocaine,[9] FDA recognized 5-year NCE exclusivity for Goprelto.  The exclusivity period expires on December 14, 2022.  AR 3623.

On July 20, 2018, FDA issued a complete response letter to Lannett, explaining that the agency had completed its review of Lannett's application and determined that it could not be approved in its present form.  AR 2502-07.  The letter described FDA's reasons for its decision and recommendations for Lannett to address the issues identified.  *Id.*  The letter informed Lannett that, within one year, it was "required to resubmit or take other actions available under 21 CFR 314.110."  *Id.*  If Lannett did not take one of these actions, FDA would consider its lack of a response "a request to withdraw the application under 21 CFR 314.65."  AR 2505.  On June 21, 2019, Lannett responded to the complete response letter.  AR 2553-54.  FDA approved Lannett's NDA for Numbrino on January 10, 2020.  AR 2717-45.

On February 1, 2019, and August 14, 2019, before FDA approved Numbrino, Genus submitted Citizen Petitions to FDA pursuant to 21 C.F.R. § 10.30.  AR 2814-31, 3157-73.  In its first petition, Genus asserted that Goprelto's 5-year NCE exclusivity barred any further submission from Lannett and barred FDA from approving Numbrino.  AR 2814-15.  Genus requested that

---

[9] FDA interprets the phrase "active ingredient" in the 5-year NCE and 3-year exclusivity provisions to mean "active moiety."  *See* 21 C.F.R. § 314.108(b)(2) (an NCE is a drug that contains no previously approved active moiety).  In turn, "active moiety" refers to the core of a molecule. 21 C.F.R. § 314.3(b) (defining "active moiety" as the part of a molecule excluding "those appended portions that cause it to be an ester, salt . . . or other noncovalent derivative"); *see also Actavis Elizabeth LLC v. FDA*, 625 F.3d 760, 762 (D.C. Cir. 2010) (upholding FDA's interpretation). Here, the active moiety of both drugs is cocaine.

FDA refuse to accept further submissions from Lanett, and to treat Lannett's application and any submissions received after December 14, 2017, as withdrawn. AR 2830. In its second petition, Genus asserted that FDA applied different filing standards to Genus's and Lannett's applications, and requested that FDA rescind its acceptance of Lannett's application to the extent that Lannett did not complete certain studies. AR 3159. FDA responded to Genus's Citizen Petitions on July 1, 2019, and January 10, 2020, respectively. AR 3140-56, 3623-44. In its July 1, 2019 letter, FDA determined that Lannett could continue to submit amendments and a resubmission to its pending 505(b)(2) application because the application was submitted before Goprelto was approved. AR 3151-56. In its January 10, 2020 response, FDA rejected Genus's argument that it applied different filing standards and informed Genus that it approved Lannett's NDA. AR 3628-44.

## ARGUMENT

When the parties file cross-motions for summary judgment in an APA case, the Federal Rule of Civil Procedure 56 standard does not apply. *Stand Up for California! v. U.S. Dep't of Interior*, 410 F. Supp. 3d 39, 46 (D.D.C. 2019). Instead, "'the district judge sits as an appellate tribunal' and 'the entire case on review is a question of law.'" *Id.* (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). The court decides "whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 37 (D.D.C. 2017).

### I.    Standard of Review

Genus argues that this Court should set aside FDA's action because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). Courts have repeatedly explained that this standard is highly deferential to the agency. *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020); *Am. Horse Prot.*

*Ass'n v. Yeutter*, 917 F.2d 594, 596 (D.C. Cir. 1990).  The agency's administrative decision is entitled to a presumption of validity, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985), and "a court is not to substitute its judgment for that of the agency," *AID Atlanta, Inc. v. U.S. Department of Health and Human Services*, 340 F. Supp. 3d 1, 4 (D.D.C. 2018) (quoting *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).  The party challenging the agency action bears the burden of proof.  *Id.* at 4.  Courts are required to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  "It is 'not enough for the agency decision to be incorrect; so long as it has some rational basis, the court is bound to uphold the decision.'"  *AID Atlanta, Inc.*, 340 F. Supp. 3d at 4 (quoting *New Life Evangelistic Ctr. v. Sebelius*, 753 F. Supp. 3d 103, 113 (D.D.C. 2010)).

This Court reviews FDA's statutory interpretation under the familiar *Chevron* two-step framework. [10]  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  At *Chevron* step one, the court considers "whether Congress has directly spoken to the precise question as issue."  *Id.* at 842.  Where Congress's intent is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  But if the Court finds that Congress "has not directly addressed the precise question at issue," the court turns to *Chevron* step two.  Under step two, the Court must uphold the agency's interpretation so long

---

[10] FDA's statutory interpretation, expressed in its responses to Genus's Citizen Petitions, is entitled to *Chevron* deference.  "Pursuant to *Barnhart* [*v. Walton*, 535 U.S. 212 (2002)], the D.C. Circuit has consistently accorded *Chevron* deference to FDA's letter rulings, including its responses to citizen petitions."  *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 18 (D.D.C. 2012).  *See also Otsuka Pharm. Co. v. Price*, 869 F.3d 987, 1002 (D.C. Cir. 2017) (deference to FDA's interpretation of the 3-year exclusivity provision in a Citizen Petition response); *AstraZeneca Pharm. LP v. FDA*, 713 F.3d 1134, 1139 (D.C. Cir. 2013) (same) (citing *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004)).

as it is "based on a permissible construction of the statute."  *Id.* at 843.  "[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."  *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  That is because "*Chevron*'s premise is that it is for agencies, not the courts, to fill statutory gaps."  *Id.* at 982.

In deferring to FDA's interpretation of the FDCA under *Chevron*, the D.C. Circuit has considered the complexity of the statutory regime and FDA's expertise.  *Mylan Labs. Inc.*, 389 at 1280; *see also Otsuka Pharm. Co.*, 869 F.3d at 993 ("We must sustain the FDA's interpretation of the scope of exclusivity . . . as long as it is consistent with the statutory terms and is reasonable."); *Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006) ("We have held on a number of occasions that FDA interpretations of the FDCA receive deference . . . ."); *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004) ("FDA interpretations of the FDCA receive deference.").

Where, as here, an agency's decision is based on evaluation of scientific information within the agency's area of technical expertise, its decisions are traditionally accorded even greater deference.  *See Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citing *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976)); *see also Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) ("The rationale for deference is particularly strong when [the agency] is evaluating scientific data within its technical expertise.").  Courts routinely apply such deference to FDA's scientific expertise in cases under the FDCA.  *See, e.g.*, *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir 1998) (deference to FDA's determination of "sameness"); *Henley*

*v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996) (deference to FDA labeling decision); *Schering Corp. v. FDA*, 51 F.3d 390, 399 (3d Cir. 1995) (deference to FDA safety and effectiveness decision).

Courts have "often deferred to agencies' reasonable readings of genuinely ambiguous regulations." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019); *see Auer v. Robbins*, 519 U.S. 452 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). Such deference is particularly warranted when the interpretation draws on the agency's substantive expertise. "Agencies (unlike courts) have 'unique expertise,' often of a scientific or technical nature, relevant to applying a regulation 'to complex or changing circumstances.'" *Kisor*, 139 S. Ct. at 2413 (quoting *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 151 (1991)).

## II.    5-year NCE Exclusivity Does Not Bar Approval of Applications Submitted Before the Exclusivity Period

According to Genus, "Congress made clear in the [5-year NCE exclusivity] provision that an application, even if legally submitted, cannot be approved by the FDA during the [NCE] exclusivity period." Mem. in Supp. of Genus's Mot. for Summ. J. ("Pl.'s Mem.") at 29. The plain language of the statute, however, demonstrates that Genus is wrong; the 5-year NCE exclusivity provision does not unambiguously bar the approval of applications submitted before the exclusivity period. To the contrary, the provision unambiguously does *not* bar such approval. Accordingly, this Court should reject Genus's argument under *Chevron* step one, or in the alternative, uphold FDA's reasonable interpretation, under step two.

### A.    The 5-Year NCE exclusivity provision unambiguously does not bar the approval of applications during the exclusivity period

The FDCA plainly does *not* bar approval of an application during the 5-year NCE exclusivity period, and this Court should give effect to the statute's unambiguous language. The 5-year NCE exclusivity provision states that "no application . . . may be ***submitted*** under

17

subsection (b) before the expiration of five years from the date of the approval of the application under subsection (b)."  21 U.S.C. § 355(c)(3)(E)(ii) (emphasis added).  By contrast, the 3-year exclusivity provision—enacted with the 5-year NCE exclusivity provision—provides that FDA "may not make the ***approval*** of [another 505(b)(2) application] effective before the expiration of three years from the date of approval of the application under subsection (b) . . . ."  21 U.S.C. § 355(c)(3)(E)(iii) (emphasis added).[11]  As Genus recognizes in its memorandum, it is a "cardinal canon" of statutory interpretation that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  Pl.'s Mem. at 22 (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).  Here, Congress provided that no applications may be submitted; it did not say that no applications may be submitted *or approved*, even though the adjacent 3-year exclusivity provision demonstrates that it easily could have added such language.  Because the text is plain and unambiguous, the analysis ends there, and the Court should apply the plain terms of the statute.  *Apotex, Inc. v. FDA*, 414 F. Supp. 2d 61, 67 (D.D.C. 2006).

Where the statute is unambiguous on its face—as it is here—there is no need to "resort to legislative history to determine what Congress intended."  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 212 (D.C. Cir. 2013).  But, to the extent the Court deems legislative history relevant, it too demonstrates that Congress understood the distinction between a prohibition on submissions and a prohibition on approvals.  Representative Waxman, discussing the parallel exclusivity provisions applicable to ANDAs, commented: "There is to be a prospective 5-year waiting period for *filing* of ANDA's following approval by FDA of a new chemical entity new drug application.  For all other NDAs involving new clinical tests, there will be a 3-year period

---

[11] *See also* 21 U.S.C. § 355(j)(5)(B)(iv)(I) (180-day exclusivity period barring approval of competing ANDAs), § 360cc(a)(2) (7-year orphan-drug exclusivity barring approval of competing drugs for the same rare disease or condition).

during which *no ANDA approval may be made effective*."  130 Cong. Rec. S23,765 (daily ed. Aug. 10, 1984) (emphasis added).

Genus agrees the statute is unambiguous but posits a different interpretation.  Specifically, Genus claims the statute unambiguously prohibits the approval of applications during the 5-year NCE exclusivity, but warns that discerning the statute's unambiguous meaning requires "parsing" the provision "at some length."  Pl.'s Mem. at 30.  The need to "parse" a provision "at some length" to discern its purportedly unambiguous meaning should give this Court pause.  As the Eighth Circuit observed more than one hundred years ago, "[t]he apparent and natural meaning of the terms of a statute is always to be preferred to any curious hidden signification deduced by the reflection and ingenuity of acute and powerful intellects.  Where the language of a statute is unambiguous, and its meaning plain, no room is left for construction."  *United States v. Missouri Pac. Ry. Co.*, 213 F. 169, 169 (8th Cir. 1914).

To begin with, Genus acknowledges that the phrase "no application . . . may be submitted under subsection (b) before the expiration of five years," unambiguously bars the submission of applications for 5 years.  Pl.'s Mem. at 22, 30 (citing 21 U.S.C. § 355(c)(3)(E)(ii)).  Genus also correctly recognizes that the statute establishes one circumstance where an applicant may submit an application 4 years after the exclusivity period began to run, as opposed to 5 years:  where the subsequent applicant includes a paragraph IV certification.  *Id.* at 30.  This is how the statute describes the exception:

> [A]n application may be submitted under subsection (b) after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in clause (iv) of subsection (b)(2)(A).

21 U.S.C. § 355(c)(3)(E)(ii).  Genus, however, misinterprets the second sentence of section 355(c)(3)(E)(ii).  That sentence states:

> The approval of **such an application** shall be made **effective in accordance with this paragraph** except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (C) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

(emphasis added).  Genus asserts that "such an application" refers to all applications potentially blocked by 5-year NCE exclusivity.  Pl.'s Mem. at 31.  But that is illogical.  The phrase "such an application" clearly refers to an application with a paragraph IV certification because the remainder of that sentence and the description of the exception in the previous sentence both relate to an application with a paragraph IV certification.

Genus then claims that the statement "[t]he approval of such an application shall be made effective in accordance with this paragraph" means that applications without paragraph IV certifications "may only be approved at a minimum after 'the expiration of five years' from the [NCE] drug's approval date."  Pl.'s Mem. at 31.  This also does not make sense.  21 U.S.C. § 355(c)(3)(E)(ii) does not bar the approval of applications for a minimum of 5 years—it simply bars the submission of a 505(b)(2) application for 5 years.  FDA, in the preamble to its proposed regulations implementing the Hatch-Waxman Amendments, explained the meaning of the second sentence of section 355(c)(3)(E)(ii).  In cases where an application may be submitted 4 years after approval of a drug with 5-year NCE exclusivity, FDA noted:

> because this exclusivity provision blocks only submission of a[] . . . 505(b)(2) application,  approval of the . . . 505(b)(2) application properly submitted after 4 years is not delayed by this provision, unless the patent owner initiates a lawsuit for patent infringement.  Where litigation is initiated, the . . . 505(b)(2) application may not be made effective by FDA for a total of 7 ½ years after the approval of the reference listed drug, unless the court holds the patent invalid or not infringed at an earlier date.

*Abbreviated New Drug Application Regulations*, 54 Fed. Reg. 28,898 (July 10, 1989).  FDA properly understood the statute in 1989: the phrase "[t]he approval of such an application shall be made effective in accordance with this paragraph," simply means that a subsequent application with a paragraph IV certification may be submitted after 4 years, and later approved in the regular course of review unless the patent owner initiates a lawsuit, in which case the approval of such an application (*i.e.*, one with a paragraph IV certification submitted after 4 years) will be delayed.

In an attempt to bolster its interpretation, Genus cites statements from *Otsuka Pharmaceutical Co., Ltd. v. Burwell*, 302 F. Supp. 3d 375 (D.D.C. 2016) ("*Otsuka I*"), and the Court of Appeals opinion affirming the district court's grant of summary judgment in FDA's favor, 869 F.3d 987 (D.C. Cir. 2017) ("*Otsuka II*"), which suggest that 5-year NCE exclusivity bars the approval of applications for 5 years.   But these statements are mere dicta. The *Otsuka* courts considered an entirely different issue related to the scope of the plaintiff's 3-year exclusivity; namely, whether the 3-year exclusivity for one drug would block the approval of a competing drug with a different active moiety.  *Otsuka I*, 302 F. Supp. 3d at 391; *see also Otsuka II*, 869 F.3d at 989.  Given the complexity of the FDCA's exclusivity provisions, courts sometimes speak imprecisely or otherwise misstate the scope of these provisions, particularly with respect to provisions that are not directly at issue in the case.  *See also Actavis Elizabeth LLC*, 625 F.3d at 762 (broadly describing all of the exclusivity provisions of 21 U.S.C. § 355,[12] including the 3-year exclusivity provision, as "preventing the submission of abbreviated applications").   Dicta aside, nothing in either *Otsuka* decision addresses the issue in this case, much less supports Genus's counter-textual effort to construe the 5-year NCE exclusivity provision to bar both the submission

---

[12] Because *Actavis* involved approval of an ANDA, the court there addressed the parallel exclusivity provisions in 21 U.S.C. § 355(j)(5)(F)(i)-(iv).  For all relevant purposes, those provisions are identical to the provisions at issue here.

and approval of applications during the exclusivity period.  *Cf. Ferring Pharms. v. Azar*, 296 F.

Supp. 3d 166, 170 (D.D.C. 2018) (explaining that NCE exclusivity "would have prevented other

drug manufacturers from submitting [ANDAs] and § 505(b)(2) NDAs of generic versions of [the

drug] for five years after the approval"); *Eisai, Inc. v. FDA*, 134 F. Supp. 3d 384, 386-87 (D.D.C.

2015) ("A company that obtains [NCE exclusivity] is entitled to a five-year period of exclusivity

during which would-be competitors cannot *apply* for approval of generic versions of that drug.")

(emphasis added).

Finally, Genus argues that FDA's interpretation is at odds with the purpose of the statutory

scheme because it could render 5-year NCE exclusivity less protective than other exclusivities,

including 3-year exclusivity.  Pl.'s Mem. at 33.  As support for this argument, Genus quotes

statements from *Otsuka II* and FDA that, according to Genus, recognize that the 5-year NCE

exclusivity is broader in scope than 3-year exclusivity.  There are different ways, however, in

which the exclusivity statutes may be broader or narrower in scope than one another.  In *Otsuka

II*, the court did not consider the amount of time afforded by the exclusivity provisions; rather, it

considered the range of drugs blocked by the 3-year exclusivity provision.  In that context, the

court observed that it would be odd for the 3-year exclusivity to block a broader range of drugs as

compared to the 5-year NCE exclusivity.  *Otsuka II*, 869 F.3d at 1001.  FDA's comment cited by

Genus also relates to the scope of drugs blocked by the exclusivity provisions.  *Abbreviated New

Drug Application Regulations*, 54 Fed. Reg. 28,872, 28,897 (July 10, 1989).  Moreover, as

discussed below, *see infra* page 25, in this same document cited by Genus, FDA recognized that

"any 505(b)(2) application submitted to FDA before the approval of another new drug application

that qualifies for exclusivity . . . is not affected by this exclusivity provision."  *Id.* at 28,901.  Thus,

FDA correctly recognized that while the 5-year NCE exclusivity provision is broader than the 3-year provision in some respects, it is not necessarily broader in every conceivable situation.

Genus follows by pointing out that, had Goprelto had been eligible for 3-year exclusivity because another applicant had obtained approval for cocaine first, FDA would not have been able to approve Numbrino for 3 years.  But that counterfactual does not mean that Genus has been "punished."  Pl.'s Mem. at 34.  Goprelto's 5-year NCE exclusivity will continue to block the submission of all cocaine applications until December 2022.[13]  If Goprelto had 3-year exclusivity, that exclusivity would have ceased to prevent approvals of any competing product as soon as it expired (in December 2020).  Genus also claims that it engaged in "more innovation (which involved not only new clinical investigations, but also creating a drug with a never-before approved active ingredient)," Pl.'s Mem. at 35, but it is not clear what this means.  It cannot mean that Genus created a novel, heretofore unknown molecule, because cocaine has been known and used for various purposes as a drug for well over a century.

In short, the statements Genus relies on do not address this unique circumstance, where two different drug companies submitted applications for drugs containing the same NCE before either had been approved.  Moreover, "neither courts nor federal agencies can rewrite a statute's plain text to correspond to its supposed purposes."  *Landstar Express Am., Inc. v. Fed. Maritime Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009).  Here, the statute's plain text does not prohibit the approval of an application during the 5-year NCE exclusivity period.

---

[13] Because FDA would need to review such applications, approval and market entry of those products would be delayed past December 2022.

**B. Even if the statute were ambiguous, FDA's interpretation is permissible under *Chevron* step two**

Even if this Court finds that the 5-year NCE exclusivity provision is ambiguous as to the precise question at issue and proceeds to *Chevron* step two, FDA's interpretation should be upheld. As the *Otsuka I* court recognized, "striking the desired balance between an innovator with an expansive exclusivity benefit (on the one hand) and a host of stifled future potential competitors (on the other) was a policy choice that Congress intended *the FDA* to make."  302 F. Supp. 3d at 404 (emphasis in original).  In this case, the therapeutic usefulness of cocaine had been widely known since at least 1884.  AR 2761-63.  And this explains why both Genus and Lannett submitted NDAs that rely, in part, on investigations they did not conduct to secure drug approval.  In responding to Genus's first Citizen Petition, FDA determined that the agency's finding—that Goprelto's NCE exclusivity did not bar approval of Lannett's application—is "consistent with the balance achieved by the Hatch-Waxman Amendments," explaining:

> The 505(b)(2) application pathway permits an applicant to rely on what is already known about a drug, thereby potentially reducing the types of studies an applicant needs to conduct or sponsor for approval of an application for a new drug.  In the present case, both Genus and Lannett submitted 505(b)(2) applications for their cocaine products that relied on published studies and reports concerning cocaine's use in the nasal and sinus surgery setting.  Therefore, as demonstrated in the present case, it is conceivable that more than one innovator company could develop a drug for a previously unapproved active moiety, particularly one that was historically marketed but unapproved, that has been used in medical practice in the United States or in a foreign country, and that such companies rely on published literature reports for approval.

AR 3155.  This outcome, according to FDA, "balances the equities in allowing a submitted but unapproved 505(b)(2) NDA to not be withdrawn even where another, similar 505(b)(2) NDA is approved first."  *Id.*

When interpreting the FDCA's exclusivity provisions, FDA may consider the Hatch-Waxman Amendment's dual purposes of promoting innovation and competition.  *See Otsuka I*,

302 F. Supp. 3d at 403-04 (explaining that requiring the exclusivity benefit to be limited based on active moieties of the relevant drugs encourages innovation and promotes competition).  And in considering those purposes, FDA is not required to interpret the exclusivity provisions in a manner that expands the scope of exclusivity.  *See, e.g.*, *Otsuka II*, 869 F.3d at 1000 (deferring to FDA's interpretation of the scope of exclusivity, which was narrower than the scope advocated by appellants); *Eisai*, 134 F. Supp. 3d at 387 (finding that FDA did not act arbitrarily and capriciously in interpreting a regulatory exception to narrow the scope of exclusivity under certain circumstances).

FDA has long understood the clear textual distinction between a bar on approval and a bar on submission, and recognized its implications in the context of concurrently pending applications. In proposing regulations governing ANDAs, FDA recognized that "any 505(b)(2) application submitted to FDA before the approval of another new drug application that qualifies for exclusivity under section 505(c)(3)(D)(ii)[14] is not affected by this exclusivity provision." *Abbreviated New Drug Application Regulations*, 54 Fed. Reg. 28,901 (July 10, 1989).  And in the preamble to its final rules on ANDAs, the agency explained that a pending application is not affected by the exclusivity provision because the 5-year NCE exclusivity provision "prohibits only the 'submission,' and not the approval, of a 505(b)(2) application." *Abbreviated New Drug Application Regulations*, 57 Fed. Reg. 17,955 (Apr. 28, 1992).  Accordingly, if the Court reaches *Chevron* step two, FDA's longstanding, reasonable interpretation—reiterated in the agency's response to Genus's Citizen Petitions—should be accorded deference.  *Barnhart v. Walton*, 535

---

[14] The 5-year NCE exclusivity provision was originally codified at 21 U.S.C. § 355(c)(3)(D)(ii) (1988).  The Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, § 1101(b)(2)(C), (D), 117 Stat. 2066, 2454, amended section 505 by, among other things, redesignating subparagraph (D) as subparagraph (E).

U.S. 212, 220 (2002) ("And this Court will normally accord particular deference to an agency['s] interpretation of 'longstanding' duration."); *Amgen Inc. v. Hargan*, 285 F. Supp. 3d 351, 372 (D.D.C. 2018) (upholding FDA's interpretation of the pediatric exclusivity provision as "eminently reasonable in light of the 'goals of the statute' and . . . 'rationally related to those objectives.'") (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999)).

### III.   FDA Reasonably Interpreted the 5-year NCE Exclusivity Provision to Permit Resubmission Following FDA's Complete Response Letter

Perhaps recognizing the flaws in its argument that the 5-year NCE exclusivity provision unambiguously bars approval of a subsequent application, Genus devotes most of its memorandum to its argument that 21 U.S.C. § 355(c)(3)(E)(ii) prohibited FDA from accepting Lannett's *resubmission* following FDA's complete response letter. For the reasons explained below, this Court should reject Genus's argument and uphold FDA's reasonable interpretation.

### A.  FDA's reasonable interpretation of the statute should be upheld under *Chevron* step two

Contrary to Genus's position, Congress has not directly spoken to the precise question at issue: whether a resubmission following a complete response letter is a "submission" of an "application" barred by the 5-year NCE exclusivity provision. At the time of enactment, complete response letters and resubmissions in response to them did not exist. Thus, Congress could not have considered whether a "resubmission" is a "submission" of an "application" prohibited by the statute. And, with a single, clerical exception, *see* note 14, *supra*, the text of the 5-year NCE exclusivity provision has not substantively changed since its enactment in 1984. Moreover, the FDCA does not define "submission," "resubmission," or "application," and therefore, does not provide guidance on how the statutory terms would unambiguously apply to this circumstance.

Because Congress has not spoken to the precise question at issue, this Court must uphold the agency's interpretation if it is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843. Here, FDA has permissibly interpreted the statutory phrase "no application . . . may be submitted under subsection (b)" not to bar a resubmission following a complete response letter.

A "resubmission" is a regulatory creation, developed and codified by FDA in 2008, almost 25 years after the enactment of the Hatch-Waxman Amendments. 21 C.F.R. §§ 314.110, 314.3(b). FDA's conclusion that a resubmission's unique features differentiate it from an application under section 505(b)(2) such that it is not barred by 5-year NCE exclusivity is reasonable. In support of this conclusion, FDA likened a resubmission to an amendment, rather than the submission of a 505(b)(2) application. AR 3149. Like an amendment, a resubmission *follows* an applicant's NDA submission and FDA's determination that the NDA is sufficient for filing. It responds to a complete response letter, in which FDA determines, after a cycle of review, that the application may not be approved in its present form. 21 C.F.R. § 314.110. The purpose of the complete response letter is to inform the applicant of specific deficiencies in an already-filed application and give the applicant an opportunity to address those deficiencies, withdraw the application, or request a hearing. *Id.* A resubmission does not require the applicant to "resubmit" any data or information already before FDA—but only those materials necessary to address the deficiencies spelled out in the letter. 21 C.F.R. § 314.3(b) (resubmission "in the context of a complete response letter is [a] submission by the applicant of all materials needed to fully address all deficiencies identified in the complete response letter"). Although a resubmission initiates a new review cycle with a new PDUFA goal (with a goal date of 2 or 6 months from receipt, depending on whether it is classified as Class 1 or 2), the goal timeframes are shorter than the 10-month goal applied to initial new drug

applications.  *See* PDUFA Goals Letter.  Finally, there is no filing determination for a resubmission.  MAPP 6020.4 at 2.

A resubmission may be contrasted with another option provided to the recipient of a complete response letter—withdrawing the application.  21 C.F.R. § 314.110(b)(2).  The regulation clarifies that withdrawing an application "is without prejudice to a subsequent submission."  *Id.*  Where an applicant withdraws an application, it is taken out of FDA's review queue (meaning there is no longer a pending application before the agency, unless and until the applicant files a new one).  And such a submission following withdrawal, unlike a resubmission, would be given a new submission date, require a new filing determination, and be subject to the longer PDUFA goal timeframe for review and action on an NDA.  A resubmission, on the other hand, does not take the application out of FDA's review queue, does not trigger a new submission date, does not require a filing determination, and is subject to a shorter review timeframe.

FDA's response to certain comments on its proposed complete response letter regulation buttresses the conclusion that a resubmission is more akin to an amendment than the submission of an application.  Commenters objected to a proposed definition that would have simply stated that an applicant could "resubmit the application . . .  addressing all deficiencies identified in the complete response letter."  *Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Application*, 73 Fed. Reg. 39,599 (July 10, 2008).  The commenters stated "that describing a resubmission without any qualifying language appears to require resubmission of the original application or supplement (as opposed to a resubmission limited to responses to the deficiencies listed in the complete response letter)."  *Id.*  In response, FDA confirmed that the intent of the regulation was not to require the resubmission of the entire application and explained that it "added a definition of resubmission . . . stating that a resubmission

is a submission by the . . . applicant of all materials needed to fully address all deficiencies identified in the complete response letter." *Id.*

As noted above, where there are ambiguities in the exclusivity provisions, Congress intended for FDA to interpret those provisions and to strike the desired balance between competition and innovation. *Otsuka I*, 302 F. Supp. 3d at 404. FDA's determination that the 5-year NCE exclusivity provision does not bar resubmissions reasonably furthers these goals. Genus argues that Lannett's application was so deficient that it should not have been filed at all, but, as demonstrated below, the record does not support that proposition. And, if accepted, Genus's argument that any deficiency leading to a complete response letter should automatically result in the subsequent application being withdrawn—and unable to be submitted again until after the 5-year exclusivity period has run—would cause the resources that the second-in-time applicant put into its application to be wasted. This would act as a disincentive to innovation and research in drug development because applicants who are in a similar situation would not be able to discern whose application would be approved first (recall that here, both applicants started their development programs many years before submitting their applications). It would also provide a windfall for the applicant who secured approval first. None of that would serve any discernible policy purpose. *Cf. Abbott Labs. v. Young*, 920 F.2d 984, 989 (D.C. Cir. 1990) ("Abbott's reading [of exclusivity] promotes neither the interests of the research-oriented pharmaceutical industry nor the generic drug industry in a rational way, producing instead a windfall depending on an accident of chemical nomenclature.").

FDA also reasonably took into account the fact that this situation is rare. As FDA explained, "[i]n the overwhelming majority of cases, a single innovator company investigates and develops a drug for a novel, previously unapproved active moiety, and subsequently submits a

505(b)(1) application for approval of that drug." AR 3154 n.84. It is not surprising, therefore, that this case raises issues of first impression, more than 35 years after the enactment of the Hatch-Waxman Amendments.

**B. The 5-year NCE exclusivity provision does not unambiguously prohibit FDA from accepting a resubmission following a complete response letter**

The Court should reject Genus's assertion that the plain language of the 5-year NCE exclusivity provision barred FDA from accepting Lannett's resubmission. As support, Genus cites dictionary definitions of "submission" and "resubmission" to make the point that a resubmission is a submission. Pl.'s Mem. at 23-24. This case, however, is not about a "resubmission" as a general matter. Instead, it is about the defined, regulatory term that applies to a specific set of circumstances. The question is not how a "resubmission," in the abstract, fits the statutory language, but whether FDA reasonably concluded that a "resubmission," as defined by 21 C.F.R. § 314.3(b), does not qualify as the submission of a 505(b)(2) application, and is not prohibited by the 5-year NCE exclusivity provision.

Genus then argues that a resubmission following a complete response letter "involves the submission of an 'application.'" Pl.'s Mem. at 24. In support of this position, Genus points out a number of ways in which, it asserts, the regulations treat a resubmission similarly to a 505(b)(2) application. For instance, Genus highlights that 21 C.F.R. § 314.50, governing the "content and format" of applications, provides that an applicant must submit an application form specifying "whether the submission is an original submission, a 505(b)(2) application, a *resubmission*, or a supplement to an application under § 314.70." Pl.'s Mem. at 24 (citing 21 C.F.R. § 314.50(a)(2)) (emphasis in original). Additionally, Genus points out that 21 C.F.R. § 314.60(a), titled "Submission of NDA," states that "FDA generally assumes that when an original NDA, supplement to an approved NDA, or *resubmission of an NDA* or supplement is submitted to the

30

Agency for review, the applicant believes that the Agency can approve the NDA, supplement, or resubmission as submitted." Pl.'s Mem. at 24-25 (emphasis in original). But contrary to Genus's argument, these regulations demonstrate that a resubmission is a distinct regulatory creation—listed separately in the regulations from a 505(b)(2) application.

Genus further argues that the procedures following a resubmission confirm that a resubmission is "the submission of an application." Specifically, Genus points out that a resubmission triggers a new review period with a new review goal date. Pl.'s Mem. at 25. But the new goal timeframe for FDA to review and act on a resubmission is shorter than the goal timeframe for FDA to review and act on an initial submission, underscoring the difference between resubmissions and original applications. S*ee* PDUFA Goals Letter at 4. Genus also claims that "just like how FDA inspects an initial application to determine whether it is complete enough to file, FDA similarly inspects a resubmitted application for completeness." Pl.'s Mem. at 25. To make that argument, Genus compares 21 C.F.R. § 314.101(d), which describes the standard for filing an NDA, with an FDA statement that the agency "will determine whether the resubmission constitutes a complete response that addresses all deficiencies in the complete response letter." AR 2774. But Genus's comparison is inapt; the agency's review of a resubmission is much more directed and limited, and it only examines whether the unresolved issues have been addressed. Moreover, a resubmission is not subject to a filing review. MAPP 6020.4 at 2 ("Applications for which an action has been taken are considered filed; therefore, no filing determination is made for resubmissions."). The only question is whether a resubmission fills the substantive holes in an existing application. Thus, FDA is clear that while both a 505(b)(2) application and a resubmission are subject to an initial review, the standards applied to them are not the same.

Genus also claims, incorrectly, that "FDA long ago recognized that [5-year NCE exclusivity] blocks 'resubmissions' following a [complete response letter]," citing 21 C.F.R. § 314.60(c)(2) out of context.  Pl.'s Mem. at 25.  The regulation, 21 C.F.R. § 314.60(c), prohibits *amendments* to an unapproved new drug application in circumstances not present here.  Specifically, this provision seeks to prevent any subsequent applicant from amending its application to explicitly rely for approval on published reports of investigations in a previously approved application during the 5-year NCE exclusivity period.  21 C.F.R. § 314.60(c).  After setting forth these conditions, 21 C.F.R. § 314.60(c)(2) provides that:

> The submission of an amendment described in paragraph (c)(1) of this section will cause the unapproved NDA to be deemed to be withdrawn by the applicant under [21 C.F.R.] § 314.65 on the date of receipt by FDA of the amendment.  The amendment will be considered a resubmission of the NDA, which may not be accepted except as provided in accordance with [the FDCA] section 505(c)(3)(E)(ii).

Read in context, it is clear that the clause "which may not be accepted except as provided in accordance with [FDCA] section 505(c)(3)(E)(ii) [the statutory 5-year NCE exclusivity provision]" applies only to amendments described in 21 C.F.R. § 314.60(c)(1), where a subsequent applicant must amend its application to include a study or studies published by the applicant of a drug with 5-year NCE exclusivity.  Moreover, *expressio unius est exclusio alterius*: the single, specific exception expressed in 21 C.F.R. § 314.60(c)(1) demonstrates FDA's long-held understanding that in any other circumstance, an unapproved 505(b)(2) application may be amended (and subsequently approved) despite another NDA's 5-year NCE exclusivity.

Finally, Genus contends that FDA's acceptance of Lannett's resubmission should be rejected "because it would be inconsistent with Congress's carefully constructed statutory scheme" because, according to Genus, a company could undermine a competitor's exclusivity by filing a "bare-bones," "incomplete, placeholder application" before the competitor's drug is approved and

then "conduct the requisite studies and investigations" after receiving a complete response letter from FDA.  Pl.'s Mem. at 28-29.  Genus's argument, however, ignores the regulatory requirements for filing an application and the reality of the time and effort required to prepare an application that clears FDA's filing threshold.  Under 21 C.F.R. § 314.101(a)(1), FDA must make "a threshold determination that the NDA is sufficiently complete to permit a substantive review."  FDA may refuse to file an NDA for a number of reasons, including because the NDA does not on its face contain information required by statute and regulation.  21 C.F.R. § 314.101(d).  The FDCA, 21 U.S.C. § 355(b), requires, among other things, that an application shall include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use."  Contrary to Genus's hypothetical, an applicant cannot defeat a competitor's potential 5-year NCE exclusivity by quickly compiling a "placeholder" application because FDA would refuse to file such an application.

The timing and substance of Lannett's application illustrate this point well.  Lannett and FDA held a pre-IND meeting in December 2009 regarding its cocaine hydrochloride topical solution 4% and 10%.  AR 1426-37.  In January 2015, FDA and Lannett met to discuss Lannett's IND application.  AR 1438-39.  Two years later, in January 2017, Lannett requested a meeting with FDA to discuss submission of a 505(b)(2) NDA for cocaine hydrochloride 4% and 10%.  AR 1450.  Before filing its NDA, Lannett conducted two Phase 3 clinical trials to assess the safety and effectiveness of the drug.  AR 1858-59.  In these studies, 316 patients received the drug in 4% strength, 318 patients received it in 10% strength, and 168 patients received a placebo.  AR 2727.  Although FDA ultimately determined during its substantive review that Lannett's application required certain additional data for approval, the application was clearly not a "bare bones" or "placeholder" application lacking studies at the filing stage.  The essential data permitting the

agency to assess safety and effectiveness were present; FDA asked for further information to address certain limited aspects of Lannett's application that did not meet the approval standard. Genus significantly overstates the negative consequences that could result from upholding FDA's approval of Numbrino, and has not provided a compelling argument that FDA's interpretation of applicable statutory and regulatory provisions should be disturbed.

## IV.   FDA Did Not Act Arbitrarily and Capriciously by Accepting Lannett's Application for Filing

Genus claims that FDA did not apply the same filing criteria to Genus's and Lannett's applications, in violation of the APA.[15]   *See* Pl.'s Mem. at 16 (citing 5 U.S.C. § 706).   Specifically, Genus contends that FDA treated the applications differently with respect to three categories of information: (1) the pharmacokinetics ("PK") and dosing of their drugs in hepatically and renally impaired populations and in geriatric patients; (2) the QT prolongation potential of the drugs; and (3) the potential of the drugs' container closure systems to leach compounds into the drug products. *See* Pl.'s Mem. at 17-20.   Genus, however, fails to meet its burden of proof because its claims are not supported by the record.   *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) ("The party challenging an agency's action as arbitrary and capricious bears the burden of proof.") (citing *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000)).   In an administrative record spanning thousands of pages, Genus has failed to point to any document

---

[15] Genus focuses almost wholly on FDA's decision to file Lannett's NDA.  *See, e.g.*, Pl.'s Mem. at 10 (FDA "required painstaking and lengthy submissions from Genus . . . prior to accepting Genus's submission," but did not "apply the same acceptance criteria to Lannett's application."), *id.* at 21 (asserting that "FDA should never have accepted Lannett's application").  Though Genus also makes passing reference to the subsequent approval of Lannett's application, it does not make a serious effort to explain why Lannett failed to meet the approval standards.  Courts need not address "conclusory or skeletal arguments."  *Reep v. U.S. Dep't of Justice*, No. 18-5132, 2018 WL 6721099, at *2 (D.C. Cir. Dec. 18, 2018) (unpublished) (citing *Davis v. Pension Benefit Guar. Corp.*, 734 F.3d 1161, 1166-67 (D.C. Cir. 2013)).  In any event, FDA has also explained at length why Lannett's NDA met the approval standard.  AR 3591-92, 3609-16, 3617-22.

which demonstrates that FDA applied a more lenient standard, or showed preferential treatment, to Lannett. To the contrary, the record clearly shows that the differences Genus identifies between the companies' NDAs result not from a different standard applied by FDA but, rather, different choices made by the companies to fulfill the regulatory filing requirements.

FDA informed both applicants that they must provide "a complete clinical pharmacology package," including PK information in hepatically and renally impaired patients and geriatric patients, and information on QT prolongation potential. AR 211-12 (advice to Genus), AR 1500-01 (advice to Lannett). Such information could come from one of three sources: (1) dedicated studies, (2) sub-population analyses in Phase 3 studies, and (3) published literature from the public domain. *Supra* pages 11-12. Genus admits that FDA gave each party these same three options. Pl.'s Mem. at 17, 19. Genus also admits that with respect to leachables, Genus and Lannett "were . . . given a materially identical instruction that, in order to file their application, they would have to complete specified risk assessments regarding potential leachables." *Id.* at 19.

It is undisputed that the parties were provided the same instructions regarding each of these three aspects of their applications. The question, then, is whether FDA applied its filing standard differently upon receipt of each NDA. The record reveals that it did not. As discussed earlier, there is a distinction between, on the one hand, deficiencies in an application that render it unreviewable and support a refusal-to-file decision and, on the other hand, deficiencies classified as review issues, which concern the ultimate approvability of an application. *See supra* pages 7-8. Consistent with the filing standard, FDA determined that both applications contained review issues, but neither application was incomplete (meaning, unreviewable) on its face. Likewise, in both cases FDA informed Genus and Lannett of review issues it identified. There was no disparate treatment between the two applications. And because the agency's filing decisions are based on

FDA's technical and scientific expertise, they should be accorded even greater deference.  *See Troy Corp.*, 120 F.3d at 283.

### A. FDA applied the same filing standard to Genus's and Lannett's applications regarding pharmokinetic and dosing information in hepatically and renally impaired patients

Genus complains that Lannett's application lacked dedicated studies to address PK and dosing in hepatically and renally impaired patients.  Pl.'s Mem. at 18.  But, as Genus acknowledges, *id.* at 17, conducting dedicated studies was not the only way to provide the requisite information about these populations.  AR 211-12, 1500-01, *see* AR 3634-36.  FDA informed both Genus and Lannett that they could provide the necessary clinical pharmacology information by either conducting dedicated studies, using subpopulation analyses from other studies, or relying on published literature.  *Id.*, *see generally* AR 3628-38.  Lannett's application did not contain any such studies because Lannett availed itself of a different option (which was also available to Genus) to submit the necessary information—published literature.  AR 1855-57.  Genus is thus wrong to the extent that it claims that Lannett's application should not have been filed because it lacked such studies.[16]

In support of its argument that it was treated unfairly, Genus also claims that, in April 2015, it "initially expressed that it did not believe special population information was relevant, and so requested permission to forgo this requirement.  FDA explicitly rejected that request."  Pl.'s Mem.

---

[16] Genus makes a cursory allegation that while Genus provided a subpopulation analysis for geriatric patients, Lannett did not include any information on such patients.  Pl.'s Mem. at 18.  To the contrary, Lannett provided a justification that "[p]lasma cocaine concentrations are not expected to be affected by age," ARSUPP 11851, referred to the safety signals across different age groups it detected in its Phase 3 clinical study, ARSUPP 11876, and based dosing recommendations for geriatric patients on vascular side effects observed in its clinical studies.  ARSUPP 11857.  This provided sufficient information for substantive review, and thus met the filing standard.

at 18 (citing AR 245). Genus then suggests that, as a result of that rejection, Genus had to conduct PK studies in hepatically and renally impaired patients. *Id.*[17] This is incorrect for two reasons. First, Genus did not request permission to forgo providing *information* regarding special populations; it requested permission to forgo special population *studies*. AR 245. Second, FDA did not reject Genus's request. It simply informed Genus that it "must provide justification as to why special population studies are not relevant to their product." *Id.* Genus, however, chose not to provide a justification, and instead opted to perform the studies. If Genus "did provide evidence in its NDA (be it from applicant-generated data or literature) demonstrating minor systemic absorption for its product, that could potentially have served as the scientific justification for why special population studies were not relevant for Goprelto, but Genus ultimately did not provide such evidence." AR 3605. Moreover, Genus's internal emails demonstrate that, in July 2016, more than one year after the meeting where FDA allegedly rejected its request to rely on literature, Genus was considering providing a justification for why Genus did not expect its drug to have an effect on renal or hepatically impaired patients. *See* AR 3567-71; *see also* AR 3590. Thus, Genus's claim that it was required to "dutifully perform[] and submit[] studies addressing all of these topics," or face a refuse-to-file determination is simply wrong. Pl.'s Mem. at 9. To the contrary, the record demonstrates Genus independently chose to conduct dedicated PK studies in hepatically and renally impaired patients. Lannett, on the other hand, chose a different option and

---

[17] Genus made a similar claim in its Citizen Petition, citing the same 2015 meeting. AR 3161. In a later-filed supplement, Genus also claimed that it had to conduct the same studies as a result of a 2016 teleconference with FDA. AR 3552. As FDA explained in its Petition response, neither the 2015 meeting minutes nor internal Genus emails about the 2016 teleconference establish that FDA required Genus to conduct such studies, or that FDA rejected Genus's initial proposal to rely on literature in lieu of such studies. AR 3634-36.

relied on published literature.[18]  Both parties provided sufficient data to permit substantive review.

Thus, both were subject to, and met, the same filing standard.

### B.  Lannett's QT prolongation potential data met the filing standard

Genus also asserts that FDA treated the applications differently with respect to information

on QT prolongation potential.  Specifically, Genus claims that it conducted a dedicated QT

prolongation study while FDA filed Lannett's NDA despite knowing Lannett's approach to

providing QT-prolongation information (a sub-population analysis) was flawed.  Pl.'s Mem. at 20.

But Genus's argument overlooks the fact that, in making a filing determination, FDA determines

whether an application is complete on its face, but does not assess whether the information an

applicant submits is sufficient to support approval.  *See* 21 C.F.R. § 314.101(a).  Genus

inappropriately conflates the filing and approval standards when it attempts to rely on FDA's later

determination that Lannett's QT-prolongation analysis was inadequate as evidence of improper

filing.  *E.g.*, Pl.'s Mem at 20 ("After the filing, FDA then confirmed that Lannett's QT prolongation

data was inadequate.").

Genus additionally claims that FDA requested a specialist team to review Lannett's QT

prolongation data because FDA recognized that Lannett's data was problematic.  Pl.'s Mem at 20.

Yet, FDA also requested a specialist team to review Genus's dedicated QT prolongation study.

_____

[18] Genus also alleges that Lannett's application did not "provide full articles to guide dosing in
these patients," and suggests FDA should have refused to file Lannett's application as a result.
Pl.'s Mem at 18 (citing AR 1915).  But that is not correct.  Lannett included full articles for the
published studies that it relied on in its NDA.  AR 1927, *see, e.g.*, AR 3619-20 (explaining
Lannett's rationale for its recommended dosing in hepatically impaired patients and describing the
literature Lannett included in its NDA).  Genus appears to be referring to FDA's request for
additional literature to help guide dosing in such patients.  FDA's request for "full articles" thus
refers to any literature submitted as a result of that literature search.  Lannett later responded by
stating that it had conducted "*additional* literature searches" for PK data in patients with hepatic
impairment, and renal impairment, but could not locate additional data.  AR 1994 (emphasis
added).

AR 513-48.  It is standard review practice to seek a consult with the Interdisciplinary Review Team for QT Studies when applicants submit an evaluation of the potential of their drug product to cause irregular heart rhythms.  *See generally* FDA, Manual of Policies and Procedures 6020.14, *Interdisciplinary Review Team for QT Studies* (2012), *available at* https://www.fda.gov/media/72745/download;  FDA, *Interdisciplinary Review Team for Cardiac Safety Studies*, *available at* https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/interdisciplinary-review-team-cardiac-safety-studies-formerly-qt-irt.  Lannett opted to submit a subpopulation analysis of its Phase 3 clinical data to evaluate the QT prolongation potential of its drug—a common and acceptable approach.  AR 1857, 3607-08.  Thus, rather than undercutting FDA's decision to file Lannett's application, the fact that there was substantive QT data for FDA to review reinforces that Lannett's application was sufficiently complete to file.

### C.  Later discovered deficiencies in Lannett's leachables data did not require a refuse-to-file decision

Finally, Genus claims that the parties were treated differently because Lannett's leachables studies were ultimately found to be deficient.  Pl.'s Mem. at 19.  This argument again fails to acknowledge the distinction between filing and substantive review.  Deficiencies identified during the substantive review for Numbrino have no bearing on whether the application contained sufficient data at the filing stage to permit that review.  *See* Pl.'s Mem. at 19 (citing deficiencies identified in a June 2018 review to assert that FDA should not have filed Lannett's NDA in November 2017).  The record demonstrates that both applicants submitted a "toxicology risk assessment for leachables [that] was considered sufficient to support a substantive review."  AR 3584, *see* AR 1474.  As FDA explained:

> During the filing review, OPQ [Office of Pharmaceutical Quality] checks if the extractables/leachables information is present (usually a performed study). If the study was performed and the application contains the data, then OPQ considers the

application fileable. From OPQ's perspective, there is typically sufficient time during the review phase to address any deficiencies identified with the data submitted. Regarding the respective cocaine hydrochloride applications at issue here, both Genus and Lannett included extractables/leachables studies in their NDAs. Applying the same standard to both NDAs, OPQ determined that each NDA was fileable because each NDA included extractables and leachables studies. Whether the information submitted was sufficient to support approval was a review issue, not a filing issue.

AR 3583-84. Based on the fact that Lannett submitted relevant leachables studies and a toxicology risk assessment, there was sufficient data to permit substantive review, and to file Lannett's application.

In short, because FDA applied the same standard to Genus's and Lannett's applications, and the record explains the differences between the applications based on the choices each company made to fulfill the filing requirements, Genus's claim that FDA held the companies to different filing standards fails. *See, e.g.*, *Amgen, Inc. v. Azar*, 290 F. Supp. 3d 65, 70-71 (D.D.C. 2018) (upholding FDA's decision to recognize pediatric exclusivity decision for one applicant while denying to another because the agency applied the same standard to both parties).

## CONCLUSION

For all the reasons stated above, the Court should dismiss Genus's complaint, deny Genus's motion for summary judgment and grant judgment in favor of the Federal Defendants.

Dated:  May 6, 2020                                     Respectfully submitted,

Of Counsel:                                              JOSEPH H. HUNT
                                                         Assistant Attorney General
ROBERT P. CHARROW                                        Civil Division
U.S. Department of Health
and Human Services                                       ETHAN P. DAVIS
                                                         Principal Deputy Assistant Attorney General
STACY CLINE AMIN

Chief Counsel
Food and Drug Administration
Deputy General Counsel
U.S. Department of Health
and Human Services

ANNAMARIE KEMPIC
Deputy Chief Counsel, Litigation
Food and Drug Administration

MUSTAFA ÜNLÜ
Food and Drug Division, OGC
Office of the Chief Counsel, FDA
White Oak 31 Room 4428
10903 New Hampshire Ave.
Silver Spring, MD 20903
(301) 796-3396

GUSTAV W. EYLER
Director

ANDREW E. CLARK
Assistant Director

/s/ Kathleen B. Gilchrist
KATHLEEN B. GILCHRIST
D.C. Bar No. 230445
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice, Civil Division
P.O. Box 386
Washington, D.C. 20044-0386
(202) 305-0489
Kathleen.b.gilchrist@usdoj.gov