**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GENUS LIFESCIENCES, INC.,    ) | |
|    ) | |
|    Plaintiff,    ) | |
|    ) | |
|    v.    ) | |
|    ) | |
| ALEX AZAR, et al.,    ) | |
|    ) | Case No. 1:20-cv-00211-TNM |
|    Defendants,    ) | |
|    ) | |
|    v.    ) | |
|    ) | |
| LANNETT CO., INC.,    ) | |
|    ) | |
|    Intervenor-Defendant.    ) | |
|    ) | |

**INTERVENOR-DEFENDANT LANNETT CO., INC.'S
REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARD ......................................................................................... 2

III.   BACKGROUND .................................................................................................. 3

     A.     NCEE and the FDCA ............................................................................. 3

     B.     NDA Process .......................................................................................... 5

     C.     Procedural History ................................................................................. 7

IV.   DISCUSSION .................................................................................................... 10

     A.     FDA's Approval Of Lannett's NDA Was Not Contrary To The FDCA
            (Contrary To Genus's Claim III) ........................................................ 10

          1.     Step 1: § 505(c)(3)(E)(ii) is not ambiguous and permits NDA
                approval............................................................................... 12

               a)     *The statutory language* ............................................. 12

               b)     *Legislative History* .................................................... 16

          2.     Step 2: If § 505(c)(3)(E)(ii) is ambiguous, FDA reasonably
                interpreted it as permitting approval of an NDA during an NCEE
                period. ................................................................................. 17

          3.     Genus's policy argument cannot save it. .................................. 20

     B.     Lannett's Submission Of Information In Response To FDA's CRL Was
            Not A Submission Barred By § 505(c)(3)(E)(ii) (Contrary To Genus's
            Claim II)............................................................................................... 22

          1.     FDA is entitled to deference under *Auer* and the *Kisor* factors. ............... 23

          2.     The first *Kisor* factor shows FDA is entitled to deference. ..................... 24

          3.     The remaining *Kisor* factors show FDA is entitled to deference............. 26

     C.     FDA Did Not Engage in Disparate and Preferential Treatment (Contrary to
            Genus's Claim I) .................................................................................. 29

          1.     Acceptance of Lannett's NDA was not arbitrary or capricious. ............... 29

          2.     Lannett's NDA included all the documents required to be
                approved............................................................................... 30

          3.     Numbrino's label conforms with FDA guidance..................................... 32

V.     CONCLUSION................................................................................................. 35

4831-7792-3772.1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Astrue v. Capato ex rel. B.N.C.*,
    566 U.S. 541 (2012)................................................................................................16

*\*Auer v. Robbins*,
    519 U.S. 452 (1997)................................................................1, 2, 3, 23, 26, 28

*\*Azar v. Allina Health Services*,
    139 S. Ct. 1804 (2019)...................................................................................13, 14

*Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*,
    515 U.S. 687 (1995)................................................................................................13

*\*Chevron U.S.A., Inc. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984).................................................1, 2, 3, 11, 12, 17, 20

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)................................................................................................12

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009)...............................................................13, 17, 18, 19

*Hosp. of the Univ. of Pa. v. Sebelius*,
    847 F. Supp. 2d 125 (D.D.C. 2012)...........................................................................3

*I.N.S. v. Cardozo-Fonseca*,
    480 U.S. 421 (1987).........................................................................................12, 16

*\*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .............................................................3, 23, 24, 26, 27, 28

*Otsuka Pharm. Co., Ltd. v. Burwell*,
    302 F. Supp. 3d 379 (D.D.C. 2016)...................................................................3, 4, 15

*Otsuka Pharm. Co., Ltd. v. Price*,
    869 F.3d 987 (D.C. Cir. 2017).....................................................................................15

*Russello v. United States*,
    464 U.S. 16 (1983).............................................................................................13, 14

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006)................................................................................3

4831-7792-3772.1

*United States v. Villanueva-Sotelo*,
  515 F.3d 1234 (D.C. Cir. 2008) ........................................................................12

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) .....................................................................18, 19

*Your Home Visiting Nurse Servs., Inc. v. Shalala*,
  525 U.S. 449 (1999)...............................................................................17, 18, 19

*Zevallos v. Obama*,
  793 F.3d 106 (D.C. Cir. 2015) .........................................................................2

## Statutes

5 U.S.C.
  §§ 706(2)(A) ...............................................................................................2
  §§ 706(2)(C) ...............................................................................................2

Federal Food, Drug, and Cosmetic Act § 505 (21 U.S.C. § 355)
  § 505...................................................................................................5, 29
  § 505(b)...................................................................................................29
  § 505(b)(1) .................................................................................................4
  § 505(b)(2) .................................................................................................4
  § 505(c)(3)(D)(ii) ..................................................................................10, 18
  § 505(c)(3)(E) .............................................................................................19
  § 505(c)(3)(E)(i) .....................................................................................4, 14
  § 505(c)(3)(E)(ii) ..............................4, 5, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22, 23, 24
  § 505(c)(3)(E)(iii) ..............................................................................4, 14, 15
  § 505(c)(3)(E)(iii)(E)(iv) ...............................................................................14
  § 505(c)(3)(E)(iv) ....................................................................................4, 15
  § 505(c)(3)(E)(v) ........................................................................................14

## Regulations

21 C.F.R.
  § 201.56 (a)(1) ...........................................................................................32
  § 314.......................................................................................................10
  § 314.3.................................................................................................25, 26
  § 314.50...........................................................................................6, 25, 26, 29
  § 314.50(a) ................................................................................................25
  § 314.50(a)(1) .............................................................................................26
  § 314.50(a)(2) .............................................................................................26
  § 314.60.................................................................................................25, 26
  § 314.70.................................................................................................25, 26
  § 314.101 ..................................................................................................26
  § 314.101(a)(1) ...........................................................................................29
  § 314.101(d)(3) .....................................................................................6, 26, 29

iv

§ 314.101(f)...................................................................................................7
§ 314.105.......................................................................................................7
§ 314.110.....................................................................................7, 24, 26 28
§ 314.110(b)..................................................................................................7
§ 314.120.....................................................................................................28

## Rules

Fed. R. Civ. P. 56.........................................................................................3

## Other Authorities

54 Fed. Reg. 17,950 (April 28, 1992) .................................................10, 18

57 Fed. Reg. 28,872 (July 10, 1992) ..........................................................18, 28

73 Fed. Reg. 39,588 (July 10, 2008) ........................................................28

130 Cong. Rec. 15,847 (1984) ....................................................................16

130 Cong. Rec. 23,767 (1984) ....................................................................16

130 Cong. Rec. 23,769 (1984) ....................................................................16

130 Cong. Rec. 24,425 (1984) ....................................................................21

*CDER: The Consumer Watchdog for Safe and Effective Drugs*, FDA.gov,
    https://www.fda.gov/drugs/drug-information-consumers/cder-consumer-
    watchdog-safe-and-effective-drugs (last updated May 4, 2016) ...............................27

FDA, CITIZEN PETITIONS AND PETITIONS FOR STAY OF ACTION SUBJECT TO
    SECTION 505(Q) OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT GUIDANCE
    FOR INDUSTRY 15-26 (2019), https://www.fda.gov/media/130878/download .......................22

FDA, CLINICAL PHARMACOLOGY SECTION OF LABELING FOR HUMAN
    PRESCRIPTION DRUGS AND BIOLOGICAL PRODUCTS—CONTENT AND FORMAT
    GUIDANCE FOR INDUSTRY 11 (2016),
    https://www.fda.gov/media/74346/download...........................................................32

FDA, GUIDANCE FOR INDUSTRY, PHARMACOKINETICS IN PATIENTS WITH IMPAIRED
    HEPATIC FUNCTION: STUDY DESIGN, DATA ANALYSIS, AND IMPACT ON DOSING
    AND LABELING (2003), https://www.fda.gov/media/71311/download ............................33, 34

FDA, GUIDANCE FOR INDUSTRY, PHARMACOKINETICS IN PATIENTS WITH IMPAIRED
    RENAL FUNCTION—STUDY DESIGN, DATA ANALYSIS, AND IMPACT ON DOSING
    AND LABELING (2010), https://www.fda.gov/media/78573/download ....................................33

FDA, PDUFA Reauthorization Performance Goals and Procedures
  Fiscal Years 2013 through 2017 5-15 (2011),
  https://www.fda.gov/media/81306/download............................................................6, 7, 30, 31

FDA, Refuse to File: NDA and BLA Submissions to CDER Guidance for
  Industry 1 (2017), https://www.fda.gov/media/109758/download......................6, 28, 29, 30

Fed. Trade Comm'n, Comment on the Food and Drug Administration's Revised
  Draft Guidance on Citizen Petitions (Dec. 2018),
  https://www.ftc.gov/system/files/documents/advocacy_documents/federal-trade-commission-
  comment-food-drug-administrations-revised-draft-guidance-industry-
  entitled/p013510_ftc_comment_regarding_fdas_revised_draft_guidance_12-3-18.pdf.........22

H.R. Rep. No. 98-857, part I (1984) ..............................................................................................4

Merriam-Webster.com, https://www.merriam-webster.com/dictionary/submit
  (last visited May 4, 2020) ......................................................................................................13

vi

## I.    <u>INTRODUCTION</u>

Contrary to Genus's argument, Food and Drug Administration ("FDA")'s approval of Lannett's New Drug Application ("NDA") for Numbrino was in compliance with the statutory and regulatory scheme articulated by Congress and the FDA.  The plain, unambiguous language of the Federal Food, Drug, and Cosmetic Act ("FDCA") permitted FDA to accept Lannett's NDA for Numbrino prior to the commencement of Genus's New Chemical Entity exclusivity ("NCEE") period, and permitted FDA's subsequent approval of Lannett's NDA.  ████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ Lastly, the FDA treated both parties fairly and equally████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████

Genus's motion for summary judgment (Dkt. 23-1) fails to even mention that FDA has fully considered—and rejected—Genus' arguments.  Specifically, Genus has filed two Citizen Petitions ("CPs") with FDA seeking to have FDA reject Lannett's application for the same reasons it now advances to this Court.  Then Genus fails even to mention the standards the Supreme Court established in *Chevron* and *Auer* under which a court reviews an agency action, such as the FDA's approval of Lannett's NDA challenged here.  Those standards require the Court, under *Chevron*, to defer to FDA's reasonable interpretation of the FDCA, even if the FDCA were ambiguous (which it is not).  Second, *Auer* deference requires the Court to defer to FDA as to its reasonable interpretation of its own regulations including what it meant by "submission" or "resubmission."  Third, FDA's actions are only arbitrary and capricious if the agency acted unreasonably.  FDA's

interpretation of the statute and the regulations at issue in this case are set forth in detail in FDA's denial of the two Genus CPs.  At every turn, FDA acted reasonably and not arbitrarily and capriciously.  Each of Genus's counts brought under the Administrative Procedure Act ("APA"), fail.

Because Genus's attempt to re-interpret FDA's interpretation of the statute and the applicable regulations fail the *Chevron* and *Auer* thresholds and requirements, Genus argues a skewed view of policy.  But policy is not on Genus's side either: contrary to what Genus would have this Court believe, Genus's Goprelto was not the result of innovation and pioneering.  Genus's Goprelto and Lannett's Numbrino are cocaine hydrochloride products indicated for anesthesia. ███████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████ Lannett respectfully requests this Court grant the Defendants summary judgment in full, and deny Genus's request for same.

## II.     LEGAL STANDARD

When courts "examine an agency's decision," they "apply the APA's highly deferential standard, meaning that [they] may set aside [agency] action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (internal quotations omitted); *see* 5 U.S.C. §§ 706(2)(A), (C) (courts are to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as agency action "in excess of statutory

2

jurisdiction, authority or limitations, or short of statutory right").  In a case involving review of final agency action under the APA, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Hosp. of the Univ. of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 133 (D.D.C. 2012).  The summary judgment standard in Federal Rule of Civil Procedure 56 does not apply to cases challenging agency actions under APA standards "because of the limited role of a court in reviewing the administrative record."  *Id.; see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (same).

Moreover, FDA's interpretations of a statute must be analyzed with the framework of *Chevron U.S.A., Inc. v. Nat. Res. Def. Council,* 467 U.S. 837 (1984).  This framework states that the court, and agency, must give effect to the "unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 843.  If the statute is silent or ambiguous, then the court must defer to a reasonable interpretation by the agency.  *See id.* at 843-44.  An agency also has latitude to interpret its own regulations, and that agency interpretation is controlling unless "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citation omitted).  Once an agency has met the five factors set forth in *Kisor v. Wilkie*, its interpretation is entitled *Auer* deference.  139 S. Ct. 2400, 2415-18 (2019).

## III.    BACKGROUND

### A.    NCEE and the FDCA

The Drug Price Competition and Patent Term Restoration Act (commonly referred to as the "Hatch-Waxman Act") was passed in 1984 as an amendment to the FDCA and with a purpose to balance (1) "introducing pioneering research and development of new drugs" and (2) "enabling competitors to bring low-cost, generic copies of those drugs to market."  *Otsuka Pharm. Co., Ltd.*

3

*v. Burwell*, 302 F. Supp. 3d 379, 382 (D.D.C. 2016).  The Hatch-Waxman Act created a new 505(b)(2) application that permit an applicant to rely on scientific studies they did not conduct themselves.  *See* FDCA § 505(b)(2) (codified at 21 U.S.C. § 355(b)(2)); A.R. at FDA003142 (FDA response to Genus's first CP summarizing the history of the Hatch-Waxman Act).  In contrast, the traditional 505(b)(1) application requires the applicant to perform original investigations for all aspects of the drug.  See FDCA § 505(b)(1).  Additionally, under the Hatch-Waxman Act, new drug research is incentivized through exclusivity periods.  *See* H.R. Rep. No. 98-857, part I, at 14-15 (1984); A.R. at FDA003143 (FDA response to Genus's first CP highlighting these incentives). There were a variety of exclusivities created, ranging from three to ten years depending on the situation.  *See* FDCA §§ 505(c)(3)(E)(i-iv).

The disputed clause in this case is § 505(c)(3)(E)(ii).  This clause grants a type of exclusivity, NCEE, to an applicant whose drug contains an active ingredient that has not yet been approved in any other application.  The language of § 505(c)(3)(E)(ii) is most easily understood by dividing the text in to an "eligibility clause," shown below with italics, a "bar clause," shown below underlined, and a "patent clause," shown below in plain text.  *See Otsuka Pharm. Co.*, 302 F. Supp. 3d at 392 (using "eligibility clause" and "bar clause" to explain the three-year exclusivities granted by §§ 505(c)(3)(E)(iii) and (iv)).

> *If an application submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), is approved after September 24, 1984,* <u>no application which refers to the drug for which the subsection (b) application was submitted and for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted may be submitted under subsection (b) before the expiration of five years from the date of the approval</u>

4

of the application under subsection (b), except that such an
application may be submitted under subsection (b) after the
expiration of four years from the date of the approval of the
subsection (b) application if it contains a certification of patent
invalidity or noninfringement described in clause (iv) of subsection
(b)(2)(A). The approval of such an application shall be made
effective in accordance with this paragraph except that, if an action
for patent infringement is commenced during the one-year period
beginning forty-eight months after the date of the approval of the
subsection (b) application, the thirty-month period referred to in
subparagraph (C) shall be extended by such amount of time (if any)
which is required for seven and one-half years to have elapsed from
the date of approval of the subsection (b) application.

FDCA § 505(c)(3)(E)(ii).  The eligibility clause describes which applications qualify for the

NCEE: any application approved after September 24, 1984 for a drug for which no active

ingredient has been approved previously in a different drug application.  *See id.*  The bar clause

sets out the length of the NCEE (five years) and what is prohibited (an application being

submitted).  *See id.* ("no application . . . may be submitted . . . before the expiration of five years").

The bar clause also describes the type of application that is being barred as one "which refers to

the drug [with the NCEE]" and which relies on, for approval, investigations that were not

conducted by the applicant.  *Id.*  The final section, the patent clause, lays out the procedures for a

subsequent applicant when the NCEE holder also has patent protection for the approved drug and

the new application contains a certification of patent invalidity or noninfringement.  *See id.*

   **B.**   **NDA Process**

      In order to market a drug, a pharmaceutical company must submit, and FDA must approve,

an NDA.  *See* FDCA § 505.  This can be the longer, more rigorous 505(b)(1) application where

applicants conduct the nonclinical and clinical studies to support approval or the shorter 505(b)(2)

application where applicants rely in part or in full on studies not conducted by the applicant to

support approval.  *See id.*  In order to streamline the review process, FDA created a pre-submission

meeting process whereby a potential applicant can have its plans to develop the data to support an NDA reviewed by FDA prior to actual submission.   FDA, PDUFA REAUTHORIZATION PERFORMANCE GOALS AND PROCEDURES FISCAL YEARS 2013 THROUGH 2017 5-15 (2011), https://www.fda.gov/media/81306/download  (describing "the Program" which FDA will use to review NDAs) (hereinafter PDUFA REAUTHORIZATION).   This meeting and feedback gives the applicant time to develop data to support its application before officially submitting it to FDA.  *See id.*;  ███████████████████████████████████████████████████████████

███████████████████████████████  After receiving the application, FDA conducts a filing review to determine if the application, on its face, contains the information required by statute and regulation.   *See* FDA, REFUSE TO FILE: NDA AND BLA SUBMISSIONS TO CDER GUIDANCE FOR INDUSTRY 1 (2017), https://www.fda.gov/media/109758/download  (explaining that FDA must make a filing determination before beginning substantive review) ("[T]his guidance focuses on the FDA's policy for refusing to file an NDA under § 314.101(d)(3) when the NDA is incomplete because it does not on its face contain information required under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and 21 CFR 314.50.") (hereinafter REFUSE TO FILE GUIDANCE).  Since a filing review is done for facial completeness, no substantive matters are considered at this phase.  *See* REFUSE TO FILE GUIDANCE at 4 ("Review issues typically are not usually considered the basis for [a Refuse to File] action").   If an application is considered substantially complete, FDA will accept it for filing.  *Id.* ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████ This gives the applicant an opportunity to add additional information to its application to facilitate FDA review and, ultimately, approval.

During the substantive review process, FDA will continue to communicate with an applicant about issues or shortcomings in their application. See PDUFA REAUTHORIZATION at 12. Ultimately, at the end of the six-month review process, FDA will approve an application or issue a complete response letter ("CRL"). *See* 21 C.F.R §§ 314.105, 101(f), 110. The CRL details information that FDA needs in order to continue reviewing the application for approval. *See* 21 C.F.R. § 314.110. Just like in the earlier stages of review, FDA is willing to point out flaws in an application in order to assist the applicant and meet its goal of providing "timely access to safe, effective, and high quality new drugs and biologics." *See* PDUFA REAUTHORIZATION at 6. An applicant sent a CRL is given the option to resubmit the information, withdraw the application, or request a hearing with FDA on the application. *See* 21 C.F.R § 314.110(b). If the needed information is submitted, FDA will continue to review the application and ultimately, if the statutory requirements are met, approve the application. *See id.*

C.   **Procedural History**

FDA received Genus's NDA for Goprelto on November 23, 2016 ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Goprelto was subsequently approved on December 14, 2017. ████████████

██████████████████████████ During the review process of Numbrino, FDA issued a CRL.

████████████████████████████████████

7

While Lannett was responding to the CRL, Genus submitted its first CP requesting FDA (1) "[r]efuse to accept any further submissions in furtherance of Lannett's 505(b)(2) application for any cocaine product, including any amendments, supplements, or resubmissions"; (2) "[t]reat as withdrawn any submissions FDA may have accepted from Lannett in support of Lannett's 505(b)(2) application after December 14, 2017"; and (3) "[c]onsider Lannett's 505(b)(2) application for a cocaine product withdrawn." *See* A.R. at FDA002814-31 (Genus's first CP dated February 1, 2019, Docket No. FDA-2019-P-0538).  FDA determined the requested actions were inconsistent with its regulations and policies, and denied the Petition.  *See* A.R. at FDA003140-56 (FDA's response dated July 1, 2019 to Genus's first CP).

Unsatisfied with this answer, Genus submitted a second CP a little over a month later, this time requesting FDA: (1) "[r]escind its acceptance for filing of Lannett's 505(b)(2) application if Lannett did not complete the QT, renal, hepatic, leachable, and/or other studies deemed necessary for an NDA for a cocaine hydrochloride product to be sufficiently complete to permit substantive review; and refuse to file any reapplication by Lannett of its application until the expiration of the NCE exclusivity attached to NDA 209963" and (2) "[r]escind its acceptance for filing of Lannett's 505(b)(2) application that was resubmitted in response to FDA's CRL because such a submission is prohibited by FDA's regulation on duplicate 505(b)(2) filings, and permit Lannett to resubmit its application only as an ANDA after the expiration of the NCE exclusivity attached to NDA 209963." *See* A.R. at FDA003157-73 (Genus's second CP dated August 14, 2019, Docket No. FDA-2019-P-3855).  Genus followed this Petition with two amendments and additional requests that FDA (3) "refuse to approve any NDA for a cocaine hydrochloride product without completing similar QT, renal, hepatic, and leachable studies conducted by Genus and described in our Citizen Petition that demonstrate the safety and efficacy of the product" and (4) "accept a new NDA

8

submission from Lannett only after Lannett has completed the renal and hepatic toxicity studies that Genus was required to complete for its own cocaine hydrochloride application to be accepted for filing." *See* A.R. at FDA003581; FDA003552-71 (Genus's first amendment to its second CP); FDA003574-75 (Genus's second amendment to its second CP).

FDA again carefully considered Genus's requests, but ultimately denied the second CP as well.  *See* A.R. at FDA003580-600 (consultation memorandum from Division of Anesthesiology, Addiction Medicine, and Pain Medicine on Genus's second CP); FDA003601-16 (consultation memorandum from Office of Clinical Pharmacology on Genus's second CP); FDA003623-44 (FDA response to Genus's second CP).  While FDA was considering Genus's second CP, it approved Numbrino. ██████████████████████████████

Genus's Claim I alleges FDA engaged in disparate treatment of Lannett and Genus that was arbitrary, capricious, an abuse of discretion, not in accordance with law, and short of statutory right.  Compl. ¶¶ 54-59.  Genus's Claim II alleges FDA's acceptance of Lannett's resubmission for Numbrino's NDA was contrary to the FDCA, specifically 21 U.S.C. § 355(c)(3)(E)(ii), and thus invalid under the APA as arbitrary, capricious, an abuse of discretion, not in accordance with law, and short of statutory right.  Compl. ¶¶ 60-69.  Genus's Claim III alleges FDA's approval of Lannett's application for Numbrino was contrary to the FDCA, specifically 21 U.S.C. § 355(c)(3)(E)(ii), and therefore also invalid under the APA as arbitrary, capricious, an abuse of discretion, not in accordance with law, and short of statutory right.  Compl. ¶¶ 70-77.  As discussed below, taking the Claims in reverse order as logically it is helpful to consider statute first, then regulation, then other agency action, each Claim fails.

9

## IV.    DISCUSSION

### A.    FDA's Approval Of Lannett's NDA Was Not Contrary To The FDCA (Contrary To Genus's Claim III)

Because FDA's approval of Lannett's application was *not* contrary to FDCA § 505(c)(3)(E)(ii), the Defendants are entitled to summary judgment on Claim III.   Under § 505(c)(3)(E)(ii), the FDA is directed that "[i]f an application submitted under subsection (b) for a drug, no active ingredient . . . of which has been approved in any other application under subsection (b), is approved[,] . . . ***no application*** *which refers to the drug* for which the subsection (b) application was submitted . . . ***may be submitted*** under subsection (b) before the expiration of five years from the date of the approval of the application under subsection (b)."   FDCA § 505 (c)(3)(E)(ii) (2017) (emphasis added).   The interaction between the eligibility and bar clauses leaves available the very scenario Lannett and Genus found themselves in where the FDA permissibly approved Lannett's application which had been *submitted* prior to the start of the NCEE period.

First, Lannett's application does not "refer to the drug in the NCEE period."   Because Goprelto was not approved at the time of Lannett's application submission, Lannett's submission could not implicate § 505(c)(3)(E)(ii).   In the rulemaking setting forth the proposed rule that would become 21 C.F.R. § 314, FDA explained, "The agency intends to interpret [the FDCA] to mean that any 505(b)(2) application submitted to FDA before the approval of another new drug application that qualifies for exclusivity under section 505(c)(3)(D)(ii) is not affected by this exclusivity provision."   54 Fed. Reg. 28,872, 28,901 (July 10, 1989); A.R. at FDA003083 (54 Fed. Reg. at 28,901).   Further, FDA expressly explained what "refer to" means: "The agency believes, however, that an exception to this rule must be made where the first applicant to obtain approval and qualify for exclusivity publishes its data and the competing applicant amends its application

10

to include the first applicant's published data.  Where that data would be essential to the approval of the competing application, the second application will be deemed to refer to the first application." *Id.*  Lannett did not amend its application to include Genus's published data (nor did FDA or Lannett rely on Genus data to approve Lannett's application*, see infra* Section IV.C.3). As such, Lannett's application did not "refer to" Genus's application.  Section 505(c)(3)(E)(ii) is inapplicable here and does not prohibit FDA's approval of Lannett's NDA.

Second, even if § 505(c)(3)(E)(ii) did apply, by its express language it only prohibits *submission* of new applications during the NCEE period.  Neither § 505(c)(3)(E)(ii), nor any other provision of the FDCA at play here, placed any restriction on FDA's ability to *approve* Lannett's application, submitted before Genus's NCEE period began.  When reviewing an agency's interpretation of a statute, *Chevron* supplies the relevant framework.  467 U.S. 837.  *Chevron* involves a two-step process when reviewing an agency's construction of a statute.  *See id.* at 842. First, the court must look to the intent of Congress and if its intent is clear, the courts and the agency must follow that clear intent.  *See id.* at 842-43.  If, however, the statue is ambiguous, the agency's permissible interpretation of that statute must guide the courts.  *Id.* at 843.  Performing this analysis demonstrates that FDA's interpretation of § 505(c)(3)(E)(ii) aligns with Congress's clear intent.

As detailed in FDA's response the Genus's second CP, FDA interprets § 505(c)(3)(E)(ii) to bar the submission of applications during a NCEE period while permitting the approval of applications submitted prior to the beginning of the NCEE period.  Not only is FDA's interpretation permissible under *Chevron* Step 2, this Court may end the inquiry at *Chevron* Step 1, as Congress has made clear that only submission, and not approval is prohibited.  *See id.* at 842-43.

1.      **Step 1: § 505(c)(3)(E)(ii) is not ambiguous and permits NDA approval.**

The language of the statute prohibits submissions during an NCEE period.  Genus admits

that § 505(c)(3)(E)(ii) "unambiguously prohibits any 'submi[ssion]' of an application.  *See* Dkt.

23-1 at 22.  But Genus then argues that the statute also prohibits approvals during an NCEE period,

where the approval is of an NDA submitted before the start of the NCEE period.  But the statutory

text simply does not say that.  Under *Chevron*, "[i]f the intent of Congress is clear . . . the court, as

well as the agency, must give effect to the unambiguously expressed intent of Congress."  *See*

*Chevron*, 467 U.S. at 842-43.  To determine this intent, court will look at the statutory language

as well as legislative history. *See id.* at 859, 862 (examining the statutory language and legislative

history of the Clean Air Act); *I.N.S. v. Cardozo-Fonseca*, 480 U.S. 421, 436-37 (1987) (discussing

the legislative history of the Immigration and Nationality Act to determine Congressional intent).

Here, the language in the statute, as well as the legislative history, makes it clear that NDA

approvals during an NCEE period are permitted.

a)      *The statutory language*

As Genus recognizes, Dkt. 23-1 at 22, the Supreme Court "ha[s] stated time and again that

courts must presume that a legislature says in a statute what it means and means in a statute what

it says there."  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  This is a

"cardinal canon" of statutory construction to which "a court should always turn first to."  *Id.* at

253.  "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial

inquiry is complete.'"  *Id.* (internal citations omitted); *see also United States v. Villanueva-Sotelo*,

515 F.3d 1234, 1237 (D.C. Cir. 2008) ("We must first determine whether the 'language at issue

has a plain and unambiguous meaning with regard to the particular dispute in the case'.  If it does,

our inquiry ends and we apply the statute's plain language.") (citations omitted).  Here, Congress

provided that "no application . . . may be submitted" during the NCEE period.   FDCA § 505(c)(3)(E)(ii).   That is what Congress meant, plainly and unambiguously.

To determine Congressional intent, a statute should be considered in the proper statutory context that can include the ordinary meaning of the words and comparisons to other provisions in the same act.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009) (comparing provision with four parallel provisions in the Clean Water Act); *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 697 (1995) (looking at the ordinary understanding of the word "harm").  As to the ordinary meaning of the words in the statute, to "submit" means "to present or propose to another for review, consideration, or decision." MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/submit (last visited May 4, 2020); *see Sweet Home*, 515 U.S. at 697 (using Webster's dictionary to determine ordinary meaning).  Nothing in that ordinary meaning definition encompasses approvals.

Next, comparing § 505(c)(3)(E)(ii) to related exclusivity passages in the same act confirms what was already clear: that FDA is permitted to approve applications.  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (holding that in the Racketeer Influenced and Corrupt Organization statute, "[h]ad Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it presumably would have done so expressly as it did in the immediately following subsection (a)(2).") (internal citations omitted).  And Congress's decision to mirror language in one provision and not in another suggests an intentional decision.  The Supreme Court recently reiterated this in *Azar v. Allina Health Servs.*, where the Supreme Court reviewed Congress's decision to generally borrow language from the APA's notice and comment provision

when drafting a notice and comment provision in the Medicare Act, but choice to have the notice and comment provision in the Medicare Act apply to "substantive legal standards," rather than using the APA's language of applying notice and comment provisions to "substantive rules." 139 S. Ct. 1804, 1811-13 (2019). The Supreme Court concluded that the "the phrase 'substantive legal standard,' . . . cannot bear the same construction as the term 'substantive rule,'" *id.* at 1814, including because Congress's choice to use different words "strongly suggests it acted 'intentionally and purposefully in the disparate' decisions," *id.* at 1813 (quoting *Russello*, 464 U.S. at 23). The Supreme Court was unpersuaded by the petitioner's argument to the contrary, explaining that the petitioner "asks us to favor a most unlikely reading over [an] obvious one," *id.* at 1813, leaving the Court "with nothing but the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way." *Id.*

Here, parallel provisions in the FDCA illustrate that, had Congress intended to bar approval of applications that were submitted and under review during an NCEE period, it would have used language expressly barring approval, not just the submission language it chose instead. In fact, every other parallel provision in the FDCA expressly prohibits approval. The FDCA in multiple other provisions provides exclusivity periods during which "the Secretary [of FDA] may not make the *approval* of an application." FDCA § 505(c)(3)(E)(iii) (three years), § 505(c)(3)(E)(iii)(E)(iv) (three years); § 505(c)(3)(E)(v) (two years); § 505(c)(3)(E)(i) (ten years). Clearly Congress was capable of creating exclusivity clauses that prohibited application approval, and yet chose a different path as to § 505(c)(3)(E)(ii).

In reading § 505(c)(3)(E)(ii) and related clauses, it is clear under the plain language of the statute that approvals are not prohibited during this exclusivity period. The plain language of the

statute only prohibits submission after another NDA has been granted FDA approval. Genus urges in its brief that the language also bars application approval, and Genus painfully slices and contorts the statutory language in an attempt to get to the convoluted conclusion it urges. *See* Dkt. 23-1 at 30-35. For example, Genus's interpretation (*see* Dkt. 23-1 at 5) of "pursuant to this paragraph" in the patent clause (*see, supra* Section III.A) is strained. The patent clause provides an application may be submitted after only four years if it contains "a certification of patent invalidity or noninfringement." *Id.* Unless a patent infringement suit is commenced, approval of this type of application will "be made effective in accordance with this paragraph." *Id.* Thus, the only application approval contingent on a patent infringement suit is the one that contains a certification of patent invalidity or noninfringement. Genus's strained explanation of this passage only confuses, rather than clarifies, the statutory meaning. Indeed, Genus boldly acknowledges that its argument requires "parsing the NCEE provision [] and several related provisions [] at some length." *Id.* at 30. It is clear Genus's position "asks [the Court] to favor a most unlikely reading over [an] obvious one," leaving the Court "with nothing but the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way." *Allina*, 139 S. Ct. 1804, 1811-13.

Genus further relies on two cases to support its assertion that § 505(c)(3)(E)(ii) prohibits approvals as well as submission, *Otsuka*, 302 F. Supp. 3d 375 (D.D.C. 2016) and its appeal, *Otsuka Pharm. Co., Ltd. v. Price*, 869 F.3d 987 (D.C. Cir. 2017). *See* Dkt. 23-1 at 5, 29 and 32. Unfortunately for Genus, § 505(c)(3)(E)(ii) was not at issue in these cases as the NCEE granted to Otsuka had long since elapsed by the time the case was filed. *Otsuka*, 302 F. Supp. 3d at 385. Instead, the parties were contesting the scope of the three-year exclusivities granted in § 505(c)(3)(E)(iii) and § 505(c)(3)(E)(iv). *See id.*; *Otsuka*, 869 F.3d at 992. Since an interpretation

of § 505(c)(3)(E)(ii) was not essential to deciding the case, anything the court said about this clause is dicta.

No more should be read into § 505(c)(3)(E)(ii) than it clearly says and means. Congress was capable of crafting exclusivities that barred application approval and would have done so here if that was Congress's intent.

b)      *Legislative History*

The legislative history of § 505(c)(3)(E)(ii) corroborates the conclusion that Congress did not intend for NCEEs to prohibit approval of concurrently pending applications.  One way courts use legislative history to determine Congressional intent is to compare the current and original versions of the legislation.  *See Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 553 (2012) (looking at the language of a provision as originally drafted); *Cardozo-Fonseca*, 480 U.S. at 441-42 (comparing the Senate and House versions of the eventual Immigration and Nationality Act).  An early version of § 505(c)(3)(E)(ii) "provides that no ANDA *approval* may be made effective . . . for 4 years after the approval of any pioneer new chemical entity drug which, upon FDA approval, is not protected by any existing patent." 130 Cong. Rec. 15,847 (1984) (emphasis added); A.R. at FDA002820 (Genus's first CP noting this version of the provision), FDA002888 (130 Cong. Rec. 15,847).  The four-year exclusivity for approving unpatented drug products was eventually rewritten as a five-year exclusivity to prohibit submission of applications. 130 Cong. Rec. 23,769 (1984); A.R. at FDA002820 (Genus's first CP noting this version of the provision); FDA002881 (130 Cong. Rec. 15,847).  This change from barring approval to barring submission did not go unnoticed; Senator Metzenbaum raised objections to the exclusivities provided. 130 Cong. Rec. 23,767 (1984); FDA002821 (Genus's first CP noting his complaint); FDA002879 (130 Cong. Rec. 23,767).

16

After evaluating statutory language and legislative history, it is nothing short of clear that Congress meant exactly what it said in statutory text: that it intended to bar *submissions* of applications during an NCEE period.  The plain language of the statute only mentions submissions whereas the four surrounding provisions all prohibit approvals specifically.  Additionally, the legislative history shows that while the five-year NCEE was originally drafted to prohibit approvals, it was later amended to bar submissions instead.  This shows Congress intended to permit approvals while only prohibiting submissions.  *Chevron* instructs courts to only conduct the second step of the analysis if the statute is silent or ambiguous about Congressional intent. 467 U.S. at 843. Section 505(c)(3)(E)(ii) does not appear silent or ambiguous.  Thus, this Court need not proceed to *Chevron* Step 2.  However, a consideration of Step 2 only reinforces the permissibility of FDA's approval of Lannett's application.

### 2.    Step 2: If § 505(c)(3)(E)(ii) is ambiguous, FDA reasonably interpreted it as permitting approval of an NDA during an NCEE period.

Based on statutory language and legislative history, § 505(c)(3)(E)(ii) is not ambiguous in permitting approval, but not submission, of applications during an NCEE period.  If the Court agrees, it need not continue to Chevron's second step.  However, if the Court determines that Congressional intent, and thus the statute, is ambiguous, under Chevron step two, FDA's interpretation of the statute to approve Lannett's NDA  was a reasonable one that the Court should not second-guess.  *See Chevron*, 467 U.S. at 844 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").  To evaluate whether an interpretation is reasonable, courts look to whether the agency interpretation has been consistent over time, the interactions with other provisions, and the legislative history even if not considered in the first step.  *See Entergy*, 556 U.S. at 224 (evaluating how long an agency had the same interpretation); *Your Home Visiting Nurse Servs., Inc. v. Shalala*,

17

525 U.S. 449, 454 (1999) (verifying that the agency's interpretation is consistent with wording in other clauses of the statute); *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 666 (D.C. Cir. 2011) ("relying on . . . legislative history . . . may appropriately guide an agency in interpreting an ambiguous statute.").

Supporting the legitimacy of FDA's action here is that an agency's consistent interpretation of a statute supports the conclusion that the interpretation is "reasonable and hence [a] legitimate exercise of its discretion." *Entergy*, 556 U.S. at 224 (regarding with approval that an agency had a generally consistent interpretation for more than thirty years). FDA first proposed a rule interpreting the various exclusivity provisions in 1989. *See* 54 Fed. Reg. at 28,901; A.R. at FDA003083 (54 Fed. Reg. at 28,901). In the preamble to these proposed rules, FDA expressed its belief that § 505(c)(3)(E)(ii) did not address how to handle applications submitted prior to an NCEE period beginning. *See* 54 Fed. Reg. at 28,901; FDA003083 (54 Fed. Reg. at 28,901); FDA003147 (FDA response to Genus's first CP noting this absence). To handle this situation, FDA stated that it "intend[ed] to interpret this phrase to mean that any 505(b)(2) application submitted to FDA before the approval of another new drug application that qualifies for exclusivity under section 505(c)(3)(D)(ii) is not affected by this exclusivity provision." 54 Fed. Reg. at 28,901 (§ 505(c)(3)(D)(ii) was renumbered as § 505(c)(3)(D)(ii) through amendments); A.R. at FDA003083 (54 Fed. Reg. at 28,901). And, the preamble to the final rule reiterated that "for concurrently pending 505(b)(2) applications, any 505(b)(2) application submitted to FDA before the approval of another NDA that qualifies for exclusivity under section 505(c)(3)(D)(ii) of the act (granting 5 years of exclusivity) is 'not affected by this exclusivity provision.'" 57 Fed. Reg. 17,950, 17,955 (April 28, 1992); A.R. at FDA003102 (57 Fed. Reg. at 17,950), FDA003149 (FDA response to Genus's first CP discussing this preamble). Through these proposed and final rules,

FDA clearly laid out its intended interpretation of § 505(c)(3)(E)(ii). This interpretation has not changed in the thirty years since first proposed.  The persistence with which FDA has held its position is a factor in favor of its reasonableness. *See*, *e.g. Entergy*, 556 U.S. at 224.

Another factor to evaluate reasonableness is how the interpretation interacts with similar statutory provisions.  *See Your Home*, 525 U.S. at 454 (assessing whether agency's interpretation was consistent with related sections). As described above, *supra* Section IV.A.1.a, interpreting § 505(c)(3)(E)(ii) to bar anything other than submissions would interfere and contradict §§ 505(c)(3)(E)(i, iii-v) which bar approval.  FDA's interpretation barring only submissions but not approvals is the only one that creates consistency.

Finally, courts have also considered legislative history in evaluating the reasonableness of an agency interpretation.  *See Vill. of Barrington*, 636 F.3d at 666.  As described above, Congress made a clear shift while drafting § 505(c)(3)(E)(ii) from prohibiting approvals, like in §§ 505(c)(3)(E)(i, iii-v), to prohibiting submissions.  *See supra* Section IV.A.1.b.   Interpreting § 505(c)(3)(E)(ii) to prohibit approvals as well as submissions would ignore Congress's clear choice to use "submission" instead of "approval" in the statutory text.   To not frustrate the intent of Congress, a bar on submissions must be interpreted to only bar submissions.  FDA's interpretation does just that, and therefore is reasonable.

FDA's interpretation of § 505(c)(3)(E)(ii) to permit the approval of applications submitted prior to the beginning of an NCEE period  satisfies the intent of Congress and is the most reasonable interpretation of the statute.  The statute prohibits FDA from accepting application submissions during the NCEE period, saying nothing regarding whether applications may be approved during the NCEE period.  Since approving an application is neither required nor prohibited by statute, it was permissible for FDA to do so.  To read the statute as barring approvals

19

as well as submission would run contrary to the statutory text, legislative history, and parallel provisions.  For these reasons, FDA's interpretation passes both steps one and two of the *Chevron* framework.  467 U.S. at 842-43.  As such, the Defendants are entitled to summary judgment as to Claim III.

### 3.    Genus's policy argument cannot save it.

Perhaps in an awareness that (1) the statutory language unambiguously prohibits submission and not approval, (2) the FDA would get deference in its reasonable interpretation if the statute were ambiguous, and (3) the FDA's interpretation was reasonable, Genus advances  a self-serving policy argument.  Dkt. 23-1 at 6 ("a bar on 'submission' is even broader than a bar on FDA 'approvals'"); *see also id.* at 33-34.  But, as the FDA ably pointed out in response to the first of Genus's CPs, "the assertion ignores certain key differences between 5-year NCE exclusivity and 3-year exclusivity."  A.R. at FDA003154 (FDA response to Genus's first CP).    FDA explained:

> [W]e recognize that, in the case of concurrently pending 505(b)(2) NDAs for a previously unapproved active moiety, it is possible that the first-approved 505(b)(2) NDA will face competition from the second-approved 505(b)(2) NDA sooner than is typical for an NDA that is eligible for 5-year NCE exclusivity.  We consider such a result to be consistent with the balance achieved by the Hatch-Waxman Amendments, however.  The 505(b)(2) application pathway permits an applicant to rely on what is already known about a drug, thereby potentially reducing the types of studies an applicant needs to conduct or sponsor for approval of an application for a new drug.  In the present case, both Genus and Lannett submitted 505(b)(2) applications for their cocaine products that relied on published studies and reports concerning cocaine's use in the nasal and sinus surgery setting.  Therefore, as demonstrated in the present case, it is conceivable that more than one innovator company could develop a drug for a previously unapproved active moiety, particularly one that was historically marketed but unapproved, that has been used in medical practice in the United States or in a foreign country, and that such companies rely on published literature reports for approval.  FDA's regulation at § 314.60(c) sets forth the

20

Agency's considered approach to this scenario and balances the equities in allowing a submitted but unapproved 505(b)(2) NDA to not be withdrawn even where another, similar 505(b)(2) NDA is approved first.

A.R. at FDA003155 (FDA response to Genus's first CP).

Moreover, Genus's claim to protection based on entitlement to reward as a "pioneering drug product" and for its "innovation," *see e.g.* Dkt. 23-1 at 3, 4, 29, 33-35, rings hollow, given how long cocaine hydrochloride's anesthesia properties have been known and used in medical procedures, *see id.* at 10 n. 6 ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

Moreover, according to Representative Waxman, the purpose of the NCEE was to provide pharmaceutical companies "the incentives needed to develop new chemical entities whose therapeutic usefulness is discovered late when little or no patent life remains."  130 Cong. Rec. 24,425 (1984).  Here, Genus has not discovered a new drug or new use for a known drug.  While Genus may have met the technical requirements to permit an NCEE, Genus has not met the spirit in which the NCEE was intended.  For the same reasons, the NCEE period for Goprelto does not satisfy the goal of the Hatch-Waxman Act to stimulate and incentivize the development of new

---

████████████████████████████████████████████

drugs. In contrast, approval of Numbrino creates competition that can benefit patients through lowered drug costs.

Further, in recent years, FDA and Federal Trade Commission have taken a dim view of pharmaceutical companies who have sought to use CPs and court litigation to extend drug monopolies. *See* FDA, CITIZEN PETITIONS AND PETITIONS FOR STAY OF ACTION SUBJECT TO SECTION 505(Q) OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT GUIDANCE FOR INDUSTRY 15-26 (2019), https://www.fda.gov/media/130878/download; Fed. Trade Comm'n, Comment on the Food and Drug Administration's Revised Draft Guidance on Citizen Petitions (Dec. 2018), https://www.ftc.gov/system/files/documents/advocacy_documents/federal-trade-commission-comment-food-drug-administrations-revised-draft-guidance-industry-entitled/p013510_ftc_comment_regarding_fdas_revised_draft_guidance_12-3-18.pdf

### B.   Lannett's Submission Of Information In Response To FDA's CRL Was Not A Submission Barred By § 505(c)(3)(E)(ii) (Contrary To Genus's Claim II)

Because Lannett's submission of information in response to the FDA's CRL was not a "submission" barred by § 505(c)(3)(E)(ii), the Defendants are entitled to summary judgment on Claim II. As discussed *supra* Section IV.A, Lannett's application did not "refer to" Goprelto in its application, and therefore Lannett's application is not subject to § 505(c)(3)(E)(ii) at all. Next, even if Lannett's application is assessed under § 505(c)(3)(E)(ii), FDA's acceptance of Lannett's application was in accord with the statute. During an NCEE period, "no application . . . may be submitted." FDCA § 505(c)(3)(E)(ii). Here, Lannett submitted its application prior to the start of Genus's NCEE period, thus not offending this prohibition. Also, responses to CRLs are regulatory matters, neither contemplated nor covered by the FDCA and its bar on original application submissions. As such, the FDCA unambiguously does not bar responses to CRLs during an NCEE period.

22

Nor do FDA's own regulations bar responses to CRLs during an NCEE period, as Genus argues.  Compl. ¶¶ 7-8, 30-31, 60-69.  Genus argues that the routine process by which FDA issues a CRL to applicants to provide additional information regarding their already-pending applications vitiates the applicant's NDA submission.  That argument makes no sense, is not contained in the regulation, and is contrary to established FDA practice.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████  Genus argues that this routine regulatory action to seek additional information from an NDA applicant erases the initial submission and constitutes a new submission with a new submission date.  However, under FDA regulations and FDA's interpretation thereof,  a "submission" of information in response to a CRL is not a "submission" of an application barred under § 505(c)(3)(E)(ii).  *See supra* Section IV.A.

### 1.   FDA is entitled to deference under *Auer* and the *Kisor* factors.

FDA's interpretation of its own regulations is that a response to a CRL is not a "submission" as used by Congress in the FDCA.  *See* A.R. at FDA003154-55 (FDA response to Genus's first CP).  Moreover, FDA's interpretation meets all five *Kisor* factors to entitle the interpretation to *Auer* deference.  An agency's interpretation of its own regulation is entitled to deference unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

*Kisor v. Wilkie* refined the application of *Auer* deference, establishing a five-prong test for when *Auer* deference to an agency interpretation of its own regulation is appropriate.  139 S. Ct.

at 2415-18.  First, there must be genuine ambiguity of the meaning of the regulation even after the court exhausts all traditional tools of construction.  *Id.* at 2415.  Second, if there is genuine ambiguity, the agency's interpretation must still be reasonable.  *Id.* at 2415.  Third, the interpretation must be the agency's authoritative or official position given by someone understood to make those policy statements.  *Id.* at 2416.  Fourth, the agency interpretation must be rooted in its substantive expertise.  *Id.* at 2417.  And, fifth, the interpretation must represent fair and considered judgment without surprises.  *Id.* at 2417-18.

### 2. The first *Kisor* factor shows FDA is entitled to deference.

The first *Kisor* factor assesses whether there is genuine ambiguity as to the meaning of the regulation even after the court exhausts all traditional tools of construction.  *Id.* at 2415.  Based on the language of the various applicable regulations, it is unambiguous that a CRL response is not the same as a submission barred by § 505(c)(3)(E)(ii).  Under step one of *Kisor*, "the court must make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning."  139 S. Ct. at 2423-24.  That a resubmission described in § 314.110 is not the same as an original application submission is reinforced by reading the regulation in the context of surrounding regulations such as §§ 314.3, 50, 60, 70, and 101, as discussed in the next few paragraphs.  Since this is the only reasonable interpretation of these regulations, it should control.

It is illuminating to consider the linguistic constraints FDA was under when crafting these regulations.  Even though a resubmission provides supplemental information, it could not be called a "supplement" because that is the process through which an NDA holder makes voluntary changes to an application subsequent to approval.  *See* 21 C.F.R. § 314.70 (entitled "Supplements and other changes to an approved NDA").  Nor could it be called an "amendment" because there is a different

24

regulatory amendment process, including amendments to resubmission.  *See id.* at § 314.60.  It seems problematic to read "resubmission" and conclude that, since it (and, unavoidably, its definition) includes the word "submission," it must mean the same thing as submission.  FDA has already provided a definition for resubmission:

> Resubmission, in the context of a complete response letter, is submission by the applicant of all materials needed to fully address all deficiencies identified in the complete response letter.  An NDA or ANDA for which FDA issued a complete response letter, but which was withdrawn before approval and later submitted again, is not a resubmission.

21 C.F.R § 314.3.  Submission is not included in the 314.3 definition section, but the requirements for a submission are set out in 21 C.F.R. § 314.50.   Parsing the resubmission definition demonstrates that it is different from a submission as used in statute.  In contrast to submissions which require extensive accompanying documentation covering a wide variety of subjects, resubmissions in response to CRLs  only require the "materials needed to fully address all deficiencies identified in the complete response letter."  21 C.F.R. § 314.3.  Since the NDA must have met the requirements of an original submission to be accepted for review, any materials sent with a resubmission constitute a fraction of the materials included with an original submission. *See* 21 C.F.R. § 314.50(a) (describing the required sections for an original NDA).  The second sentence of the resubmission definition provides further support for differentiating resubmission and submission.  This sentence separates a submission of new information in response to a CRL (resubmission) from a submission of a new original NDA.

Other regulations would be rendered meaningless if resubmissions were considered the same as original submissions.  For example, when sending a resubmission, the applicant must include the NDA number from the original submission.  *See* 21 C.F.R § 314.50(a)(1).  Since a resubmission only provides additional information, it is reviewed by FDA under the NDA number

25

given to the original application.  It would not make sense to include this NDA number if a resubmission was meant to be its own, unique submission.

Furthermore, it is logical that FDA would require resubmissions to be titled as such when received by the agency.  *See* 21 C.F.R. § 314.50(a)(2) (requiring the applicant to include a form indicating if the submission is an "original submission, a 505(b)(2) application, a resubmission, or a supplement.").  Since resubmissions are not complete applications, the materials would result in a refuse-to-file action unless FDA was alerted that the information was meant to be added to an existing application. *See* 21 C.F.R. § 314.101(d)(3) (explaining that FDA may refuse to file an NDA if "it does not on its face contain information required under section 505(b) or section 505(j) of the [FDCA] and §314.50 or §314.94.").  By reading all relevant regulations together, it seems unambiguous that resubmissions are not the same as original submissions.

### 3.      The remaining *Kisor* factors show FDA is entitled to deference.

The other four factors confirm that FDA's interpretation of resubmission as distinct from submission is entitled to *Auer* deference.  The second *Kisor* factor says that, if there is genuine ambiguity, the agency's interpretation must still be reasonable.  *See Kisor*, 139 S. Ct. at 2415.  As discussed *supra* Sections IV.B.1-2, it is reasonable that FDA interprets resubmissions to be different from submissions.  There is significant evidence in the content of 21 C.F.R. §§ 314.3, 50, 60, 70, 101, and 110 that support this interpretation.

Third, the interpretation must be the agency's authoritative or official position given by someone understood to make those policy statements.  *See Kisor*, 139 S. Ct. at 2416.  The interpretation must come from "those actors, using those vehicles, understood to make authoritative policy in the relevant context."  *Kisor*, 139 S. Ct. at 2416 (citing *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 587 (D.C. Cir. 1997) (abrogated on other grounds)).

Here, the main source of interpretation comes from the FDA responses to the two CPs filed by Genus. A.R. at FDA003140-57 and 3623-44. These are both signed by the Director of the Center for Drug Evaluation and Research, the FDA center responsible for reviewing, and approving, NDAs. *See* A.R. at FDA003156 (FDA response to Genus's first CP signed by the Director; Center for Drug Evaluation and Research); FDA003644 (FDA response to Genus's second CP signed by the Director; Center for Drug Evaluation and Research) █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ If a director of a sub-group within the Center for Drug Evaluation and Research has the authority to issue NDA approvals, then the director of the entire group should have the authority to issue an official interpretation of FDA.

Fourth, the agency interpretation must be rooted in its substantive expertise. *See Kisor*, 139 S. Ct. at 2417. FDA's Center for Drug Evaluation and Research is the self-styled consumer watchdog for safe and effective drugs. *See CDER: The Consumer Watchdog for Safe and Effective Drugs*, FDA.gov, https://www.fda.gov/drugs/drug-information-consumers/cder-consumer-watchdog-safe-and-effective-drugs (last updated May 4, 2016). They are tasked with reviewing NDAs for approval and issuing CRLs if needed. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████ Clearly the opinions expressed in the CPs are from a division with special expertise in the relevant subject matter.

And, fifth, the interpretation must represent fair and considered judgment without surprises.  *See Kisor*, 139 S. Ct. at 2417-18.  Section 314.110 was amended in 2008 to create the process by which applicants are sent CRLs for their submitted applications.  *See* 73 Fed. Reg. 39,588 (July 10, 2008).  CRLs replaced approvable and not approvable letters, both of which conveyed to the applicant that some amendment was needed in order to proceed.  *See* 21 C.F.R. §§ 314.110 & 120 (from 57 Fed. Reg. at 17,989-90).  After receiving an approvable or not approvable letter, an applicant was directed to submit an amendment to their application to place it in a position for approval.  *See id.*  The CRL process was created to simplify this process with only one type of letter rather than two.  *See* 73 Fed. Reg. at 39,588.  Since the CRL grew out of approvable and not approvable letters, it seems logical that a resubmission after a CRL is analogous to the amendments required by approvable and not approvable letters.  While FDA's interpretation of resubmission was perhaps first articulated to Genus in FDA's response to their first CP, FDA's reasoning is based on the history of the regulation.   It is because of this consistency that FDA's interpretation shows "fair and considered judgment."

When the traditional rules of construction are applied here, it is clear that a resubmission is not the same as an original submission.  Even if there were some ambiguity between the two, the remaining five factors of *Kisor* are satisfied so as to entitle FDA's interpretation to *Auer* deference.  FDA's interpretation was reasonable, issued by someone with the authority and

28

expertise to make such it, and supported by considered judgment.  For the above reasons, the Defendants are entitled to summary judgment on Claim II.

### C.   FDA Did Not Engage in Disparate and Preferential Treatment (Contrary to Genus's Claim I)

FDA's treatment of Lannett and Genus was not arbitrary and capricious.  Throughout the application and review process, both parties were given the same guidance and provided the same opportunities to response to deficiencies in their applications.  While Genus and Lannett chose different ways of meeting the statutory and regulatory requirements to get an application approved, both ways were acceptable.  Since both applications were subjected to the same FDA standard, FDA's actions were neither arbitrary nor capricious.

### 1.   Acceptance of Lannett's NDA was not arbitrary or capricious.

FDA accepting an application for filing is "a threshold determination that the NDA is sufficiently complete to permit a substantive review." 21 C.F.R. § 314.101(a)(1).  In order to accept an application, FDA undertakes a filing review.  *See id.*; REFUSE TO FILE GUIDANCE at 2. A filing review is not a substantive review, just a verification that the application, on its face, contains the information required under § 505 and 21 C.F.R. § 314.50.  *See* REFUSE TO FILE GUIDANCE at 1 ("[T]his guidance focuses on the FDA's policy for refusing to file an NDA under § 314.101(d)(3) when the NDA is incomplete because it does not on its face contain information required under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and 21 CFR 314.50.").  Since FDA performed the same filing review of Lannett's NDA as it did for Genus', and applied the same standard as to whether the NDAs on their faces contained the required information, FDA's acceptance of Lannett's NDA was not arbitrary or capricious.

As a filing review is done for facial completeness, any substantive issue will not cause FDA to refuse to file the application.  *See* REFUSE TO FILE GUIDANCE at 4 ("Review issues are not

29

usually considered the basis for [a Refuse to File] action"). FDA instead "consider[s] the significance of the missing or incomplete information in the context of the proposed drug product, the proposed indication(s), and the amount of time needed to address the given deficiency." *Id.* Filing issues that may cause FDA to refuse to file an application are complex, such as whether there is adequate support for one of more of multiple indications, assessment of potential abuse of the drug, non-electronic submission of information that is required electronically, and "materially lacking or inadequately organized applications." *Id.* ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ FDA

determined both applicants satisfied FDA's approval requirements ██████████████████

██████████████████████████████████████████████

███████████████████████████████████████

### 2.    Lannett's NDA included all the documents required to be approved.

There are multiple points throughout an application's lifecycle when FDA offers feedback and requests additional information. *See* PDUFA REAUTHORIZATION at 5-15 (describing "the Program" which FDA will use to review NDAs). The first opportunity for this feedback is a pre-submission meeting between FDA and the potential applicant about the proposed application. *Id.* at 6. This meeting is held prior to an application being submitted so that an applicant has time to respond to the feedback and add additional information to its application as potentially needed. *Id.*

██████████████████████████████████████████████

30

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

After submission, FDA engages in an ongoing conversation with an applicant about the

content of their NDA. ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

FDA does not require that an NDA is completely perfect at the time it is submitted.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████ Both applications were accepted for filing, ████████

████████████████████████████████████████████████████████████

Refusing to allow additional information to be submitted by application after an application is

accepted would frustrate FDA's goal of providing patients with "timely access to safe, effective,

and high quality new drugs and biologics."  *See* PDUFA REAUTHORIZATION at 6.  If every

31

augmentation of the application required the applicant to submit an entirely new application, starting a new review period and prolonging the date of approval, it would take an inordinate amount of time for applications, and drugs, to be approved.  Rather, all applicants benefit from the iterative submission process FDA permits.  For these reasons, Lannett submitted sufficient documents to enable FDA to conduct a proper review of its NDA.

### 3.       Numbrino's label conforms with FDA guidance.

In some instances, where Lannett was unable to rely on literature and did not perform its own studies, the label for Numbrino reflects as such.  This underscores that FDA's review and approval of Numbrino was not arbitrary and capricious, as FDA did not rely on any of Genus's data in approving Numbrino's label.[2]  FDA contemplates that some studies will not be performed with a drug and provides guidance on how that information should be conveyed in the labeling. *See* FDA, CLINICAL PHARMACOLOGY SECTION OF LABELING FOR HUMAN PRESCRIPTION DRUGS AND BIOLOGICAL PRODUCTS—CONTENT AND FORMAT GUIDANCE FOR INDUSTRY 11 (2016), https://www.fda.gov/media/74346/download (providing draft language if no [pharmacokinetic] studies or analyses were performed on certain populations).  For geriatric patient, patients with hepatic impairment, and patients with renal impairment populations, Numbrino's label states that the pharmacokinetics "have not been studied." A.R. at FDA002737 (Numbrino label at 12.3 Pharmacokinetics).  Numbrino's label reflects the more limited information FDA had available when reviewing the application.  Accordingly, Numbrino's use is limited in ways that Goprelto is not.

---

[2] A drug label contains all information about the "safe and effective use of the drug." 21 C.F.R. § 201.56 (a)(1).  A label cannot make a claim if there is inadequate evidence in support of that claim. *Id.* at § 201.56(a)(3).

FDA has population-specific guidance materials for both renally impaired patients and hepatic impaired patients.  *See* FDA, GUIDANCE FOR INDUSTRY, PHARMACOKINETICS IN PATIENTS WITH IMPAIRED RENAL FUNCTION—STUDY DESIGN, DATA ANALYSIS, AND IMPACT ON DOSING AND LABELING (2010), https://www.fda.gov/media/78573/download (hereinafter RENAL IMPAIRMENT GUIDANCE); FDA, GUIDANCE FOR INDUSTRY, PHARMACOKINETICS IN PATIENTS WITH IMPAIRED HEPATIC FUNCTION: STUDY DESIGN, DATA ANALYSIS, AND IMPACT ON DOSING AND LABELING (2003), https://www.fda.gov/media/71311/download (hereinafter HEPATIC IMPAIRMENT GUIDANCE).  These provide further instruction on label language.  Lannett's Numbrino label conforms with the language and instructions set forth in these guidance materials and does not reflect any reliance on the studies performed by Genus.

The Renal Impairment Guidance states, "[f]or some drugs, renal impairment is not likely to alter PK enough to justify dosage adjustments.  In such cases, a study to confirm that prediction may be helpful, but is not necessary."  RENAL IMPAIRMENT GUIDANCE at 3.  ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Accordingly, Numbrino's label indicates that, "The pharmacokinetics of NUMBRINO in patients with renal impairment has not been studied.  Based on information available on the metabolism and excretion of cocaine, dose initiation in patients with renal impairment should follow a conservative approach."  A.R. at FDA002732 (Numbrino label at 8.7 Renal Impairment).  Even though renal impairment data was available (from Genus's studies), Numbrino's label does not indicate this.  Rather, the label is based solely off the information that Lannett provided to FDA.

33

The Hepatic Impairment Guidance provides specific language that a label can include if no study has been performed on patients with hepatic impairment.  HEPATIC IMPAIRMENT GUIDANCE at 10-11.  If an applicant does not know how the drug is metabolized, the applicant should proceed as if the drug is extensively metabolized.  *Id* at 11.  This implicates the most conservative language stating the drug "should be avoided or used with great caution in this patient population."  *Id*.  ■

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ Numbrino's label cautions, "[t]he clearance of NUMBRINO 4% has not been evaluated in subjects with hepatic impairment when compared to patients with normal hepatic function, and sufficient data are not available in literature to guide dosing in these subjects. Thus, NUMBRINO should be avoided in patients with hepatic impairment."  A.R. at FDA002732 (Numbrino label at 8.6 Hepatic Impairment).  FDA treated Lannett the same way it treats all drug applicants who do not have data on a drug's mechanisms in patients with hepatic impairment.[3]  Just like for renal impairment, FDA had hepatic impairment data from Genus but did not use this knowledge to approve use of Numbrino in these patients.  ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[3] For examples of other drug labels with similar language for patients with hepatic impairment, *see* Diacomit Label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/206709s000,207223s000lbl.pdf (updated August 2018),  and Letairis label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/022081s041lbl.pdf (updated Aug. 2019)

██████████████████████████████████████████████████████████████

████████████████████████ It is merely coincidental that FDA knew, from Genus's studies, that this conservative approach is supported by clinical data.

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████ FDA relied on the information submitted by Lannett to approve a label for Numbrino with more conservative language, and thus more limited use, than Goprelto.  Since FDA did not treat Lannett differently that other applicants without data on specific subpopulation, and did not use Genus's data in approving Numbrino's label, FDA's actions were not arbitrary or capricious.

## V.   CONCLUSION

For the foregoing reasons, Lannett respectfully requests this Court grant the Defendants summary judgment, and deny Genus's motion for summary judgment.

May 6, 2020

Respectfully submitted,

/s/ Lori A. Rubin
David A. Hickerson, DC Bar No. 414723
Lori A. Rubin, DC Bar No. 1004240
Paul Joseph, DC Bar No. 448495
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
(202) 672-5300
dhickerson@foley.com
larubin@foley.com

*Attorneys for Intervenor-Defendant Lannett Co., Inc.*