**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| GENUS LIFESCIENCES, INC., |
| Plaintiff, |
| v. |
| ALEX AZAR et al, |
| Defendants, |
| LANNETT CO., INC. |
| Intervenor-Defendant. |

Case No. 1:20-cv-00211-TNM

## PLAINTIFF GENUS LIFESCIENCES, INC.'S MOTION TO COMPLETE THE ADMINISTRATIVE RECORD

Plaintiff Genus Lifesciences, Inc. (Genus) hereby respectfully moves for an order requiring the Defendants to complete the administrative record by adding to it the documents identified in Exhibits A-C, attached to the accompanying Declaration of Ryan S. Baasch.  Genus brought this suit under the Administrative Procedure Act (APA).  Under the APA, agency action is evaluated on the basis of the administrative record compiled by the defendant agency.  An administrative record must include any information that was considered by the agency when it issued the decision under review.  As is evident from the accompanying memorandum and attached documents (which Defendant the Food and Drug Administration (FDA) produced under the Freedom of Information Act in related litigation), FDA actually considered all of the documents in question in reaching the decision challenged in this case but omitted all of them from the administrative record.

Genus respectfully requests that the Court order FDA to incorporate these FOIA documents into the administrative record.  Genus also respectfully requests that the Court conduct in camera

1

review of redactions in certain documents, and order that those documents be included in the record without redactions.   Finally, Genus respectfully requests the opportunity to file a short supplemental brief addressing any documents the Court orders added to the administrative record.

Pursuant to Local Rule 7(m), I hereby certify that Counsel for Genus conferred with Counsel for the Federal Defendants and Counsel for Intervenor Lannett on July 31, 2020 and August 3 and 4, 2020.  The Federal Defendants oppose Genus's motion.  Lannett takes no position on Genus's motion.

Respectfully submitted,

Dated:  August 6, 2020

*/s/Andrew D. Prins*
Philip J. Perry (DC Bar 434278)
John R. Manthei (DC Bar 477123)
Andrew D. Prins (DC Bar 998490)
Ryan S. Baasch (DC Bar 144370)
Monica C. Groat (DC Bar 1002696)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
*Attorneys for Plaintiff Genus Lifesciences, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GENUS LIFESCIENCES, INC.,

            Plaintiff,

    v.

ALEX AZAR et al,

            Defendants,

LANNETT CO., INC.

            Intervenor-Defendant.

Case No. 1:20-cv-00211-TNM

**PLAINTIFF GENUS LIFESCIENCES, INC.'S MEMORANDUM IN SUPPORT OF
MOTION TO COMPLETE THE ADMINISTRATIVE RECORD**

## <u>TABLE OF CONTENTS</u>

PAGE

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT .........................................................................................................................6

I.      CATEGORY 1 (Ex. A):  DOCUMENTS INDICATING THAT FDA ALTERED
        ITS ACCEPTANCE/APPROVAL SCHEDULE WITH THE PURPOSE OF
        DEFEATING GENUS'S EXCLUSIVITY .........................................................................8

II.     CATEGORY 2 (Ex. B):  DOCUMENTS CONTRADICTING FDA's
        ARGUMENTS REGARDING lANNETT'S "RESUBMISSION" OF ITS
        "APPLICATION" .........................................................................................................13

III.    CATEGORY 3 (Ex. C):  DOCUMENTS SHOWING FDA's ARBITRARY
        FILING STANDARDS FAVORED LANNETT'S APPLICATION ..............................18

CONCLUSION.....................................................................................................................21

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*ACA Int'l v. FCC*,
    885 F.3d 687 (D.C. Cir. 2018)................................................................18

*Access Reports v. DOJ*,
    926 F.2d 1192 (D.C. Cir. 1991)............................................................11

*Alexander v. FBI*,
    186 F.R.D. 170 (D.D.C. 1999)..............................................................12

*Amfac Resorts, LLC v. U.S. Dep't of Interior*,
    143 F. Supp. 2d 7 (D.D.C. 2001)............................................................6

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
    641 F.3d 504 (D.C. Cir. 2011)..............................................................12

*Catalyst Pharms. v. FDA*,
    No. 1:19-cv-22425 (S.D. Fla. May 1, 2020), ECF No. 74.................3, 21

*Catalyst Pharms. v. FDA*,
    No. 19-22425 (S.D. Fla. Feb. 14, 2020), ECF No. 59 ......................5, 21

*Charleston Area Med. Ctr. v. Burwell*,
    216 F. Supp. 3d 18 (D.D.C. 2016).........................................................6

*Coastal States Gas Corp. v. Dep't of Energy*,
    617 F.2d 854 (D.C. Cir. 1980)..............................................................11

*Etelson v. Office of Pers. Mgmt.*,
    684 F.2d 918 (D.C. Cir. 1982)..............................................................12

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*,
    345 F. Supp. 3d 1 (D.D.C. 2018)............................................................7

*Global Tel*Link v. FCC*,
    866 F.3d 397 (D.C. Cir. 2017)..............................................................17

*Greenberg v. U.S. Dep't of Treasury*,
    10 F. Supp. 2d 3 (D.D.C. 1998)............................................................11

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
    92 F.3d 1248 (D.C. Cir. 1996)..............................................................12

*Inst. for Fisheries v. Burwell Res.*,
  2017 WL 89003 (N.D. Cal. Jan. 10, 2017) ............................................................3

*Latham & Watkins LLP v. FDA*,
  No. 1:20-cv-0509-TNM (D.D.C.) ..........................................................................1

*Nat'l Courier Ass'n v. Bd. Of Governors of Fed. Reserve Sys.*,
  516 F.2d 1229 (D.C. Cir. 1975) ......................................................................6, 21

*Nat. Sec. Archive v. CIA*,
  752 F.3d 460 (D.C. Cir. 2014) ............................................................................12

*Oceana, Inc. v. Ross*,
  290 F. Supp. 3d 73 (D.D.C. 2018) .................................................................3, 6, 7

*Oceana Inc. v. Ross*,
  920 F.3d 855 (D.C. Cir. 2019) ............................................................................12

*Regents of Univ. of Cal. v. DHS*,
  2017 WL 4642324 (N.D. Cal. Oct. 17, 2017) .......................................................7

*Rhea Lana, Inc. v. U.S. Dep't of Labor*,
  2016 WL 10932817 (D.D.C. Dec. 6, 2016) .........................................................21

*Seeger v. Dep't of Def.*,
  2019 WL 2058721 (D.D.C. May 9, 2019) ..............................................................6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  2019 WL 2028709 (D.D.C. May 8, 2019) ..............................................................7

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
  785 F.3d 740 (D.C. Cir. 2015) ............................................................................18

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
  749 F.2d 788 (D.C. Cir. 1984) ..............................................................................7

**STATUTES**

21 U.S.C. § 355(c)(1) ...............................................................................................14

21 U.S.C. § 355(c)(3) .................................................................................................2

21 U.S.C. § 355(c)(3)(E)(ii) ................................................................................2, 13

21 U.S.C. § 355(d) ...................................................................................................14

Pub L. No. 102-571, § 736(a)(1)(A), (B), 106 Stat. 4491, 4494 .............................15

Pub L. No. 102-571, § 736(a)(1)(C), 106 Stat. 4491, 4494 ....................................15

## REGULATIONS

21 C.F.R. § 314.3(b) ........................................................................................13, 15

21 C.F.R. § 314.60(b) ...............................................................................................14

21 C.F.R. § 314.101(a) ...............................................................................................9

21 C.F.R. § 314.110 .................................................................................................13

21 C.F.R. § 314.110(a) .........................................................................................5, 14

21 C.F.R. § 314.110(b) .............................................................................................17

21 C.F.R. § 314.110(b)(1) .................................................................................14, 15

21 C.F.R. § 314.110(c)(1) .........................................................................................14

21 CFR § 314.3 .........................................................................................................13

21 CFR § 314.110 .....................................................................................................13

69 Fed. Reg. 43,351, 43,358 (July 20, 2004)...........................................................14

## OTHER AUTHORITIES

*Guidance to Client Agencies on Compiling the Administrative Record*, 48 U.S.
    ATTY'S BULLETIN No. 1 (Feb. 2000),
    https://www.justice.gov/sites/default/files/usao/legacy/2006/06/30/usab4801.p
    df ........................................................................................................................7

H.R. Rep. No. 102-895 (1992)...................................................................................15

## INTRODUCTION

Plaintiff Genus Lifesciences, Inc. (Genus) brought this Administrative Procedure Act (APA) suit to challenge FDA's approval of Intervenor-Defendant Lannett's competing drug Numbrino.  At the same time, Genus's counsel is the plaintiff in a related case also pending in this Court against FDA under the Freedom of Information Act.  *Latham & Watkins LLP v. FDA*, No. 1:20-cv-0509-TNM (D.D.C.) (FOIA Action).  The FOIA Action sought documents related specifically to the subject matter of this case, in order to ensure that the administrative record FDA assembled for this case was complete.  In response to the FOIA Action, FDA has recently produced thousands of pages of additional material from its records that should have been part of the administrative record in this case from the outset, but were omitted.  This is problematic:  cross motions for summary judgment have already been briefed, the Court has recently asked for supplemental briefing on one specific claim, and the case is nearly ready for argument.  In the meantime, Lannett's product is illegally on the market competing with Genus's drug despite Genus's five year statutory market exclusivity.  *See, e.g.*, Genus MSJ at 29-35; Genus Reply at 22-31.

Although thousands of pages of the new FOIA materials are directly pertinent to this case and should have been in the record at the outset, Genus recognizes that a prolonged dispute about such a voluminous set of materials could be counterproductive.  Instead, Genus is requesting that the Court order FDA to add to the record only a focused subset of those FOIA materials—33 pages, all of which are specifically applicable to the claims here.  Genus anticipates that the Court may need to conduct *in camera* review of a small number of those pages, because portions of the material are inappropriately redacted as "deliberative process."  If the Court agrees that a certain or all of the new FOIA materials should be part of the record, Genus also requests that it be permitted to file a short supplemental brief addressing the new record materials.

## BACKGROUND

*Issues in this Case*

This case relates principally to the plain text of 21 U.S.C. § 355(c)(3)(E)(ii), governing the five year period Congress enacted for New Chemical Entity Exclusivity (NCEE) under the Federal Food, Drug, and Cosmetic Act (FDCA).  If FDA approves a new 505(b)(2) drug application for a drug with an active ingredient never previously utilized in any FDA-approved drug, then NCEE bars FDA from accepting a submission of another competing drug application for the same active ingredient for five years, and from approving any pending application with the same active ingredient during that same period.  21 U.S.C. § 355(c)(3)(E)(ii).[1]

FDA admits that it granted Genus's drug Goprelto® this five year period of exclusivity, which began on December 14, 2017 and runs through December 14, 2022.  *See* JA1912.[2]  And it is undisputed that Lannett's 505(b)(2) drug application was for the same active ingredient as Goprelto®: cocaine hydrochloride.  JA584; JA1329.  Plaintiff Genus had made three principal arguments in this case:  (1) that FDA illegally accepted Lannett's submission of its drug application for filing in November 2017, Genus MSJ at 16-22; (2) that FDA then illegally accepted a "resubmission" of that application on June 21, 2019, after issuing its Complete Response Letter (CRL) indicating that it "could not approve" Lannett's application, *id.* at 22-29; and (3) that FDA then illegally approved Lannett's application on January 10, 2020, *id.* at 29-35.

---

[1] On August, 12, 2020, in its response to the Court's request for supplemental briefing on Claim III of the complaint, Genus will respond to the Court's question regarding 21 U.S.C. § 355(c)(3), and explain how the specific text of multiple relevant statutory provisions supports its argument that an approval bar applies here.

[2] JA citations are to the Joint Appendix, ECF No 49.

*FDA's Obligation to Provide a Complete Record and New FOIA Materials*

In reviewing Genus's claims, this Court's review focuses on FDA's administrative record, which must include "all documents and materials that the agency directly or indirectly considered, no more and no less." *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018). Genus filed its Complaint in this suit on January 27, 2020. On February 10, 2020, this Court entered a Scheduling Order directing FDA to produce the administrative record by February 28, 2020. ECF No. 13. But FDA produced an incomplete administrative record on that date. Genus "identified numerous documents" that appeared to be "missing from the administrative record" and that would be required for summary judgment briefing. ECF No. 22 ¶ 7. After a meet and confer, FDA ultimately produced a supplemental set of over 12,000 pages to Genus that were omitted from the original production. Declaration of Ryan S. Baasch (Baasch Decl.) ¶ 7.

Although FDA is obligated to produce a complete administrative record in the APA action at the outset, FDA has not always done so. In recent years, two other courts have ordered FDA to complete or supplement the record with material it wrongfully failed to include. *See Inst. for Fisheries v. Burwell Res.*, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017) (noting FDA's "reliance on an overly narrow understanding of the universe of materials that may need to be included in the administrative record"); Order on Administrative Record Completion at 9, *Catalyst Pharms. v. FDA*, No. 1:19-cv-22425 (S.D. Fla. May 1, 2020), ECF No. 74 (concluding that FDA improperly omitted documents from its administrative record that FDA decision makers "were actually considering . . . when forming their decision"). On February 22, 2020, Genus's counsel filed the FOIA Action in order to guard against that pattern repeating itself here.

Sure enough, FDA's recent FOIA production of documents contained thousands of additional pages of material directly relevant to the claims in this case, but which were omitted

from the administrative record.  Among other things, those omitted documents memorialize FDA's decisionmaking about:

• When to approve Genus's application; whether and when to file Lannett's application, and how the timing of those decisions impacted Genus's exclusivity;

• Whether, in light of Genus's exclusivity, FDA could accept Lannett's resubmission of its application after FDA concluded that Lannett's application "could not be approved" in July 2018; and

• Whether, ultimately, FDA could approve Lannett's resubmitted application despite Genus's exclusivity.

Genus would now be justified in seeking to complete the administrative record with thousands of pages of FDA's newly produced FOIA material.  But Genus is focusing instead on only a focused subset of the those documents.

***First***, FDA's defense in this case hinges almost entirely on its belief that Genus's exclusivity does not apply because FDA accepted Lannett's initial drug application in November 2017, ***very shortly before*** it issued its approval of Genus's drug (on December 14, 2017).  *See* FDA Reply at 13-14 ("[T]he 5-year NCE exclusivity provision plainly does not bar FDA from approving an application that was submitted before the exclusivity period began."); *see also, e.g.*, *id.* at 1 ("[T]he 5-year NCE exclusivity provision did not prevent Lannett from submitting its application for Numbrino . . . before Goprelto's exclusivity period began."); FDA MSJ at 14 ("FDA determined that Lannett could continue to submit amendments and a resubmission to its pending 505(b)(2) application because the application was [initially] submitted ***before*** Goprelto was approved." (emphasis added)); *id.* at 17 ("The plain language of the statute . . . does not unambiguously bar the approval of applications submitted before the exclusivity period.").  Of

4

course, it would be unlawful if FDA *intentionally* altered the timing of those actions with the purpose of depriving Genus of its statutory exclusivity.  But FDA omitted from the record several now-available documents that explicitly address that particular timing issue and leave little doubt that FDA altered the timing of Genus's approval.  Those materials belong in the administrative record.

**Second**, FDA regularly convenes its internal "Exclusivity Board" to address questions of statutory exclusivity.[3]  FDA has conceded in other litigation that the material before the Exclusivity Board, including briefing materials, *are properly part of an administrative record*.  *See* Fed. Defs.' Combined Opp'n to Catalyst Pharms. Mot. to Complete and/or Suppl. the Admin. Record & Reply as to Def's Mot. to Strike at 2, *Catalyst Pharms. v. FDA*, No. 19-22425, (S.D. Fla. Feb. 14, 2020), ECF No. 59.  FDA convened its Board here as well specifically to address the question of whether it could allow Lannett to "resubmit" its drug "application" after FDA concluded it "could not approve" the application.  But no hint appears in FDA's administrative record of what issues or documents were before the Board, or what the Board ultimately decided.  Among the thousands of pages of previously undisclosed documents are specific statements by Mr. Jay Sitlani, a senior member of FDA's Exclusivity Board, addressing Genus's exclusivity and contradicting FDA's arguments in this action.  That material should also be part of the administrative record.

---

[3] As FDA has explained in separate litigation, a decision by the "Exclusivity Board" is the "culminat[ion]" of intra-agency discussions about "whether [one] drug c[an] be approved in light of [another's] new chemical entity" exclusivity.  *See* Fed. Defs.' Combined Opp'n to Catalyst Pharms. Mot. to Complete and/or Suppl. The Admin. Record & Reply as to Def's Mot. to Strike at 12, *Catalyst Pharms. v. FDA*, No. 19-22425 (S.D. Fla. Feb. 14, 2020), ECF No. 59.  The newly produced FOIA material here contains [six] redacted drafts of internal legal memoranda purporting to analyze whether FDA could legally accept any Lannett "resubmission" of its application after FDA concluded that the Lannett application could not be approved pursuant to 21 C.F.R. § 314.110(a).

***Third***, FDA also argues in this case that it applied the same substantive criteria for accepting Lannett's drug application at the outset that it applied to Genus, and offered no preferential shortcuts.  *See* FDA MSJ at 32-33 (FDA would have "refused to file" Lannett's application if it lacked the required substantive analyses).  Genus submitted precisely the material that FDA requested as part of its drug application, Genus MSJ at 8-10, 12, but Lannett did not respond to the same FDA requirements with genuinely responsive material.  Rather than refuse to file Lannett's submission, as was required, FDA applied a materially more lenient standard, only requiring that *some piece of paper* existed in the file purporting to address such issues rather than determining if Lannett had actually met the applicable filing requirements (as Genus did).  The newly available FOIA documents also specifically address this issue.

## ARGUMENT

"The administrative record consists of all documents and materials that the agency directly or indirectly considered, no more and no less."  *Oceana*, 290 F. Supp. 3d at 77; *Seeger v. Dep't of Def.*, 2019 WL 2058721, at *2 (D.D.C. May 9, 2019).  That "include[s] all materials that might have influenced the agency's decision," regardless of whether the agency ultimately relied on the information.  *See Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001); *see also Charleston Area Med. Ctr. v. Burwell*, 216 F. Supp. 3d 18, 23 (D.D.C. 2016) ("As part of the record, the Court may consider any document that might have influenced the agency's decision and not merely those documents the agency expressly relied on in reaching its final determination.") (citing *Nat'l Courier Ass'n v. Bd. Of Governors of Fed. Reserve Sys.*, 516 F.2d 1229, 1241 (D.C. Cir. 1975)).  As the Department of Justice has advised in its internal guidance for federal agencies, a proper administrative record should include:

- "Documents and materials which were available to the decision-making office at the time the decision was made";

- "E-mail[s]";

- "communications the agency received from . . . the public, and any responses to those communications"; and

- "information that supports or opposes the challenged agency decision."

*See Guidance to Client Agencies on Compiling the Administrative Record*, 48 U.S. ATTY'S BULLETIN No. 1 (Feb. 2000).[4]  Although this guidance does not *bind* agencies, courts have looked to it to determine whether an agency has faithfully fulfilled its obligation to compile a complete administrative record.  *See, e.g.*, *Regents of Univ. of Cal. v. DHS*, 2017 WL 4642324, at *3 n.5 (N.D. Cal. Oct. 17, 2017).

In cases where an agency omits this type of material from the administrative record, courts order agencies to "complete" the record.  "To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case," and "[i]f a court is to review an agency's action fairly," it must have this information before it.  *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).  Where a plaintiff makes a "reasonable, non-speculative" showing that "documents were considered by the agency [yet] not included in the record," the agency will be ordered to complete the record with them.  *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 2019 WL 2028709, at *2 (D.D.C. May 8, 2019).[5]

---

[4] https://www.justice.gov/sites/default/files/usao/legacy/2006/06/30/usab4801.pdf.

[5] This is in contrast to "supplementation"—"the addition of newly created evidence or of documents that were not before the agency when the decision was made, but should have been." *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 9 (D.D.C. 2018).  In that inapposite circumstance the courts require the plaintiff to make a stronger showing before ordering the agency to add documents to the record.  *Id.*; *see also Oceana*, 290 F. Supp. 3d at 78 (same).

As demonstrated below, Genus has assembled a discrete series of recently obtained documents that should have been included in the administrative record under applicable case law. Even with their substantial FOIA redactions, the documents demonstrate that FDA actually considered those materials when it made the decisions at issue in this case. Genus requests that the Court order FDA to include the unredacted versions of the documents described herein in the administrative record for this matter, subject to the Protective Order (ECF No. 20).

## I. CATEGORY 1 (EX. A): DOCUMENTS INDICATING THAT FDA ALTERED ITS ACCEPTANCE/APPROVAL SCHEDULE WITH THE PURPOSE OF DEFEATING GENUS'S EXCLUSIVITY

The new FOIA documents, even in highly redacted form, appear to indicate that key FDA decisionmakers sought to alter the acceptance and approval schedules for Lannett and Genus to benefit Lannett—with the specific purpose of defeating Genus's statutory exclusivity:

- On three separate occasions in late October 2017 (October 17, 26, and 30), FDA review personnel emailed colleagues about their concern that Genus's exclusivity would bar them from accepting Lannett's drug application. This concern arose because the schedule for Genus's approval was anticipated to be completed in mid-November, and Lannett's acceptance would lag behind. ***Had that timing occurred, it is undisputed that Lannett's submission of its application would be barred by Genus's exclusivity and Lannett's product would not be on the market today.*** *See supra* at 4.

- For example, Shelly Kapoor (the FDA decisionmaker in charge of Lannett's filing, *see* JA1241), emailed another FDA decisionmaker on October 26, 2017 (Matthew Sullivan) to ask a question about Genus's "5 year exclusivity." FDACDER002258. Specifically, she understood that FDA was "planning on taking the action for [Genus's drug] ***prior to the filing date*** for [Lannett's drug Numbrino]," and wanted to understand the exclusivity implications

8

for that sequence.  *Id.*  (emphasis added).  Sullivan then copied Sara Stradley, with the specific question: "If we approve [Genus's drug Goprelto®] before day 60 of [Lannett's drug], can we subsequently even FILE [Lannett's Numbrino] . . . ?"  *Id.*  (capitalization in original).  In response, Ms. Stradley provided a lengthy, *fully redacted*, explanation from Jay Sitlani.  Ms. Stradley also said that Sitlani "wants to check with OCC [FDA's Office of Chief Counsel] for confirmation," and Sullivan responded "[h]opefully OCC doesn't have a different view of things."  FDACDER002257-58.

- At around the same time, key FDA decisionmakers on the *Genus* side of the house were *also* discussing this topic.  On October 17, Diana Walker (the manager for Genus's application, *see* JA240) emailed Jay Sitlani and others to give a "heads up on a potential exclusivity/blocking issue"; that the "[l]ikely" "action date" for Goprelto®'s approval was "**mid-11/2017**." FDACDER002240-41 (emphasis added).  In other words, she explained that Goprelto® was "likely" to be approved *before* Lannett's application would be filed by the agency (Lannett's application was filed on November 29, 2017).  *See also* FDACDER002265 (showing, again, that FDA was planning to approve Genus's Goprelto® before filing Lannett's Numbrino).  Ms. Walker then appears to have posed a question about this situation, but it is also entirely redacted.    FDACDER002241.    Sitlani's response likewise is almost entirely redacted. FDACDER002240.

- Then, on October 30, 2017, Sara Stradley emailed the most senior members of *both the Genus and Lannett* drug review/approval teams asking about when the Genus Goprelto® approval would occur.  Specifically, she asked "Will the action occur <u>before</u> the filing date of [Lannett's

Numbrino] which is Nov 20?"[6] (underline in original).  Stradley indicated she is "working with

Jay Sitlani for some legal input" on Lannett's application.   Ms. Kapoor then responded that

she "just spoke with Jay Sitlani," who "ask[ed] if it ***would be possible to***" do something specific

with the application/s.  Although the remaining text of Sitlani's request is redacted, the context

is clear that Sitlani, a senior member of FDA's Exclusivity Board, was instructing or advising

the review team ***to delay Genus's approval in order to avoid application of Genus's***

***exclusivity to Lannett's application***.  FDACDER002264-65 (emphasis added).

---

[6] By regulation, FDA aspirationally seeks to make filing determinations "[w]ithin 60 days after
FDA receives [the] NDA."  21 C.F.R. § 314.101(a).  Because FDA received Lannett's application
on September 21, 2017, the 60-day mark would have been November 20, 2017.  FDA, however,
does not contend that November 20, 2017 was the filing date as a matter of fact:  Instead, as it has
explained: "On November **29**, 2017, FDA informed Lannett that its application was sufficiently
complete for filing and substantive review."  FDA MSJ at 12.



- A senior FDA official immediately received the message from Sitlani, and understood the context. He responded: "[t]hat may very well be what will comes to pass" and indicated specifically that subsequent communications on the topic should occur *by phone* and *not* via email. FDACDER002264-65. No other emails then follow, but FDA continued to diligently work on filing Lannett's application while delaying approval of Genus's until December 14, 2017. And now FDA's defense in this action is predicated almost entirely on the timing of these two specific actions.

FDA may claim that it is entitled to conceal the redacted text on the key Sitlani exchanges in these documents under the "deliberative process privilege." But the privilege is applicable only

if the material in question is both "predecisional" (meaning it "was generated before the adoption of an agency policy") and "deliberative" (meaning it "reflects the give-and-take of the consultative process").  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

As a threshold matter, the redacted instruction or advice from Mr. Sitlani, a senior member of the Exclusivity Board, was likely not predecisional—it appears from the exchange that it *was the substantive decision* that resulted in the relevant action, a change in the timing of the review processes to deprive Genus of statutory exclusivity.  *See, e.g.*, *Access Reports v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (a document "moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take."); *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 17 (D.D.C. 1998) ("[A]n instruction from a senior to a junior official as to what legal action should be taken [is] a final decision which does not merit" deliberative process privilege protection).  Nor does it appear to be "deliberative"—Mr. Sitlani was not exchanging deliberative views on the merits of any FDA policy decision; he was conveying an instruction, or advising the review teams, to change the timing of the FDA reviews for Lannett and Genus to achieve FDA's particular preferred legal outcome on exclusivity.  *Cf. Nat. Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) (the privilege exists "to encourage the candid and frank *exchange* of ideas in the agency's decisionmaking process" (emphasis added)); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) ("Purely factual material usually cannot be withheld . . . unless it reflects an exercise of discretion and judgment calls.").

Moreover, even if the redacted portion of the email chain could be construed as both predecisional and deliberative, this Circuit has specifically recognized an exception where the arguably privileged communications would disclose "improper" federal agency activity.  *See*

*Oceana Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019); *see also, e.g.*, *Alexander v. FBI*, 186 F.R.D. 170, 177 (D.D.C. 1999) ("The Court of Appeals has made clear that the deliberate process privilege disappears altogether when there is *any* reason to believe government misconduct occurred.").  There is likely no dispute in this case that any FDA action to alter its review process with the specific purpose of depriving Genus of its statutory exclusivity to favor Lannett would indeed be improper under this Circuit's precedents.  *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996); *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982) (agencies cannot play favorites: "Government is at its most arbitrary when it treats similarly situated people differently.").  Indeed, it is difficult to imagine an appropriate rationale for an FDA official instructing, advising or even suggesting that the FDA review teams alter their schedules for that purpose.  The Court can conduct an *in camera* review and make each of these assessments in reviewing an unredacted version of all the emails.

## II.   CATEGORY 2 (EX. B):  DOCUMENTS CONTRADICTING FDA'S ARGUMENTS REGARDING LANNETT'S "RESUBMISSION" OF ITS "APPLICATION"

Genus has explained (at Genus MSJ at 22-29) that the plain statutory and regulatory text governing exclusivity prohibited FDA from accepting a *resubmission* of Lannett's application (or approving it).  *See* 21 U.S.C. § 355(c)(3)(E)(ii).  The text of the NCEE provision at issue provides that "no application" may be "submitted" for a five year period.  Paralleling that text, the relevant regulations at 21 C.F.R. §§ 314.3 and 314.110 make clear that a "resubmission" of "an application" following a CRL is a "*submission*" of an "application," 21 C.F.R. § 314.3(b); *id.* § 314.110—and there is no dispute that Genus's NCEE bars the submission of an application.  *See* FDA Reply at 1 ("It is undisputed that Genus's drug Goprelto (cocaine hydrochloride) has 5-year new chemical entity ('NCE') exclusivity and, in accordance with [the FDCA], FDA will not accept the submission of any 505(b)(2) application for a drug containing cocaine until December 2022.").  In

order to avoid this outcome, and strictly for purposes of this case, "FDA [has] likened a resubmission to an amendment, rather than the submission of a [new] application" in order to support its decision to accept Lannett's resubmitted application after Genus's NCEE took effect. FDA MSJ at 27.   FDA has suggested that this approach is "reasonable" and that various components of its argument warrant significant deference because they reflect "longstanding" FDA policy.   *See* FDA MSJ at 32 (referring to "FDA's long-held understanding that in [all but one] circumstance, an unapproved 505(b)(2) application may be amended (and subsequently approved) despite another NDA's 5-year NCE exclusivity.").

There are multiple problems with this approach, as Genus explained at length in its reply brief (at 5-11).  One of the problems is that the FDCA's plain text does not allow FDA to invite and accept a "resubmission" of an application as part of its review of an NDA—it must instead either approve, deny, or set a hearing on that NDA within a fixed period of time; either the initial review cycle (by statute, 180 days), or a longer period, if the parties agree.  21 U.S.C. § 355(c)(1); *id.* § 355(d).  FDA says that a resubmission constitutes "an agreement to ***further extend*** the review clock" and is permissible under FDCA Section 505(c)(1), 21 U.S.C. § 355(c)(1).  FDA Reply at 5.  ***But that argument is directly refuted by the plain language of FDA's regulations***.  Here, the distinction between an amendment and a resubmission is critical.

On the one hand, FDA's regulations characterize the voluntary submission of an "**amendment**" to an application as "an agreement by the applicant under section 505(c) of the [FDCA] to **extend** the initial review cycle by 3 months."  21 C.F.R. § 314.60(b) (emphasis added); *see also* JA577 (showing that in response to a *Genus* amendment, FDA "extended" the initial review period by three months).  By contrast, a CRL is the functional equivalent of an instruction that the application cannot be approved.  *See* 21 C.F.R. § 314.110(a) (FDA issues CRL "if the

agency determines that [it] will not approve the application . . . in its present form.").  And an applicant "agrees to extend the review period" after receiving a CRL only until the time *when it responds to the CRL* (*i.e.*, to ensure it will be able to request a hearing as guaranteed under the statute).  *Id.* § 314.110(c)(1); 69 Fed. Reg. 43,351, 43,358 (July 20, 2004) (explaining purpose of extension is to "ensure that, if we do not approve an application, the applicant is provided a notice of opportunity for a hearing within the time specified by section 505(c)(1) of the Act.").  If the applicant decides to *resubmit an application*, then—far from "**extending**" the existing review cycle, as FDA incorrectly claims (FDA Reply at 5)—the regulatory text clearly indicates that the applicant is acceding to the start of a "**new** . . . review cycle" for a ***new application***, *Id.* § 314.110(b)(1), via the "submission" of the new *application* itself, not an amendment to it.  *Id.*; *id.* § 314.3(b).  Again, this is textually distinct from "extending" the preexisting review period through an amendment.[7]

---

[7] FDA has argued (FDA Reply at 5) that, "in enacting laws related to user fees, Congress has" implicitly adopted its approach.  But the user fee law FDA is referring to (the Prescription Drug User Fee Act (PDUFA)) is actually fatal to the agency's argument.  The PDUFA was enacted to provide a framework where applicants pay "user fees" to have FDA act on their applications.  As it was originally enacted, the PDUFA provided that "50 percent of the fee" was due upfront, and the "final payment" was due once FDA acted on an application (either by approving it or issuing FDA's regulatory forerunner to a CRL—the "non-approval letter")—indicating that Congress thought that the issuance of a non-approval letter ended the review process for an application.  *See* Pub L. No. 102-571, § 736(a)(1)(A), (B), 106 Stat. 4491, 4494.  Congress then made an exception to the fee requirement in the event that the same person later submitted a new application for the same drug, recognizing that a "resubmission" (as FDA is now calling it) would in fact constitute a new "submission" of an "application"—the *exact* thing that Genus's NCEE blocks.  *See id.* § 736(a)(1)C).  Moreover, at the time of the PDUFA's enactment, FDA's Commissioner specifically confirmed to Congress that FDA considers a resubmission following a non-approval letter to constitute the submission of a new, complete application.  H.R. Rep. No. 102-895 at 33 (1992) (discussing FDA goal to "[r]eview and act on *complete applications resubmitted* following receipt of a non-approval letter within 6 months after the resubmission date" and explaining that by using the term "act on" he means "the issuance of an action letter *after the filing of an application*." (emphases added)).

15

Although FDA's regulations addressing the "resubmission" of an "application" utilize the same terminology as the NCEE statutory provision (both expressly address "submission" of an "application"), *see* Genus MSJ at 24-25 (discussing the key textual portions of FDA's regulations), FDA now argues that its regulations were actually always intended to treat a "resubmission" of an application like an amendment.   But the new FOIA documents contradict that notion:   FDA forthrightly acknowledges that FDA did not have any "longstanding" policy of treating resubmissions like amendments, and that the agency well-understood the consequences of a "resubmission" versus an "amendment."   The new documents show that the agency created this new interpretation in 2018-19 to justify accepting Lannett's resubmission and to support its prior decision not to honor Genus's exclusivity.   Accordingly, these new FOIA materials are directly relevant to FDA's arguments and belong in the administrative record.

- On February 21, 2018, Shelly Kapoor emailed Jay Sitlani to ask whether "Lannett [would] have to wait until the exclusivity for Goprelto runs out before they can resubmit" their application.   Sitlani responded "*[t]hat's an issue we haven't quite addressed yet* from a legal and regulatory perspective," and that it "*needs further discussion* with [FDA's Office of Chief Counsel (OCC)] and additional legal review."   (emphasis added).   Sitlani followed up on March 5, 2018 to indicate that he "spoke to OCC about this issue, and we are going to bring it to an Exclusivity Board meeting very soon."   And then on April 25, 2018, he followed up again to indicate that "ORP has just written a draft opinion that we will be putting before the [Exclusivity Board] (including OCC)." FDACDER002434-41.   (FDA's administrative record, however, does not contain a single document that was apparently presented to or generated by the Exclusivity Board.   Baasch Decl. ¶¶ 4-7.)   *See also* FDACDER0002417-19 (FDA officials

discussing "shared exclusivity" between Genus and Lannett and remarking "Just wait for the lawsuits….").

- Thereafter, FDA continued to deliberate over a lengthy period on this issue, drafting multiple draft memoranda to attempt to rationalize the decision regarding resubmission that they now argue was "longstanding" FDA policy.  *See* FDACDER02443; *see also* Baasch Decl. ¶ 12.

- In the meantime, FDA reviewers proposed another way to try to help Lannett avoid Genus's exclusivity, by considering whether Lannett could accelerate its effort to submit a missing scientific study before July 20, 2018, when FDA issued its CRL.  FDACDER002443.  FDA officials expressly considered (in an email exchange between Mr. Sitlani and Ms. Kapoor) whether they could extend Lannett's existing review period again through amendment (rather than issue a CRL)—if Lannett could quickly supply the missing scientific analysis.  *See* FDACDER002435 (addressing the missing QT study).  Lannett could not do so, and FDA then issued its CRL indicating that it "could not approve" Lannett's application.  This discussion of the Lannett review process demonstrates that the agency understood the potential consequences of a Lannett resubmission following an FDA CRL (versus an amendment).  FDACDER002443.  It also indicates (again) that FDA was actively trying to sidestep Genus's statutory exclusivity, rather than objectively calling balls and strikes. Relatedly, on May 30, 2018, Shelly Kapoor indicated that although the Lannett application was "heading for" a CRL, FDA "may be able to extend the clock" on the application if Lannett were able to submit certain information "before the [agency's] action date." FDACDER002449.  A substantial block of text is then redacted.  But afterwards, there is a note that the team "will see what the lawyers say." *Id.*  It is highly likely in this context that

17

the redacted text discusses the upshot of an amendment (extending the clock) versus a
resubmission (which starts a *new* clock, 21 C.F.R. § 314.110(b)).

- On June 5, 2018 (a little over one month before FDA rejected the initial iteration of Lannett's
  application *see* JA1182-87), a senior FDA decisionmaker emailed Shelly Kapoor and others to
  instruct: "<u>Please do not take action until the exclusivity memorandum is finalized</u>" and to
  "please coordinate with the exclusivity board."  FDACDER002448-52 (underline in original).

These documents sharply undercut FDA's interpretation in this case.  FDA created a new
interpretation to fit this situation—one that directly contradicts its own regulatory text.  This has
important consequences:  FDA's new *ad hoc* reading of its authorities should not be entitled to the
type of "deference" FDA argues should apply here.  *See, e.g.*, *Global Tel*Link v. FCC*, 866 F.3d
397, 417 (D.C. Cir. 2017) ("It is clear that no *Chevron* deference is due to agency decisions that
are unsupported by reasoned decisionmaking.").   And the documents underscore the key
distinction between amendment and resubmission, as Genus has been arguing throughout this case.
The documents should be added to the administrative record so that Genus can properly
supplement its argument on this important point.  And Genus respectfully requests that the Court
review FDA's deliberative process redactions on page FDACDER002449 *in camera.*

## III.   CATEGORY 3 (EX. C):  DOCUMENTS SHOWING FDA'S ARBITRARY FILING STANDARDS FAVORED LANNETT'S APPLICATION

Genus has also explained how FDA's application of its filing standard in this case is
arbitrary and capricious in multiple ways.  *See* Genus MSJ at 10-12, 16-21.  FDA directed both
Genus and Lannett to include multiple critical pieces of data in their applications in order to be
filed, but then filed Lannett's application *without* much of this critical information and with
knowledge that Lannett's application as submitted would not support an approval.  *See* Genus
Reply at 32-40.  The existing administrative record, for example, shows that Lannett's application

clearly contained defective "QT prolongation data" (among other shortfalls), but FDA filed the application anyway.  Genus MSJ at 20.  The facts support one of only two possibilities:  Either (1) FDA watered down its filing approach in order to allow Lannett's application to be filed even though it did not include what FDA told *both* Genus and Lannett *was substantively required*, or (2) FDA's approach is standardless, and can be administered case by case to support any outcome desired.  In either case, the agency's conduct here was arbitrary and capricious.  *See U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 753 (D.C. Cir. 2015) (when agencies exercise discretion they must employ "comprehensible standard[s]"); *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (it is arbitrary and capricious if "an agency cannot satisfactorily explain why a challenged standard embraces one potential application but leaves out another, seemingly similar one").

Multiple documents in the FOIA production demonstrate that, just as Genus argued in its summary judgment briefs, Lannett did not submit adequate information to be filed.  *During* FDA's filing review, the agency emailed Lannett's head of regulatory affairs (JA633) asking for specific hepatic impairment information for the filing review process, but there is no indication in the FOIA production or the administrative record that Lannett ever supplied this information.  FDACDER000137-38.  But that did not stop FDA from filing Lannett's application.  Similarly, in February 2018—shortly *after* filing Lannett's application—FDA recognized it would have to discuss "the hepatic impairment labeling issue" given that Lannett submitted no information on hepatically impaired patients.  *See* FDACDER001281; *see also* Genus Reply at 36 (discussing how FDA and Lannett decided to modify the Lannett label to make up for the complete absence of information on hepatically impaired patients).  In addition, as Genus explained in its summary judgment briefing, the FOIA documents confirm that Lannett failed to submit a dedicated QT

prolongation study.  *See* FDACDER002249.  FDA argued that Lannett's application could nevertheless be filed because it contained a "subpopulation analysis . . . to evaluate the QT prolongation potential of its drug."  FDA MSJ at 39.  But the FOIA documents show that even *that* analysis was defective at the filing stage.  *See* FDACDER002248 ("I noticed too that there was not a dedicated QT study and I am not sure why honestly."); *Id.* ("The QT group is having trouble finding the subpopulation analysis.").  Ultimately, as Genus has explained, FDA did conclude that Lannett would need to submitted a dedicated QT prolongation study in order to be approved. Genus MSJ at 13, 20.

Most critically, the FOIA documents show exactly *how* FDA rationalized that it could overlook these shortcomings.  Specifically, on September 26, 2017 (five days after Lannett submitted its application), Deep Kwatra—one of the Lannett filing reviewers—emailed Diana Walker to discuss whether Lannett submitted viable QT prolongation data.  Walker copied Shelly Kapoor on the email to advise her that in light of the QT prolongation issue the filing team would need "more time to look [the application] over."  Kwatra then emailed another CDER employee about the issue.  The employee responded that as long as Lannett "included *something* in the NDA submission, it is unlikely to be a filing issue but it will be a review issue."  (emphasis added). Kwatra responded that this is what he told another filing reviewer:  that "as long as *something* is there it is not a filing issue."  FDACDER002225-26.  And again, all of this occurred in the context discussed above *supra* at 8-11, in which the review teams were concerned that any delay in accepting Lannett's application could result in application of Genus's statutory exclusivity.

These email  exchanges should be added to the administrative record.  FDA claims its filing review was an exercise of "technical and scientific expertise," FDA MSJ at 35, but these documents clearly shows the opposite—FDA already knew specifically that Lannett had not

supplied information sufficient to address the underlying scientific criteria, but decided to let the application be submitted with information it knew to be deficient, so long as some piece of paper is in the record and FDA could (literally) check the box.  *See*, JA776; *see also* Genus MSJ at 16-22; Genus Reply at 32-40.  These documents also undercut FDA's argument that "an applicant cannot defeat a competitor's potential 5-year NCE exclusivity by quickly compiling a 'placeholder' application because FDA would refuse to file such an application."  FDA MSJ at 33.  FDA's filing review was thus purposely blind: it did not actually involve a substantive examination of what was filed at all.  As noted, this review and filing issue is important because FDA predicates its defense almost entirely on the fact that it properly accepted Lannett's submission before Genus's drug application was approved.

## CONCLUSION

For the reasons set forth herein, the Court should order FDA to complete the administrative record with unredacted versions of the documents discussed in this memorandum and attached to the accompanying Declaration of Ryan S. Baasch.  And if FDA continues to assert deliberative process privilege over a subset of these materials (14 pages), Genus respectfully requests that this Court should conduct an *in camera* review to determine whether the material is actually privileged.  *See, e.g.*, Order, *Catalyst Pharms. v. FDA*, No. 19-22425 (S.D. Fla. Apr. 21, 2020), ECF No. 73 (ordering *in camera* review); *Nat'l Courier Ass'n.*, 516 F.2d at 1242-43 (*in camera* review of documents in APA case to determine whether factual information should have been unredacted); *Rhea Lana, Inc. v. U.S. Dep't of Labor*, 2016 WL 10932817, at *1 (D.D.C. Dec. 6, 2016) (*in camera* review "to determine if the redactions warrant [the agency's] exercise of [a specific] privilege").

Genus also respectfully requests expedited supplemental briefing so that Genus may have an opportunity to explain in more detail how these documents support its principal arguments in

support of summary judgment. *See* Order on Administrative Record Completion at 12-13, *Catalyst Pharms. v. FDA*, Case No. 19-22425 (S.D. Fla. May 1, 2020), ECF No. 74 (ordering supplemental briefing after directing FDA to complete the administrative record).

                                    Respectfully submitted,

Dated:  August 6, 2020              */s/Andrew D. Prins*
                                    Philip J. Perry (DC Bar 434278)
                                    John R. Manthei (DC Bar 477123)
                                    Andrew D. Prins (DC Bar 998490)
                                    Ryan S. Baasch (DC Bar 144370)
                                    Monica C. Groat (DC Bar 1002696)
                                    LATHAM & WATKINS LLP
                                    555 Eleventh Street NW, Suite 1000
                                    Washington, DC 20004
                                    Tel: (202) 637-2200
                                    Fax: (202) 637-2201
                                    Email: andrew.prins@lw.com
                                    *Attorneys for Plaintiff Genus Lifesciences, Inc.*